1   **WO**

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                  **FOR THE DISTRICT OF ARIZONA**

8

9   Murray Hooper,                    )   No. CV 98-2164-PHX-SMM
                                      )
10              Petitioner,           )   <u>DEATH PENALTY CASE</u>
                                      )
11   vs.                             )
                                      )   **MEMORANDUM OF DECISION**
12                                    )   **AND ORDER**
    Dora B. Schriro et al.,           )
13                                    )
              Respondents.            )
14                                    )
                                      )
15   _____)

16          Petitioner Murray Hooper is a state prisoner under sentence of death.  Pursuant to the

17   Court's general procedures governing resolution of capital habeas proceedings, the parties

18   have completed briefing of both the procedural status and the merits of Petitioner's habeas

19   claims.  Before the Court is Petitioner's Supplemental Petition, which raises thirty-nine

20   claims for habeas relief.  (Dkts. 29, 31.)[1]  In previous Orders, this Court denied Petitioner's

21   motion for discovery and evidentiary hearing and denied a number of claims finding they

22   were procedurally barred or without merit.  (*See* Dkts. 96, 114.)  In this Order, the Court

23   resolves Petitioner's remaining claims and concludes that he is not entitled to habeas relief.

24                    **FACTUAL AND PROCEDURAL BACKGROUND**

25          On December 24, 1982, a jury convicted Petitioner and William Bracy of two counts

26

27   _____

28          [1]      "Dkt." refers to the documents in this Court's file.

of first degree murder, one count of attempted murder, other associated crimes and criminal conspiracy.  *See State v. Hooper*, 145 Ariz. 538, 543, 703 P.2d 482, 487 (1985); *State v. Bracy*, 145 Ariz. 520, 524-25, 703 P.2d 464, 469-70 (1985).

Pat Redmond and Ron Lukezic were partners in a successful printing business in Phoenix called Graphic Dimensions.[2]  In the summer of 1980, Graphic Dimensions was presented with the possibility of some lucrative printing contracts with certain hotels in Las Vegas, but these deals fell through.

Robert Cruz wanted Redmond killed in order to obtain his interest in the printing business and pursue the Las Vegas contracts.  In September 1980, Cruz asked Arnold Merrill if he would be willing to kill Redmond for $10,000.  Merrill declined, but arrangements were made with others.  In early December 1980, Cruz and Merrill picked up William Bracy and Petitioner who arrived on a flight from Chicago.

Petitioner and Bracy stayed in the Phoenix area for several days, during which Merrill took Bracy and Petitioner to see Cruz, who gave Bracy a stack of $100 bills, some of which Bracy gave to Petitioner.  That same day, at Cruz's direction, Merrill took Bracy and Petitioner to a gun store owned by Merrill's brother, Ray Kleinfeld.  Petitioner picked out a large knife and Bracy told Kleinfeld to put it on Cruz's account.  Kleinfeld gave Bracy a bag which contained three pistols.  While Petitioner and Bracy were staying at Merrill's home, Merrill introduced them to Ed McCall.

A few days later, Merrill drove Petitioner and Bracy to a cocktail lounge patronized by Pat Redmond.  When Redmond departed, they followed his car.  While following Redmond, Merrill noticed Petitioner pointing a gun at Redmond's vehicle, getting ready to fire.  Merrill swerved from Redmond's car to prevent the shooting.  After the failed shooting, McCall told Merrill that he was "joining up" with Bracy and Petitioner.

During the evening hours of December 31, 1980, Petitioner, Bracy and McCall went

---

[2]   This factual summary is based on the Court's review of the record and the Arizona Supreme Court's opinion setting forth the facts in the companion case of *State v. Bracy*, 145 Ariz. 520, 524-25, 703 P.2d 464, 469-70 (1985).

to the home of Pat Redmond and forced their entrance at gunpoint.  Redmond, his wife Marilyn, and his mother-in-law Helen Phelps were present.  The three victims were taken into a bedroom where they were robbed of valuables, bound with surgical tape and gagged. Each was shot in the head and Pat Redmond's throat was slashed.  Pat Redmond and Helen Phelps died.  Marilyn Redmond survived.

Petitioner and Bracy were convicted and sentenced to death for the murders.[3]  (ROA 1113, 1116.)[4] On direct appeal, the Arizona Supreme Court affirmed Petitioner's convictions and death sentence.  *See Hooper*, 145 Ariz. 538, 703 P.2d 482.  Petitioner sought certiorari in the United States Supreme Court, which was denied.  *Hooper v. Arizona*, 474 U.S. 1073 (1986).

Following direct appeal, Petitioner, *pro se*, filed his first petition for post-conviction relief ("PCR") in the trial court ("PCR court").  (ROA 1494.)  Subsequently, counsel was appointed and filed supplements to the PCR petition (Petitioner's *pro se* PCR filing and counsel's supplements are hereafter collectively referred to as "first PCR petition").  (ROA 1529, 1540, 1570, 1581.)   After discovery and the filing of affidavits, the PCR court summarily denied Petitioner's first PCR petition.  (ROA 1574, 1596.)  Petitioner moved for

---

[3]      Prior to Petitioner's and Bracy's trial, a jury convicted McCall and Cruz in a joint trial for the same crimes.  *See State v. McCall*, 139 Ariz. 147, 677 P.2d 920 (1983); *State v. Cruz*, 137 Ariz. 541, 672 P.2d 470 (1983).  Cruz's convictions were reversed on appeal due to improper admission at trial of his alleged ties to organized crime.  Although re-tried multiple times, Cruz was eventually acquitted.  Another jury convicted Joyce Lukezic of being a co-conspirator in the murder-for-hire plot and she was sentenced to death. The trial judge vacated her conviction and sentence due to violations of *Brady v. Maryland*, 373 U.S. 83 (1963).  That decision was upheld on appeal, *State v. Lukezic*, 143 Ariz. 60, 691 P.2d 1088 (1984); although retried, Lukezic was not convicted.

[4]      "ROA" refers to twenty-five volumes of records from trial and post-conviction proceedings, which was prepared for Petitioner's petition for review to the Arizona Supreme Court upon denial of his third post-conviction relief petition (Case No. CR-97-0410-PC). "RT" refers to the reporter's transcripts of the joint trial of William Bracy and Petitioner. "ME" refers to the minute entries of the state trial court. A certified copy of the state court record was provided to this Court by the Arizona Supreme Court on November 7, 2005. (Dkt. 87.)

1   rehearing, which was denied. (ROA 1597, 1599.) Petitioner submitted a petition for review

2   to the Arizona Supreme Court, which was denied. (ROA 1600, 1602.) Petitioner sought

3   certiorari in the Supreme Court, which was denied. *Hooper v. Arizona*, 497 U.S. 1031

4   (1990).

5       In 1991, Petitioner filed a petition for writ of habeas corpus in this Court, No. CIV 91-

6   1495-PHX-SMM. On November 18, 1992, this Court dismissed the petition without

7   prejudice, to allow Petitioner to return to state court to exhaust additional claims.

8       Following this Court's dismissal, Petitioner filed a second PCR petition in state court.

9   (ROA 1626-27.) The PCR court conducted a two-day evidentiary hearing on one of the

10  claims in the petition. (*See* No. CIV 95-2339-PHX-SMM, Dkt. 26, 27.) Following the

11  hearing, the PCR court denied relief. (ROA 1720.) Petitioner submitted a petition for

12  review, which was denied. (ROA 1733.) Petitioner sought certiorari in the Supreme Court,

13  which was denied. *Hooper v. Arizona*, 516 U.S. 829 (1995).

14      Subsequently, Petitioner filed a third PCR petition. (ROA 1741.) The PCR court

15  summarily dismissed this petition. (ROA 1769.) Thereafter, Petitioner sought review, which

16  was denied. (ROA 1771.)

17      In 1998, Petitioner returned to this Court and filed an initial habeas petition. (Dkt. 1.)

18  Subsequently, he filed a supplemental petition for writ of habeas corpus and a memorandum

19  in support. (Dkts. 29, 31.) In his supplemental petition, Petitioner claimed, in part, that his

20  Arizona sentence violated the Eighth Amendment because his sentencing court relied upon

21  invalid Illinois murder convictions to find the existence of the (F)(1) statutory aggravating

22  circumstance.[5] Petitioner alleged that his Illinois murder convictions were invalid because

23  he was tried and sentenced by a judge later convicted of racketeering – for having taken

24  bribes for outcomes in cases, including murder cases occurring at the same time as

25

26      [5]      At the time of Petitioner's sentencing, A.R.S. § 13-703(F)(1) provided, as
27  follows: "F. Aggravating circumstances to be considered shall be the following: 1. The
    defendant has been convicted of another offense in the United States for which under
28  Arizona law a sentence of life imprisonment or death was imposable."

- 4 -

1    Petitioner's Illinois capital trial, *see United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995)

2    (upholding former judge Maloney's convictions).  (Dkt. 29 at 9; Dkt. 31 at 59.)

3         Based upon this newly discovered evidence, the Court concluded that Claim 16,

4    Petitioner's judicial bias claim, was unexhausted.  (Dkt. 32.)  Petitioner withdrew Claim 16,

5    and this Court stayed this habeas proceeding pending exhaustion of this claim in state court.

6    (*Id.*)  However, after waiting more than five years without state court resolution, this Court

7    vacated its stay and ordered the parties to brief the procedural status, merits and requests for

8    evidentiary development as to all claims.[6]  (Dkt. 55.)  Petitioner filed a motion for discovery

9    and/or evidentiary hearing, which this Court denied.  (Dkts. 79, 96.)  Subsequently, Petitioner

10   moved to add Claim 16 back into his supplemental petition.  (Dkt. 106.)  The Court denied

11   amendment, concluding that Claim 16 was without merit and, therefore, amendment was

12   futile.  (Dkt. 114.)

13              **PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT**

14        A writ of habeas corpus may not be granted unless it appears that a petitioner has

15   exhausted all available state court remedies.  28 U.S.C. § 2254(b)(1); *see also Coleman v.*

16   *Thompson*, 501 U.S. 722, 731 (1991).  To exhaust state remedies, a petitioner must "fairly

17   present" the operative facts and the federal legal theory of his claims to the state's highest

18   court in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848

19   (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78

20   (1971).  If a habeas claim includes new factual allegations not presented to the state court,

21   it may be considered unexhausted if the new facts "fundamentally alter" the legal claim

22   presented and considered in state court.  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

23        Exhaustion requires that a petitioner clearly alert the state court that he is alleging a

24

25        [6]    Further, the Court allowed that, if appropriate, it would grant leave to amend

26   once exhaustion was complete.  (Dkt. 55.)  Subsequently, the state court denied the merits
     of Claim 16, concluding that "because [Petitioner] cannot demonstrate that the invalidity of

27   his Illinois convictions would probably have resulted in a sentence less than death, he has not
     presented a colorable claim for relief."  (Dkt. 106, Ex. C.)

28

- 5 -

1    specific federal constitutional violation.  *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir.

2    2004); *see also Gray v. Netherland*, 518 U.S. 152, 163 (1996) (general appeal to due process

3    not sufficient to present substance of federal claim); *Lyons v. Crawford*, 232 F.3d 666, 669-

4    70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (general reference to insufficiency

5    of evidence, right to be tried by impartial jury, and ineffective assistance of counsel lacked

6    specificity and explicitness required); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999)

7    ("The mere similarity between a claim of state and federal error is insufficient to establish

8    exhaustion.").  A petitioner must make the federal basis of a claim explicit either by citing

9    specific provisions of federal law or case law, *Lyons*, 232 F.3d at 670, or by citing state cases

10   that plainly analyze the federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153,

11   1158 (9th Cir. 2003) (en banc).

12          In Arizona, there are two primary procedurally appropriate avenues for petitioners to

13   exhaust federal constitutional claims: direct appeal and PCR proceedings.  Rule 32 of the

14   Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner

15   is precluded from relief on any claim that could have been raised on appeal or in a prior PCR

16   petition.  Ariz. R. Crim. P. 32.2(a)(3).  The preclusive effect of Rule 32.2(a) may be avoided

17   only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and

18   the petitioner can justify why the claim was omitted from a prior petition or not presented in

19   a timely manner.  *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

20          A habeas petitioner's claims may be precluded from federal review in two ways.

21   First, a claim may be procedurally defaulted in federal court if it was actually raised in state

22   court but found by that court to be defaulted on state procedural grounds.  *Coleman*, 501 U.S.

23   at 729-30.  The procedural bar relied on by the state court must be independent of federal law

24   and adequate to warrant preclusion of federal review.  *See Harris v. Reed*, 489 U.S. 255, 262

25   (1989).  A state procedural default is not independent if, for example, it depends upon a

26   federal constitutional ruling.  *See Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam).

27   A state bar is not adequate unless it was firmly established and regularly followed at the time

28   of the purported default.  *See Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

1    Second, a claim may be procedurally defaulted if the petitioner failed to present it in

2    state court and "the court to which the petitioner would be required to present his claims in

3    order to meet the exhaustion requirement would now find the claims procedurally barred."

4    *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998)

5    (stating that the district court must consider whether the claim could be pursued by any

6    presently available state remedy). If no remedies are currently available pursuant to Rule 32,

7    the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732,

8    735 n.1; *see also Gray*, 518 U.S. at 161-62.

9    Because the doctrine of procedural default is based on comity, not jurisdiction, federal

10   courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*,

11   468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a

12   procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure

13   to properly exhaust the claim in state court and prejudice from the alleged constitutional

14   violation, or shows that a fundamental miscarriage of justice would result if the claim were

15   not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

16                          **AEDPA STANDARD FOR RELIEF**

17   Petitioner filed his petition after the effective date of the Antiterrorism and Effective

18   Death Penalty Act ("AEDPA"). The AEDPA established a "substantially higher threshold

19   for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of

20   state and federal criminal sentences.'" *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40

21   (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly

22   deferential standard for evaluating state-court rulings' . . . demands that state-court decisions

23   be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per

24   curiam) (quoting *Lindh v. Murphy,* 521 U.S. 320, 333 n.7 (1997)).

25   Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

26   "adjudicated on the merits" by the state court unless that adjudication:

27       (1) resulted in a decision that was contrary to, or involved an unreasonable
         application of, clearly established Federal law, as determined by the Supreme
28       Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially

indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts.  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).   In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240.  However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness.  *Miller-El I,* 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that

1   subsection pertains only to state-court determinations of factual issues, rather than

2   decisions.").

3          As the Ninth Circuit has noted, application of the foregoing standards presents

4   difficulties when the state court decided the merits of a claim without providing its rationale.

5   *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160,

6   1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  In those

7   circumstances, a federal court independently reviews the record to assess whether the state

8   court decision was objectively unreasonable under controlling federal law.  *Himes*, 336 F.3d

9   at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal

10  court nevertheless defers to the state court's ultimate decision.  *Pirtle*, 313 F.3d at 1167

11  (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state

12  court did not decide the merits of a properly raised claim will the claim be reviewed de novo,

13  because in that circumstance "there is no state court decision on [the] issue to which to

14  accord deference."  *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012,

15  1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

16                              **DISCUSSION**

17          **Claim 1 – Prosecutorial Misconduct**

18          Petitioner argues that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963),

19  by failing to disclose favorable evidence to him prior to trial; Petitioner appears to be alleging

20  thirteen separate prosecutorial violations.  (Dkt. 31 at 12-14; Dkt. 79 at 16-17.)  Respondents

21  concede that Claim 1 is exhausted and entitled to merits review.  (Dkt. 67 at 17.)

22          *Brady*, *Agurs*, 427 U.S. 97 (1976), and *United States v. Bagley*, 473 U.S. 667 (1985),

23  were clearly established federal law before Petitioner's conviction became final.[7]   A

24  successful *Brady* claim requires three findings:  (1) the prosecution suppressed evidence;

25  (2) the evidence was favorable to the accused; and (3) the evidence was material to the issue

26

27          [7]    Even though *Bagley* was decided after the Arizona Supreme Court resolved
    Petitioner's direct appeal, *Bagley* was issued before Petitioner's convictions became final in
28  January 1986.

1   of guilt or punishment.  373 U.S. at 87.  Evidence is material "if there is a reasonable

2   probability that, had the evidence been disclosed to the defense, the result of the proceeding

3   would have been different.  A 'reasonable probability' is a probability sufficient to

4   undermine confidence in the outcome." *Bagley*, 473 U.S. at 682; *see also Harris v. Vasquez*,

5   949 F.2d 1497, 1528 (9th Cir. 1990).  The prosecutor's duty to disclose includes

6   impeachment as well as exculpatory evidence.  *Bagley*, 473 U.S. at 676.

7                Undisclosed Benefits to Witness Arnold Merrill

8         Petitioner alleges that witness Arnold Merrill received undisclosed benefits for his

9   testimony, specifically that:  (1) a prosecution investigator, Dan Ryan, made car payments

10   for Kathy Merrill, Arnold's wife, totaling over $800, for which Ryan received only partial

11   reimbursement; (2) Mrs. Merrill received approximately $3,000 from the Maricopa County

12   Protected Witness Program; and (3) Arnold Merrill made approximately twenty-two long

13   distance phone calls from an office in the county attorney complex, some with Ryan's

14   knowledge, others while unattended in Ryan's custody.  The trial court held an extensive

15   evidentiary hearing on these allegations.  (*See* ROA 1229, 1231, 1247, 1255, 1258-60; RT

16   7/21/83, 7/22/83, 9/12/83, 9/13/83, 9/14/83, 9/15/83, 9/20/83.)  The court found that these

17   items had not been disclosed prior to trial, but denied Petitioner's motion to vacate judgment

18   on this basis because the evidence was cumulative and other evidence tied Petitioner to the

19   murders.  (ROA 1265.)  The Arizona Supreme Court concluded that the benefits to Merrill

20   were exculpatory and not disclosed.  *See Bracy*, 145 Ariz. at 528, 703 P.2d at 472.  However,

21   the court found that the nondisclosed information was not material because it was cumulative

22   – the defense possessed and used at trial significant impeachment material regarding

23   Merrill's bias and bad character – and there was more than sufficient other evidence to

24   support Petitioner's conviction.  *Id.* at 528-29, 703 P.2d at 472-73.

25         This Court now assesses whether the state court's *Brady* determination was contrary

26   to, or an unreasonable application of, clearly established federal law.  *See Williams*, 529 U.S.

27   at 406-07.  Petitioner has satisfied the first two prongs of a *Brady* analysis, the evidence was

28   suppressed by the prosecution and was exculpatory.  First, the state court made a factual

1   finding that this evidence was not disclosed to Petitioner prior to trial; this Court defers to

2   that finding. *See* 28 U.S.C. § 2254(e)(1). Second, the evidence was favorable to Petitioner

3   as it could have been used as impeachment against the prosecution's witness Arnold Merrill.

4   Thus, the only question is whether the impeachment evidence is material – is there a

5   reasonable probability that, if the evidence had been disclosed, the result of the proceeding

6   would have been different. *Bagley*, 473 U.S. at 682.[8]

7          The Ninth Circuit discounts the materiality of undisclosed impeachment evidence that

8   is cumulative to similar impeachment evidence:  "additional evidence of the [witness's]

9   penchant for lying would not have affected the jury when his proclivity for lying had already

10  been firmly established." *Barker*, 423 F.3d at 1096; *see also United States v. Croft*, 124 F.3d

11  1109, 1124 (9th Cir. 1997) (finding cumulative a nondisclosed psychiatric report establishing

12  witness's memory loss because defense had elicited memory loss on cross-examination);

13  *United States v. Marashi*, 913 F.2d 724, 733 (9th Cir. 1990) (stating that nondisclosed

14  evidence that contradicted trial testimony was cumulative because deposition contained same

15  contradiction).  In contrast, impeachment evidence that provides a new and different ground

16  for impeachment may be material.  *See Horton v. Mayle*, 408 F.3d 570, 580 (9th Cir. 2005)

17  (finding that although witness's testimony was impeached by evidence of drug use, lying to

18  police and assisting in the crime, nondisclosed evidence of promised immunity is a "wholly

19  different kind of impeachment evidence").

20         The Arizona Supreme Court identified significant impeachment evidence that the

21  defense possessed and used at trial: "Merrill's plea bargain with the state; his extensive drug

22  use; his past participation in arson, burglary, kidnapping, and robbery; his past lies to police

23

24         [8]     In *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995), the Supreme Court further

25  elaborated upon materiality regarding impeachment evidence and concluded that
    nondisclosed impeachment evidence must be evaluated piece by piece and cumulatively in

26  the context of the whole case. *Id.* at 436 n.10. Even though *Kyles* had not been decided at
    the time of the state court decision, the Arizona Supreme Court evaluated the additional

27  nondisclosures and also evaluated the cumulative effect of all the impeachment evidence.

28  *See Bracy*, 145 Ariz. at 528-29, 703 P.2d at 472-73.

1    officers; and his private out-of-jail visit with his wife while being incarcerated for first degree

2    murder." *Bracy*, 145 Ariz. at 529, 703 P.2d at 473.  The fact that Merrill received additional

3    monetary benefit for his testimony is not substantially different than the impeachment

4    evidence demonstrating bias that was before the jury – that Merrill testified pursuant to a plea

5    bargain and had been given a private visit with his wife.  In sum, the defense significantly

6    attacked Merrill's testimony by demonstrating bias and bad character; the additional evidence

7    was not substantially different.

8         The additional impeachment evidence does not establish a reasonable probability that,

9    had the evidence been disclosed to the defense, the jury would have acquitted Petitioner

10   because this is not a case where the witness supplied the only evidence linking Petitioner to

11   the crime.  The Arizona Supreme Court identified the key evidence, apart from Merrill's

12   testimony, that supported Petitioner's conviction:

13            [T]he strong eyewitness testimony of Mrs. Redmond in combination
            with independent evidence of defendant's participation in the conspiracy is
14          more than sufficient to uphold the convictions.  Mrs. Redmond testified that
            [Bracy], Hooper, and McCall entered her home at gunpoint and killed her
15          husband and mother.  This evidence was particularly strong because Mrs.
            Redmond had ample opportunity to view all three men in her home.  In
16          addition, evidence apart from that presented through Merrill showed
            defendant's presence in Phoenix in early and late December, his connection to
17          Robert Cruz, and his participation in Cruz's conspiracy to kill Pat Redmond.

18   *Bracy*, 145 Ariz. at 529, 703 P.2d at 473.  Further, other witnesses, including Nina Marie

19   Louie, Dean Bauer and George Campagnoni corroborated Merrill's testimony.  (Louie, RT

20   11/22/82, 11/23/82, 11/24/82; Bauer, RT 11/16/82; Campagnoni, RT 11/24/82, 11/29/82.)[9]

21

22            [9]    Nina Marie Louie testified that the murders were contract killings.  (RT

23   11/23/82 at 40-43.)  She also testified that Petitioner expected to receive $50,000 for the job.

24   (*Id*. at 20.)  On December 31, 1980, when she was with Petitioner, Bracy and Edward
     McCall, Bracy informed her that he, Hooper and McCall would soon have plenty of money

25   and that they had some business to take care of that evening.  (*Id*. at 32-33.)  The next day,
     after Louie heard and read about the Redmond murders, McCall came over to the apartment.

26   (*Id*. at 38-39.)  McCall informed her that the murders were contract murders.  (*Id*. at 42-47.)

27            George Campagnoni corroborated Marilyn Redmond's testimony.  He testified that

28   on the evening of December 31, 1980, Petitioner, Bracy and McCall arrived at Merrill's

1   Thus, the additional undisclosed impeachment evidence does not put the whole case in such

2   a different light as to undermine confidence in the verdict and is not material.[10]  *See Bagley*,

3   473 U.S. at 682.

4           The decision of the Arizona Supreme Court denying this claim was not contrary to,

5   or an unreasonable application of federal law as determined by the Supreme Court.

6   Petitioner is not entitled to relief regarding this portion of Claim 1.

7           Late Disclosure of Police Documents

8           Petitioner alleges that the prosecution untimely disclosed police reports involving

9   incriminating statements attributed to Petitioner; investigative notes by Officer Perez; and

10  a police report and photographs involving three Black men arrested on New Year's Eve

11  1980.  The statements by Petitioner, contained in a police report, were excluded from trial,

12  and the witness, Christina Nowell, through which the evidence was to be presented never

13  testified. (RT 10/13/82 at 16-54; ROA 859.) Petitioner described the statements in the police

14  report as "horribly incriminating"; thus, the Arizona Supreme Court found that they were not

15  exculpatory and their nondisclosure did not violate *Brady*.  *Bracy*, 145 Ariz. at 527, 703 P.2d

16  at 471.  Further, because the report was disclosed, although late, and not admitted at trial, the

17  supreme court held that Petitioner could not have been prejudiced.  *Id.*  Because this evidence

18  was not exculpatory, and was disclosed prior to trial, *see Gantt v. Roe*, 389 F.3d 908, 912

19  (9th Cir. 2004) (finding no *Brady* violation if information disclosed at a time when of value

20  to the defendant), the Arizona Supreme Court's ruling is not an unreasonable application of

21  ───────────────

22  house around 7:00 p.m.  (RT 11/24/82 at 79-86.)  He further testified that he saw them with
    jewelry, a man's and a woman's watch, and wedding bands.  (*Id*. at 86-87.)

23

24      [10]     Petitioner attempts to align himself with Joyce Lukezic, who was granted a new
    trial based on the prosecution's failure to disclose exculpatory evidence.  As discussed by the

25  Arizona Supreme Court, there was no direct evidence of Lukezic's participation in the
    murder conspiracy, thus, Merrill's testimony was pivotal in her case but only corroborative

26  in Petitioner' trial.  *Bracy*, 145 Ariz. at 529, 703 P.2d at 473.  Further, impeachment evidence
    regarding another key witness in Lukezic's trial, George Campagnoni, was withheld from

27  Lukezic but disclosed to Petitioner.  Thus, Petitioner's circumstances are significantly

28  distinguishable from Lukezic's.

1    *Brady*.

2          Officer Perez's handwritten notes from his on-the-scene interview of Marilyn

3    Redmond were consistent with her trial testimony describing the three assailants; however,

4    his police report contradicted both his notes and her testimony.  The Arizona Supreme Court

5    found no *Brady* violation because the notes corroborated Redmond's testimony and were

6    inculpatory.  *Bracy*, 145 Ariz. at 527-28, 703 P.2d at 471-72.  Additionally, Petitioner had

7    the notes in time for Officer Perez to be cross-examined on the conflict with his report (RT

8    11/3/82 at 250-257).  *Id.* at 530, 703 P.2d at 474.  Because this evidence was not exculpatory,

9    was disclosed in time to be of value to Petitioner, and there is not a reasonable probability

10   that earlier disclosure would have changed the verdict, the supreme court's decision was not

11   an unreasonable application of *Brady*.

12         During cross-examination of Officer Quaife, the defense elicited testimony that

13   Phoenix police arrested three Black males the night of December 31.  (RT 11/9/82 at 275.)

14   On redirect, the prosecution attempted to introduce their photographs to help explain why

15   they were not treated as murder suspects.  (*Id.* at 275-81, 295-303.)  Because the prosecution

16   had not previously disclosed the photographs, the defense objected to their admission and

17   they were excluded.  (*Id.* at 295-303.)  The supreme court found no *Brady* violation both

18   because Petitioner did not want the photographs admitted in evidence and because Petitioner

19   suffered no prejudice from the nondisclosure.  *Bracy*, 145 Ariz. at 528, 703 P.2d at 472.

20   Similarly, during trial, the parties litigated the late disclosure of police reports regarding the

21   three Black males arrested on December 31.  (RT 11/10/82 at 26-53; RT 11/15/82 at 85-86;

22   RT 11/22/82 at 17-31.)  The defense used these reports during trial.  (RT 12/8/82 at 4-15.)

23   The Arizona Supreme Court found no *Brady* violation because the reports were presented

24   to the jury.  *See Bracy*, 145 Ariz. at 528, 703 P.2d at 472.  Because the photographs were not

25   admitted at trial, and Petitioner made use of the police reports, there is not a reasonable

26   probability that the outcome would have been different if they had been disclosed earlier.

27   The supreme court's denial of this claim was not objectively unreasonable.

28         <u>Payments to Witness Louie and Informant Harper</u>

Petitioner alleges that the prosecution paid witness Nina Marie Louie $878 for her testimony, and made payments to informant Valinda Harper. Louie testified at trial to the payment she received from the Maricopa County Witness Protection Program (RT 11/23/82 at 64-73); therefore, the Arizona Supreme Court found no *Brady* violation, *Bracy*, 145 Ariz. at 528, 703 P.2d at 472. Harper was an informant for the prosecution but did not testify at trial because she was unavailable and her location unknown. (RT 12/20/82 at 13-27.) However, the fact that Harper received money through the witness protection program did come out at trial. (*Id.*) Because the payments were disclosed at trial, and Harper did not testify, there is not a reasonable probability that earlier disclosure would have changed the verdict and *Brady* was not violated.

Benefits Provided to Prosecution Witnesses

Petitioner alleges that the prosecution falsified the presentence reports for witnesses George Campagnoni and Arnold Merrill; provided conjugal visits for Merrill and his wife; failed to disclose Merrill's addiction to Valium and the provision of Valium to Merrill while in custody before trial; and took witnesses Michael Gill and George Campagnoni out of jail and supplied them with alcoholic beverages. All of this information was known to Petitioner, and his counsel used it at trial to impeach Merrill, Campagnoni, Investigator Ryan, and Gill. (RT 11/17/82 at 137-38, 142-45; RT 11/18/82 at 58, 98, 168-77; RT 11/29/82 at 23-40; RT 12/16/82 at 18-62; RT 12/20/82 at 36-40, 80, 83-86, 97-102, 150-52). *See Bracy*, 145 Ariz. at 526-27, 529, 703 P.2d at 470-71, 473.

Because all of this evidence was known to Petitioner prior to trial, the prosecution did not suppress it and *Brady* was not violated.

McCall's Confession

Petitioner alleges that the prosecution did not disclose a statement by prison inmate James Leon Carpenter that McCall confessed to the murders and stated that he should have slit Marilyn Redmond's throat. During post-conviction proceedings, the PCR court found that Carpenter's statements were not exculpatory and, therefore, not subject to disclosure under *Brady*. (ROA 1574.)

McCall's regret that Marilyn Redmond lived and that he should have made sure she was dead after he shot her (*see* ROA 1554), was not favorable to Petitioner's alibi defense at trial.  Because of Petitioner's associations with McCall during the relevant time period, it would have been unfavorable to introduce McCall's confession of the murders at trial.  Louie testified that Petitioner was with McCall on December 31, 1980, and that McCall, Bracy and Petitioner were all armed with guns and indicated to her that they had an important appointment to keep after it got dark.  (RT 11/23/82 at 26-36.)  Campagnoni testified that Petitioner was with McCall later on that evening when they arrived at Merrill's home around 7:00 p.m.  (RT 11/24/82 at 78-90.)  Merrill testified that upon arriving, Petitioner said "we got three."  (RT 11/17/82 at 112-15.)  Thus, any further testimony disclosing McCall's confession of the murders would have been inculpatory, and the PCR court's conclusion that the failure to disclose such evidence was not a violation of *Brady* was not objectively unreasonable.  *See Bagley*, 473 U.S. at 676; *Agurs*, 427 U.S. at 109-10.

Grand Jury Testimony

Petitioner contends that Investigator Ryan testified falsely before the Grand Jury.  Specifically, Petitioner alleges that Ryan identified Petitioner as a part of the Royal Family street gang in Chicago, and presented other false allegations to the Grand Jury regarding Michael Gill, Joyce Lukezic, Morris Nellum and Dean Bauer.  This is not an allegation of nondisclosure, but rather one of other prosecutorial misconduct.

Because the jury ultimately convicted Petitioner of the charged offenses, "any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *United States v. Mechanik*, 475 U.S. 66, 70 (1986); *see Williams v. Stewart*, 441 F.3d 1030, 1041-42 (9th Cir.), *cert. denied*, 127 S. Ct. 510 (2006) (observing that any constitutional error from prosecutor's alleged misconduct during grand jury proceeding harmless because petitioner ultimately convicted on charged offenses).  Petitioner is not entitled to relief on his Grand Jury allegations.

False Statement by Morris Nellum

Petitioner alleges that Investigator Ryan threatened and coerced Morris Nellum into

making a false statement to police that Nellum took Petitioner to the Chicago airport in late December 1980.   This is not an allegation of nondisclosure, but rather one of other prosecutorial misconduct.

Morris Nellum was Petitioner's chauffeur in Chicago.  *See McCall*, 139 Ariz. at 164-65, 677 P.2d at 937-38.  Nellum was prepared to testify at trial regarding admissions made to him by Petitioner regarding the Redmond homicides and Petitioner's payment for those killings.  *Id.*  Prior to trial, the judge prohibited Nellum from testifying for the prosecution because he failed to cooperate in a defense interview.  (RT 9/14/82 at 19-27; *see also* RT 9/9/82 at 3-4.)  Nellum told the trial judge that he did not want to testify due to threatening phone calls allegedly from Petitioner.  (RT 9/14/82 at 19-22.)

Clearly established federal law provides that the appropriate standard of federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  Therefore, in order to succeed on this claim, Petitioner must prove that the prosecutorial misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.*; *see Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

Because Nellum did not testify at trial there was no prosecutorial misconduct that resulted in actual prejudice to the defense.  Petitioner is not entitled to relief on this allegation.  On the basis of the foregoing, Petitioner is not entitled to relief on any of his prosecutor misconduct allegations.

### **Claim 3(A) – Ineffective Assistance of Counsel at Trial Regarding Severance**

In Claim 3(A), Petitioner contends that his defense counsel, Grant Woods, rendered ineffective assistance at trial by failing to file a motion to sever his trial from co-defendant Bracy, despite having argued orally that severance was necessary.  (Dkt. 31 at 24-25.)  Specifically, Petitioner asserts that severance was necessary because the incompetence of

1   Bracy's defense counsel, Stephen Rempe, impacted Petitioner's right to a fair trial.  (*Id.*)

2   This claim is exhausted and entitled to merits review.  (Dkt. 96 at 10-12.)

3   <u>Background</u>

4   In August 1981, a Maricopa County Grand Jury indicted Bracy and Hooper on eleven

5   counts. (ROA 1.)  They were arraigned on March 10, 1982. (ROA 98.)  Following extensive

6   pretrial proceedings, trial commenced on October 18, 1982. (RT 10/18/82.)  After six weeks

7   of trial, on November 30, Petitioner's counsel orally advised the trial court that he intended

8   to file a motion for severance, arguing that Rempe's incompetence was preventing his client

9   from receiving a fair trial.  Counsel explained:

> MR. WOODS:  I will move the Court, on behalf of Mr. Hooper, . . .
> pursuant to Rule 13.4 of the Arizona Rules of Criminal Procedure to grant a
> severance at this time, in that the incompetence of co-counsel, Mr. Rempe, has
> reached the point, although it has been present throughout the case, it has
> reached the point where a severance is necessary to promote a fair
> determination of the guilt or innocence of my client.  It has reached the point
> where in trial Mr. Hooper's due process rights to a fair trial are being severely
> jeopardized.
> I can cite probably fifty incidents in the course of the case of outrageous
> conduct, and in my opinion incompetent conduct.  And, I would like, because
> of the time problems, I would like to file a written memorandum with the
> Court, which I can have to the Court on – for argument Monday.  But, it is
> something which I hesitate to do.  But we have reached the point of no return,
> and since we're there, I would move for severance.  I can present everything
> I can think of at the moment, if the Court would consider severing at this
> moment, or I can put it in the written form and give it to the Court for
> consideration before the start of the defense on Monday.
>
> THE COURT: I would prefer it to be in a written form, and I would
> assume that you are focusing your attention on the remaining portion of the
> trial, should the Court not grant the Rule 20 motions for one or both of the
> Defendants.
>
> MR. WOODS: That's correct.
>
> THE COURT: I would assume that's where you are really aiming your
> discussion, as opposed to at this juncture, where we're right now with one and
> a half witnesses remaining.
>
> MR. WOODS: Well, actually, your honor, I can't be assured – when we
> reach – Let me put it this way: when we reach the point where counsel for a
> Defendant is reading a [Police Departmental Report] and reads up to the word,
> words that Mr. Hooper and Bracy were on parole, when we reach that point
> where he is reading out himself that my client was on parole, even after the
> Court has told the State to stay away from that area, when we reach that point,
> I can't be confident that with even the remaining one and one-half witnesses,
> Mr. Hooper is not going to be jeopardized because I found it's getting worse.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

But, if you are talking about priors, it denigrates our whole defense, if you are talking about reading off my client's on parole. And I am scared to death of Mrs. Redmond coming up, frankly. I – we're also talking about the defense. We have a situation where my co-counsel cannot remember, because, in my opinion, he was intoxicated at the time of the interview that these gentlemen did with Margaret Bracy; he cannot remember what she told them. I wasn't there, I don't know what she told them. But [the prosecution has] noticed her as an alibi or as a rebuttal witness, which scares me to death, having that situation, that you have an interview that co-counsel can't remember, in my opinion, because of intoxication. And [the prosecution says] we're going to use her for rebuttal, and that's the wife of the co-defendant. Now, there is a tape of that, supposedly, and hopefully we'll get to hear that.

. . . .

And now we're at the point, and I'll tell you what exacerbated the whole thing, besides the things that have come out in the last few days, which has just been outrageous, in my opinion. Now we are at the point where we have an agreement among defendants to present a unified defense that, you know, Hooper and Bracy were here and there or whatever, that it's altogether, and now we are at the point where Mr. Rempe informs me that he's, as he did yesterday when I had to object, he's going to start taking shots at Mr. Hooper. Now to do that eight weeks into the case, and after I've given my opening, and after we've done the whole investigation, is outrageous conduct, and, in my opinion, denying Mr. Hooper his right to a fair determination of the guilt and innocence of himself in this matter. And the remedy is a severance at this point. . . .

[PROSECUTOR] MR. JONES: My only point was that ineffective assistance of counsel is not something Mr. Hooper can raise, he doesn't have standing to raise that issue. Even though he may feel affected by alleged –

THE COURT: I don't think that's the issue he's raising, Mike. Ineffective assistance of counsel is not the issue he's raising, because I agree with you, Hooper couldn't raise it for Bracy. What he's raising is the taint, the prejudice, the contamination which flows over to his client by being precluded from doing certain things that he would otherwise be able to do if I had granted a severance when it appeared that [the prosecution] was going to use the statements.[11] And quite frankly, I was the progenitor of the concept of not using those statements so we could keep these guys together. . . . Nonetheless, it was my decision that it would progress efficiently, fairly meeting constitutional requirements if that was not done; and I think I've followed rather strenuously the constitutional requirements. . . .

---

[11]    The trial court refers to a previous motion for severance filed by Bracy on the basis of Petitioner's statements to police officials which implicated both of them in the crimes. (ROA 345.) Bracy argued for severance to prevent police testimony from being introduced against him without being able to confront Petitioner. (*Id.*) Subsequently, to prevent severance, the prosecution agreed and the trial court ordered that the prosecution not use any inculpatory statements made to police, either by Petitioner or Bracy, in its case-in-chief. (RT 9/2/82 at 4-5; *see also* ROA 329.)

1            MR. WOODS: Judge, the Rule says, you can grant a severance at any
2 time, during the trial, if it's necessary to promote a fair determination of the guilt or innocence of a defendant. . . .

3            THE COURT: That's based on a factual revelation to the Court, which
4 is why I get back to the fact of needing pleadings detailing the need. If, out of those pleadings, I don't feel its sufficient . . . That's where I get back to some
5 kind of a pleading in the file for me to review and to make a determination, make a considered determination, which I've tried to do on everything that's
6 been filed in this matter, and I've read everything that's been filed on this matter, I might add, every single word, to be truthful about it.

7            MR. WOODS: I'll provide you a memorandum then.

8 (RT 11/30/82 at 5-11.)  Trial counsel did not follow up and file a motion to sever with the

9 trial court.

10         Petitioner raised this ineffective assistance of counsel (IAC) claim in his first PCR

11 petition.  (ROA 1570.)  The PCR court indicated an initial intent to hold an evidentiary

12 hearing on the merits of this claim.  (ROA 1574, 1577.)  However, after the parties obtained

13 and proffered their discovery, the trial court summarily rejected the claim without a hearing,

14 concluding that Petitioner had failed to substantiate his allegation of deficient performance

15 for failure to file a motion to sever.  (ROA 1596.)

16     Discussion

17         *Strickland v. Washington*, 466 U.S. 668 (1984), was clearly established federal law

18 at the time Petitioner's conviction became final.  Under *Strickland*, to prevail on a claim of

19 ineffective assistance of counsel, a petitioner must show that counsel's performance was

20 deficient and that such deficient performance prejudiced his defense.  *Id.* at 687.  A court

21 need not address both components of the inquiry, or follow any particular order in assessing

22 deficiency and prejudice.  *Id.* at 697.  To be entitled to relief arising from counsel's failure

23 to move for severance, Petitioner must show both that the motion would have been granted

24 and that he suffered prejudice as a result of the unsevered trial.  *See United States v*

25 *Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985).

26         When two or more defendants have been joined for trial, an Arizona trial court is

27 required to grant a defendant's motion for severance if it is necessary to promote the fair

28 determination of guilt or innocence of a defendant, or if the court detects the presence or

absence of unusual features of the crime or case that might prejudice a defendant. *See Cruz*, 137 Ariz. at 543, 672 P.2d at 472. The court must balance the possible prejudice to the defendant against interests of judicial economy. *Id.* at 544, 672 P.2d at 473. In challenging a failure to sever, a defendant must demonstrate compelling prejudice against which the trial court was unable to protect. *Id.* In *State v. Lawson*, 144 Ariz. 547, 555, 698 P.2d 1266, 1274 (1985), "spillover" or "rub off" in a joint trial was discussed as occurring when the jury's unfavorable impression of the defendant against whom the evidence is properly admitted influences the way the jurors view the other defendant. Severance is rarely granted in such cases because defendants usually cannot demonstrate substantial prejudice from the joint trial since, generally, a trial court's cautionary instruction will allow the jury to independently evaluate and categorize the evidence against each defendant. *Id.*

The Court concludes that the trial court would not have granted a formal written motion for severance if counsel had filed one. The record reflects the trial court's efforts to hold a joint trial and avoid the need for severance, as referenced in the above-quoted colloquy. (RT 11/30/82 at 9-10.) When Bracy sought severance, the prosecution stipulated that it would not use in its case-in-chief any inculpatory statements that Bracy or Petitioner made to police. (RT 9/2/82 at 4-5.) The court accepted the stipulation and mooted Bracy's motion for severance. (*Id.*; ROA 345; ROA 704.) The court also denied Bracy's supplemental motion for severance. (*See* ROA 755, 859.) Finally, prior to the November 30 colloquy, the court denied a written motion for severance by Petitioner, which was premised on an allegation that Bracy had confessed the crimes to Christina Nowell; Nowell also stated that she had heard Petitioner make inculpatory statements about the crimes. (*See* ROA 808, 859.) Because the prosecution had failed to follow proper disclosure rules for Nowell's proposed testimony, the court prohibited Nowell from testifying and denied the associated severance motion. (ROA 859; RT 10/13/82 at 16-54.)

Despite the trial court's efforts to maintain a joint trial, Petitioner contends that severance would have been granted if requested in writing because Rempe's incompetence was "spilling over" and substantially prejudicing Petitioner's right to a fair trial. (Dkt. 31 at

24-25.)

In the November 30 colloquy, defense counsel alleged that Rempe, at trial, had almost revealed their probationary status at the time of the crimes, even though the trial court had ruled that this fact was irrelevant.  (RT 11/30/82.)  However, Petitioner does not allege the specific facts that defense counsel should have presented in a written motion for severance. Petitioner merely alleges that defense counsel should have followed through and filed a written motion for severance.  Such a conclusory allegation does not entitle Petitioner to habeas relief.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (stating that conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief).

Further, Petitioner has not demonstrated that he was prejudiced by the joint trial from November 30 forward.  The crux of Petitioner's argument is that Rempe's incompetence wrecked Bracy's alibi defense and this, in turn, diminished the believability of Petitioner's alibi.  This argument is not supported by the record.  Bracy's counsel presented numerous alibi witnesses, including Margaret Bracy, who testified that Bracy was in Chicago at the time of the crime.  (RT 12/9/82.)  Additionally, counsel presented a tow truck driver that towed Bracy's vehicle from his Chicago home to a repair facility and identified Bracy as the one he dealt with on December 31, 1980; the driver further identified a receipt for services rendered on that date.  (*Id.*)  During her pretrial interview, Margaret Bracy stated that her husband was home on Christmas eve, rather that New Year's eve; however, at trial, she testified that it was New Year's eve.  (RT 12/14/82.)

More importantly, Petitioner fails to show that Rempe's conduct interfered with his own alibi defense.  Petitioner presented his alibi defense at trial.  (RT 12/8/82, 12/9/82.) Petitioner presented witnesses from Chicago indicating that he was in Chicago on New Year's Eve.  (*Id.*)  During cross-examination and during the prosecution's rebuttal case, the prosecution sought to impeach Petitioner's witnesses.  (RT 12/8/82, RT 12/15/82.)  Rempe's conduct did not interfere with Petitioner's ability to put on his own alibi defense.  Based on the evidence presented at trial, the jury rejected Petitioner's alibi defense, however, it was

not due to any interference from Rempe.

Petitioner has failed to demonstrate that a request for severance would have been granted or that he was prejudiced by not having his trial severed as of November 30. In sum, Petitioner has not established a violation of *Strickland* based on counsel's alleged failure to formally move for severance during trial. Petitioner is not entitled to relief regarding this claim.

### Claims 3(B) & 6 – *Batson* challenge

Petitioner contends that one of his prospective jurors, Freddie Hanshaw, was Black and removed from his case in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). (Dkt. 31 at 25-26.) Petitioner argues that this juror's removal violated his due process rights (Claim 6) and that trial counsel was ineffective because he failed to petition for relief from the unlawful peremptory challenge (Claim 3(B)). (*Id.* at 39.) These claims are exhausted and entitled to merits review. (Dkt. 96 at 11-12 (Claim 3(B); Dkt. 67 at 32 (Claim 6).

Background

The Redmond/Phelps murders were notorious in the community due to the circumstances of the killings, the number of people involved in the criminal conspiracy and the miraculous survival of one of the intended victims, Marilyn Redmond. As a result, there was considerable press coverage, including television, radio and the print media, regarding the homicide investigation and the trials of the various suspects. (*See, e.g.,* RT 10/14/82 at 123-29.) By the time Bracy and Petitioner came to trial in October 1982, other courts had already tried Edward McCall, Robert Cruz and Joyce Lukezic. As a result of the extensive publicity prior to Petitioner's trial, the trial court secured a large number of potential jurors. The first panel consisted of seventy-five potential jurors. (RT 10/18/82 at 5.) The trial court discussed the case, admonished the potential jurors, and required each one to fill out and return a juror questionnaire. (*Id.* at 5-7, 13-20.) The trial court and counsel then reviewed the questionnaires. (*Id.* at 13-20.)

After the court and the parties reviewed the juror questionnaires, thirty-nine of the potential jurors, including Freddie Hanshaw, were struck for cause without objection due to

1    prior knowledge of the case.  (ROA 867; RT 10/20/82 at 24-28.)  Jurors were struck for

2    cause because they were unwilling to put aside their sympathy for Mrs. Redmond, due to all

3    that she endured as a result of the crimes.  (RT 10/20/82 at 26.)  Jurors were also struck due

4    to their unwillingness to be fair and decide the case based on the evidence, rather than their

5    predetermined sense that guilt had already been established.  (*Id.* at 26-28.)

6         Due to the large number of jurors excused for cause, the trial court immediately

7    brought in another panel of forty-five potential jurors.  (*Id.* at 21-24.)  After this panel had

8    been sworn in and given a jury questionnaire to fill out, counsel for Petitioner addressed the

9    court:

10        "MR. WOODS:  Bracy, and I am going to move the Court to strike the entire
          panel because the panel that we have been exposed to so far discriminates
11        against my client on the basis of race in that there have been only two blacks
          on the panel out of 120, and I ask the Court leave to file Memorandum.

12        THE COURT:  That's denied."

13   (*Id.* at 28.)  Following this colloquy, the trial court and the parties began individual voir dire

14   of the remaining jurors from the first jury panel.[12]  (*Id.*)

15        After the *Batson* decision was announced, Petitioner brought a claim in his first PCR

16   petition arguing that counsel's comments about the lack of minority representation on his

17   jury panels raised a *Batson* challenge.  (ROA 1529.)  Petitioner also contended that if

18   counsel's comments did not raise a *Batson* challenge, then counsel was ineffective for failing

19

20        _____

21        [12]    Petitioner never presented a claim that Blacks were being systematically
     excluded from the jury pool in Maricopa County, Arizona.  Even if he had, the claim would
22   have had no merit.  In *State v. Lee*, 114 Ariz. 101, 559 P.2d 657 (1976), the Arizona Supreme
     Court reviewed the jury panel selection procedures of Maricopa County.  The court
23   determined that Blacks and other minorities were not being systematically excluded.  *Id.*
     Rather, the court upheld the county's selection procedures, finding that "jurors in Arizona
24   are selected at random from voter registration lists pursuant to A.R.S. § 21-301(A) (1976).
     "The use of voter registration lists as the sole source of the names of potential jurors is not
25   constitutionally invalid, absent a showing of discrimination in the compiling of such voter
     registration lists."  *Id.* at 103, 559 P.2d at 659 (further citation omitted); *see also United
26   States v. Parker*, 428 F.2d 488, 489 (9th Cir. 1970) (same).  The *Lee* court further stated that
     in a trial, "[m]ere observation that a particular group is underrepresented on a particular panel
27   does not support a constitutional challenge."  114 Ariz. at 103, 559 P.2d at 659.

28

to raise this challenge.  (*Id.*; ROA 1546.)  Regarding *Batson*, he argued that the prosecution racially discriminated against him by using their peremptory challenges to strike Black jurors.  (*Id.*)  In support, Petitioner attached the juror questionnaire of Freddie Hanshaw, a prospective Black juror, and asked for an evidentiary hearing.  (*Id.* at 9, 11.)

The PCR court ruled, as follows:

> The Defendant's allegation concerning denial of a jury of his peers was not raised at trial and was consequently waived both for appellate purposes and these purposes.  Assuming arguendo, however, that the defendant does present a viable issue on the question of arbitrary removal of all blacks from the jury panel by the prosecutors' use of the peremptory challenges, the Defendant's request, non-the-less [sic], should be denied.  The Defendant's matter was concluded in the appeals court prior to the decision in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).
> The U.S. Supreme Court in <u>Allen v. Hardy</u>, 478 U.S. [255], . . . (1986) and in <u>Griffith v. Kentucky</u>, 479 U.S. [314] . . . (1987) has precluded retroactive application of <u>Batson</u>, <u>supra.</u>, to matters being considered by the courts, application here would be retroactive and precluded.
> * * *
> The Court conducted extensive detailed jury voir dire incorporating jury questionnaires as a part of the effort to "sanitize" the jury.
> This process resulted in the defendant receiving a jury which was fair and impartial and which was also strongly instructed about its obligations to remain same during the trial.

(ROA 1574.)

<u>Discussion</u>

In *Batson*, the United States Supreme Court held that the Fourteenth Amendment Equal Protection Clause forbids a prosecutor from using peremptory challenges to strike prospective jurors on account of their race.  476 U.S. at 89.  In *Allen v. Hardy*, 478 U.S. 255, 257-58 (1986), the Court further resolved that *Batson* does not apply retroactively on collateral review for convictions already final when *Batson* was announced.  The *Allen* Court defined final as the date when judgment of conviction has been rendered, the availability of appeal exhausted, and the time for petition for certiorari has elapsed.  *Id.* at 258 n.1.

Petitioner's judgment of conviction was entered on February 11, 1983 (ROA 1118); the Arizona Supreme Court issued its mandate following the conclusion of direct appeal on August 22, 1985 (Az. Sup. Ct. Dkt. 61, CR-83-0044-AP); and the United States Supreme Court denied his petition for certiorari on January 13, 1986 (*Hooper v. Arizona*, 474 U.S.

1073 (1986)).   Therefore, relief pursuant to *Batson* is unavailable because Petitioner's

conviction and sentence already were final when the Supreme Court issued that decision in

April 1986.

Even if *Baston* were retroactive, Petitioner would not be entitled to relief.  *Batson* only

applies to jurors removed by a peremptory challenge.   476 U.S. at 96-98.   The jury

empanelment record conclusively demonstrates that juror Hanshaw was  removed for cause

based upon answers he provided on the juror questionnaire long before counsel exercised

their peremptory challenges (RT 10/20/82 at 24-28; ROA 867, 913).  *See Swain v. Alabama*,

380 U.S. 202, 220 (1965) (stating that "challenges for cause permit rejection of jurors on a

narrowly specified, provable and legally cognizable basis of partiality"), *rev'd on other

grounds*, *Batson*, 476 U.S. 79.

Because *Batson* had not been decided at the time of Petitioner's trial, trial counsel was

not deficient for failing to raise a claim based on that law.   Further, Petitioner was not

prejudiced because juror Hanshaw was struck for cause; thus, there was no basis to challenge

the prosecutor's peremptory challenges.  Petitioner has failed to demonstrate that his counsel

was constitutionally ineffective.   The PCR court's decision denying these claims was not

contrary to or an unreasonable application of clearly established Supreme Court precedent.

Claims 3(B) and 6 are without merit.

### Claim 5 – Untimely Disclosure of Presentence Report

Petitioner alleges that the untimely disclosure of a supplemental presentence report

deprived him of a reasonable opportunity to explain, rebut or deny the information contained

in the report in violation of his due process rights at sentencing.   (Dkt. 31 at 38-39.)

Petitioner further contends that he has a liberty interest in the state following its own

procedures regarding timely disclosure.  (*Id.*)

Petitioner raised this claim in his second PCR petition, incorporating the arguments

made by his co-defendant  Bracy in a parallel PCR petition.   (ROA 1626, 1627 at 33),

Respondents contend that the PCR court found Claim 5 procedurally defaulted.   (Dkt. 67 at

30-31.)  The PCR court found Claim 5 procedurally defaulted as waived pursuant to Ariz.

R. Crim. P. 32.2(a)(3), 32.10. (ROA 1721 at 12-21, 52-53.) In addition, Petitioner did not complete the exhaustion process. Rule 32.9, the rule in effect at the time of Petitioner's second PCR proceeding, required that alleged errors in a PCR ruling had to be raised in a motion for rehearing following denial of post-conviction relief. *See State v. Bortz*, 169 Ariz. 575, 577, 821 P.2d 236, 238 (App. 1991) (holding that former Rule 32.9 prohibits appellate review of any claims not preserved in a motion for rehearing following denial of post-conviction relief). The purpose of the rule was to give the PCR court an opportunity to correct any errors it may have made in ruling on the PCR petition and to provide a clear statement of issues preserved for review. *Id.* at 578, 821 P.2d at 239. Thus, in order to preserve this claim for further appellate review, Petitioner had to present it in his motion for rehearing. *See State v. Gause*, 112 Ariz. 296, 297, 541 P.2d 396, 397 (1975); *see also State v. Pope*, 130 Ariz. 253, 254-55, 635 P.2d 846, 847-48 (1981) (citing cases supporting the rule that petitioners must comply with Rule 32.9); *State v. Carriger*, 143 Ariz. 142, 692 P.2d 991 (1984) (requiring petitioners to strictly comply with the provisions of Rule 32 or be denied relief). The Ninth Circuit has upheld this rule. *See Cook v. Schriro*, 516 F.3d 802, 827-28 (9th Cir. 2008).

A writ of habeas corpus may not be granted unless it appears that a petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman*, 501 U.S. at 731. To exhaust state remedies, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan*, 526 U.S. at 848; *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Anderson*, 459 U.S. at 6; *Picard*, 404 U.S. at 277-78. Despite the Arizona rules in effect at the time of his second PCR, Petitioner did not present Claim 5 in a motion for rehearing. (ROA 1723.) Furthermore, he did not present this claim to the Arizona Supreme Court. (ROA 1733.) Therefore, it was not properly exhausted in state court. *See Cook*, 516 F.3d at 827-28.

If Petitioner were to return to state court now and attempt to litigate this claim, it would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona

Rules of Criminal Procedure because it does not fall within an exception to preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h).  Therefore, this claim is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *Coleman*, 501 U.S. at 732, 735 n.1.  Claim 5 will not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice, which Petitioner does not attempt to establish.  Claim 5 is procedurally barred.

### **Claims 8 and 12 – Shackling & Right to be Present at Trial**

In Claim 8, Petitioner alleges that the trial court's shackling order denied him his Sixth and Fourteenth Amendment right to be present at all critical stages of his trial, including his right to be present during the empaneling of his jury. (Dkt. 31 at 41-42; Dkt. 78 at 49-50.) In Claim 12, Petitioner alleges that the trial court's shackling order violated his right to a fair trial under the Fourteenth Amendment.  (Dkt. 31 at 45-47.)  Claims 8 and 12 are exhausted and entitled to merits review based on this Court's earlier ruling.  (Dkt. 96 at 13-14.)

<u>Background</u>

Prior to trial, Petitioner moved to remain free from shackling contending that it would be prejudicial for the jury to see him bound in shackles as there was no justification for such an extreme measure. (ROA 813.)  The prosecution responded that Petitioner's and Bracy's triple homicide conviction and death sentence in Illinois, as well as their long history of violent conduct, necessitated extreme security measures at trial. (ROA 842.)  The Maricopa County Sheriff's Office also forwarded a letter to the court advising that shackling Petitioner and Bracy was necessary for the reasons stated by the prosecution. (ROA 858.)  The trial court conducted a hearing, part of which was held in the special trial courtroom so that the parties and Maricopa County officials would have an opportunity to view the special courtroom and advise the court regarding security.  (RT 10/14/82 at 86-122; ROA 853.)  At the hearing, Maricopa County officials reiterated:

> I feel very deeply responsible to keep these people shackled at all times when they are under the Sheriff's Department and when they are outside of the confines of the Maricopa County Jail.  I feel very strongly about that. . . . If I am allowed to secure them the way I think they should, I think they should be shackled which is at the waist and leg irons and cuffs and a minimum of eight

people.

(RT 10/14/82 at 99.) Counsel for Petitioner argued that every juror would be able to see their shackles under the table if the court followed this recommendation. (*Id.* at 119.) Maricopa County officials then proposed, "One suggestion I would make, we could use drapes over the table to restrict vision from anyone in the jury box from seeing underneath the tables there." (*Id.* at 122.)

> The trial court ruled:

> Defendant Hooper's Motion to Remain Free from Manacles and Shackles in the jury's presence is granted as follows:  The defendants shall only have leg brace restraints and ankle restraints on in the presence of the jury.  Waist restraints shall be maintained on the defendants without confining their arms in front of the jury.

(ROA 859.)

Before the first panel of prospective jurors was brought into the courtroom, the court discussed security with the parties.  "The Courtroom will be secured before we get started.  They're going to put everybody out including the jurors.  You'll get a chance to get your clients in, get them settled and we will get the jury back in a sweep."  (RT 10/18/82 at 3.) Petitioner was present and introduced to the initial seventy-five member jury panel. (*Id.* at 14.)  After Petitioner's introduction, counsel waived Petitioner's presence for all other jury empanelment proceedings except the exercise of peremptory challenges.  (*Id.* at 28.) Petitioner specifically stated on the record that he waived his presence before the other jury panels and individual voir dire because he did not want to risk prospective jurors viewing him in shackles.  (RT 11/1/82 at 139-41.)  After the court and counsel qualified thirty-five potential jurors (RT 10/18/82, 10/20/82, 10/22/82, 10/25/82, 10/28/82, 11/1/82), and the parties were set to exercise peremptory strikes, Petitioner was introduced to the remaining potential jurors (RT 11/1/82 at 120-21).  During trial, counsel for Petitioner did not raise any further argument that Petitioner's shackling was visible to the jury.  (*See* RT 10/14/82 at 119 (prior to the decision to cover the tables to prevent the jury from viewing the shackles, trial counsel had asked permission, from the jury box, to photograph Petitioner in shackles to preserve the record for appellate purposes).)

On direct appeal, the Arizona Supreme Court held that the trial court justifiably ordered Petitioner's shackling at trial due to his three Illinois death sentences and his prior felony convictions for crimes of violence. *Hooper*, 145 Ariz. at 543-44, 703 P.2d at 487-88. The court pointed out that the trial court had taken precautions so that Petitioner's shackling would not be visible to the jury. *Id.* Regarding waiver, the court held that Petitioner voluntarily chose to be absent during individual voir dire. *Id.*

Shackling Discussion

In Claim 12, Petitioner contends that the trial court's shackling order was unjustified because it was not made on an individualized record and because it interfered with his ability to participate in his defense. (Dkt. 78 at 50.) In both *Illinois v. Allen*, 397 U.S. 337, 344-46 (1970), and *Estelle v. Williams*, 425 U.S. 501, 503-05 (1976), the Supreme Court recognized that shackling may have a significant effect on the jury's presumption of innocence regarding the defendant and should not be utilized except when justified by an essential state interest. The *Allen* Court also found that shackling may interfere with a defendant's ability to communicate with his counsel. 397 U.S. at 344. However, the *Allen* Court upheld a trial court shackling and gagging a contentious defendant who, after repeated warning, continued to intentionally disrupt his trial and, ultimately, had to be removed from the courtroom. *Id.* at 343.

The Arizona Supreme Court made a factual finding that the jury did not see Petitioner's restraints; this Court defers to that finding because Petitioner has not refuted it with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Petitioner has cited no Supreme Court case – and this Court is not aware of any – that stands for the proposition that non-visible shackling violates a defendant's constitutional rights. *Estelle* and *Allen* both indicate that the constitutional concerns arise from the impact upon a jury of learning that a defendant is in pretrial incarceration or physically restrained during trial. *Estelle*, 425 U.S. at 504-05 (explaining that the concern related to compelling a defendant to go to trial in prison attire is that it acts as a "constant reminder" of the accused's status and is "so likely to be a continuing influence throughout trial" that it creates an unacceptable risk that

1  impermissible factors will influence the verdict); *Allen*, 397 U.S. at 344 (acknowledging that

2  seeing the shackles "might have a significant effect on the jury's feelings about a

3  defendant"). In a later case, the Supreme Court again emphasized that "the law has long

4  forbidden routine use of *visible* shackles during the guilt phase of a trial." *See Deck v.*

5  *Missouri*, 544 U.S. 622, 626 (2005) (emphasis added)). Because the jury did not see

6  Petitioner's shackling, the Arizona Supreme Court's decision was neither contrary to, nor an

7  unreasonable application of clearly established law. *See Musladin*, 127 S. Ct. at 654.

8      Further, Petitioner is not entitled to relief because an essential state interest justified

9  the shackling. *See Estelle*, 425 U.S. at 505 (noting that physical restraints can be justified

10  by an essential state interest); *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986) (holding that

11  courtroom security specific to the defendant on trial is an essential state interest that may

12  justify shackling). The trial court's shackling order was justified based upon a pretrial

13  hearing. (RT 10/14/82 at 86-122.) At the hearing, officials from Maricopa County

14  recommended that Petitioner be shackled at trial due to his recent triple homicide conviction,

15  his accompanying death sentences and his record of prior felony convictions for violent

16  conduct. (*Id.*; ROA 853.) Based upon his extensive and dangerous criminal record, the trial

17  court individually determined that Petitioner was a courtroom security risk and that shackling

18  was necessary. (ROA 859.) In light of this record, the trial court's decision to shackle

19  Petitioner was neither contrary to, nor an unreasonable application of clearly established

20  federal law. *See Musladin*, 127 S. Ct. at 654.[13]

21      Additionally, even if the Court assumes that the trial court's decision to physically

22  restrain Petitioner during trial was unjustified, the Court concludes that any error was

23  harmless. *See Deck*, 544 U.S. at 626 (stating that non-visible shackling is constitutional,

24  even if the decision to physically restrain is not justified); *Williams v. Woodford*, 384 F.3d

25

26      [13]   Regarding Petitioner's contention that the trial court's shackling order
27  interfered with his ability to participate in his defense, Petitioner provides no factual basis
   to support this contention. Conclusory allegations which are not supported by a statement
28  of specific facts are not entitled to relief. *James*, 24 F.3d at 26.

567, 591 (9th Cir. 2004) (even assuming physical restraints were unjustified, any error was harmless because the shackles were not visible to the jury).

For all of the above reasons, Petitioner is not entitled to relief on Claim 12.

<u>Right to be Present Discussion</u>

In Claim 8, Petitioner contends that the trial court's shackling order caused him not to be present for jury empanelment proceedings.  (Dkt. 78 at 50.)

A person charged with a felony has a right to be present at every stage of the trial. *Allen*, 397 U.S. at 338.  A defendant's right to be present derives from the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985).  This includes the right to be present at the voir dire and empaneling of the jury.  *Diaz v. United States*, 223 U.S. 442, 455 (1912).

Generally, a defendant's constitutional rights may be waived, provided such waiver is voluntary, knowing and intelligent.  *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  In particular, it is long established that a noncapital defendant can waive his right to be present at trial.  *See Diaz*, 223 U.S. at 455.  However, the Supreme Court has never determined whether a capital defendant can waive his right to be present at trial; rather, the Court specifically reserved this question in *Drope v. Missouri*, 420 U.S. 162, 182 (1975).  Here, the Arizona Supreme Court held that Petitioner voluntarily waived his right to be present, choosing to be absent during individual voir dire.  *Hooper*, 145 Ariz. at 543-44, 703 P.2d at 487-88.  The *Drope* Court's reservation of the question precludes any argument that the supreme court's decision was contrary to clearly established Supreme Court precedent.  *See Musladin*, 127 S. Ct. at 654.  Furthermore, the Court concludes that the Arizona Supreme Court's resolution extending waiver into the capital context was not an unreasonable application of federal law in violation of 28 U.S.C. § 2254(d)(1).  *See Campbell v. Wood*, 18 F.3d 662, 671-72 (9th Cir. 1994) (en banc) (concluding that a capital defendant can

1  constitutionally waive his right to be present for trial proceedings);[14] *see also United States*

2  *v. Mitchell*, 502 F.3d 931, 987 (9th Cir. 2007) (defendant waived his right to be present at

3  sentencing).

4  Out of the presence of the remaining jurors, the trial court questioned Petitioner

5  personally as to whether he had voluntarily chosen not to be present during individual juror

6  voir dire proceedings.  (RT 11/1/82 at 139-42.)  In the ensuing colloquy between the trial

7  court and Petitioner, Petitioner indicated that he understood his right to be present but

8  voluntarily chose not to be present for those proceedings to ensure that no juror would see

9  him shackled.  (*Id.*)  The Arizona Supreme Court's determination that Petitioner voluntarily

10 waived his right to be present during the individual voir dire proceedings was not contrary

11 to or an unreasonable application of federal law. Petitioner is not entitled to relief on Claim

12 8.

13 **Claim 11 – Fair and Impartial Jury**

14 Without citation to the record, Petitioner alleges that the trial court violated his right

15 to a fair and impartial jury by not allowing him to inquire about prospective jurors' racial

16 bias in light of the interracial nature of the crime – since the victims were White and he is

17 Black. (Dkt. 31 at 44-45.) Respondents concede that this claim is exhausted but contend that

18 Petitioner did not ask the trial court to make such an inquiry.  (Dkt. 67 at 40-41.)  In

19 response, Petitioner contends only that the trial court had a *sua sponte* duty to inquire of

20 prospective jurors.  (Dkt. 78 at 62.)

21 This claim was raised in Petitioner's first PCR petition and denied:

22 The defendant was not entitled to inquiry on the issue of the interracial nature
   of the murders because he did not raise the issue during trial.  He waived the
23 right and the Court was under no obligation to sua sponte raise the issue during
   the trial proceeding.  *Turner v. Murray*, 476 U.S. [28], 106 S. Ct. 1683, 95
24 L.Ed. 2d 262 (1986).

25 ⎯⎯⎯⎯⎯⎯
   [14]  Relying on *Bustamonte v. Eyman*, 456 F.2d 269 (9th Cir. 1972), Petitioner
26 argues that his presence at the empaneling of his jury was nonwaivable.  As the Court has
   clarified, only Supreme Court precedent qualifies as clearly established federal law.
27 Moreover, in *Campbell*, the Ninth Circuit explicitly overruled *Bustamonte*.  *See Campbell*,
   18 F.3d at 672 n.2.
28

(ROA 1574.)

In *Turner v. Murray*, 476 U.S. 28, 36 (1986), the Court held that a "capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." However, the Court went on to hold that "a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry." *Id.*

Thus, *Turner* explicitly refutes Petitioner's argument that the trial court had a *sua sponte* responsibility to question the jurors about racial bias issues. Consequently, the state court's decision was not contrary to or an unreasonable application of clearly established federal law. Claim 11 is without merit.

### Claim 13 – *Enmund* Claim

Citing *Enmund v. Florida*, 458 U.S. 782 (1982), Petitioner contends that his death sentence violates the Eighth Amendment because the jury did not resolve that he acted with the intent to cause death or with reckless indifference to human life. (Dkt. 31 at 47.) Regardless of exhaustion, this claim is without merit. *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on the merits); *Rhines v. Weber*, 544 U.S. 269, 277 (2005) (holding that a stay is inappropriate in federal court to allow claims to be raised in state court if they are subject to dismissal under (b)(2) as "plainly meritless").

At sentencing, the trial court considered *Enmund* and found it distinguishable because Enmund was sentenced to death though only an accomplice in a felony murder prosecution, while Petitioner was convicted of conspiracy to commit murder as well as two first degree murder charges. (ROA 1116.) The sentencing court concluded that Petitioner and his co-conspirators were guilty of performing a contract killing for which they were to receive $10,000. (*Id.*)

On direct appeal, the Arizona Supreme Court addressed Claim 13, as follows:

> In addition, we have reviewed this case in light of *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed.2d 1140 (1982) and find imposition of the death penalty proper. Though defendant had accomplices, the record contains sufficient evidence that defendant killed, attempted to kill, or intended to kill.

*Hooper*, 145 Ariz. at 551, 703 P.2d at 495.

In *Enmund*, the Supreme Court held that a defendant convicted of felony murder is eligible for the death penalty only if he actually killed, attempted to kill, or intended to kill the victim. 458 U.S. at 797. A state court's *Enmund* finding is a factual determination which is presumed correct and which Petitioner "bear[s] the heavy burden of overcoming." *Cabana v. Bullock*, 474 U.S. 376, 388 (1986), *overruled in part on other grounds, Pope v. Illinois*, 481 U.S. 497, 503 n.7 (1987); *see Paradis v. Arave*, 20 F.3d 950, 959 (9th Cir. 1994). The trial court and the Arizona Supreme Court found that Petitioner killed, or attempted or intended to kill. Petitioner has not overcome that factual finding, and it is supported by the record.

At the time of Petitioner's direct appeal, no clearly established Supreme Court law required that the *Enmund* finding be made by a jury. *Cf. Enmund*, 458 U.S. at 801 (addressing error in state supreme court finding without mention of jury). Subsequent Supreme Court law established that the finding of culpability required by *Enmund* may be made by the trial court or the appellate court. *Cabana*, 474 U.S. at 387-88. Therefore, Petitioner's argument that the *Enmund* finding must have been made by the jury fails. The Arizona Supreme Court's resolution of this claim is not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to relief.

### Claim 14 – Death Penalty Statutory Challenges

Petitioner contends that Arizona's death penalty statute constitutes cruel and unusual punishment; establishes a presumption in favor of death; provides for judicial fact-finding at sentencing in violation of Petitioner's right to a trial by jury; fails to require the sentencer to find that aggravating circumstances outweigh mitigation beyond a reasonable doubt; unconstitutionally required Petitioner to bear the evidentiary burden for mitigation; fails to provide safeguards for weighing aggravating circumstances against mitigating factors; allows prosecutors unbridled discretion to determine whether to pursue the death penalty; and includes an unconstitutionally vague aggravating circumstance, A.R.S. § 13-703(F)(6). (*See* Dkt. 31 at 47-57.)

Regardless of whether all aspects of this claim are exhausted, they are meritless. *See* 28 U.S.C. § 2254(b)(2); *Rhines*, 544 U.S. at 277.  The Arizona Supreme Court's rejection of these claims, *Hooper*, 145 Ariz. at 543, 703 P.2d at 487 (citing its reasoning from *Bracy*, 145 Ariz. at 536, 703 P.2d at 480), was neither contrary to nor an unreasonable application of clearly established federal law.

Clearly established federal law holds that the death penalty does not constitute cruel and unusual punishment.  *See Gregg v Georgia*, 428 U.S. 153, 169 (1976);  *see also Roper v. Simmons*, 543 U.S. 551, 568-69 (2005) (noting that the death penalty is constitutional when applied to a narrow category of crimes and offenders).

In *Walton v. Arizona,* 497 U.S. 639, 651 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002), the Supreme Court rejected the argument that "Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the Constitution."  *See also Delo v. Lashley*, 507 U.S. 272, 275-76 (1993) (referring to *Walton* and stating that the Court had "made clear that a State may require the defendant 'to bear the risk of nonpersuasion as to the existence of mitigating circumstances'").  *Walton* also rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency. 497 U.S. at 651-52 (citing *Blystone v. Pennsylvania,* 494 U.S. 299 (1990); *Boyde v. California,* 494 U.S. 370 (1990)); *see Kansas v. Marsh,* 548 U.S. 163, 126 S. Ct. 2516, 2524 (2006) (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators).

The Constitution does not require that a capital sentencer be instructed in how to weigh any particular fact in the capital sentencing decision. *See Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994).  Nor does the Constitution require that a specific weight be given to any particular mitigating factor.  *See Harris v. Alabama*, 513 U.S. 504, 512 (1995).  Rather, the state sentencer has broad discretion to determine whether death is appropriate

once a defendant is found eligible for the death penalty. *Tuilaepa*, 512 U.S. at 979-80. Thus, Arizona's death penalty statute need not enunciate specific standards to guide the sentencer's consideration of aggravating and mitigating circumstances. *See id.*; *see also Smith v. Stewart,* 140 F.3d 1263, 1272 (9th Cir. 1998) (summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty statute and its failure to apply the beyond-a-reasonable-doubt standard).

In *Smith*, the Ninth Circuit likewise disposed of the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." 140 F.3d at 1272; *see Gregg*, 428 U.S. at 199 (pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional); *Silagy v. Peters,* 905 F.2d 986, 993 (7th Cir.1990) (holding that the decision to seek the death penalty is made by a separate branch of the government and is not a cognizable federal issue).

In *Ring v. Arizona*, 536 U.S. 584, 609 (2002), the Supreme Court found that Arizona's aggravating factors are an element of the offense of capital murder and therefore must be found by a jury. However, in *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Court held that *Ring* does not apply retroactively to cases already final on direct review. Because direct review of Petitioner's case was final prior to *Ring*, he is not entitled to federal habeas relief premised on that ruling.

Finally, the *Walton* Court specifically rejected Petitioner's argument that A.R.S. § 13-703(F)(6), the cruel and heinous aggravating factor, as applied by the Arizona courts is unconstitutionally vague. 497 U.S. at 654 (finding that the Arizona Supreme Court has given substance to the operative terms in the statute and that its construction meets constitutional requirements). Based on the foregoing, Petitioner is not entitled to relief on Claim 14.

### Claim 15 – Right to Testify

Petitioner contends that he was deprived of his right to testify at trial because the prosecutor threatened to use allegedly invalid prior convictions as impeachment if Petitioner chose to testify. (Dkt. 31 at 57-59.) Respondents contend, and Petitioner concedes, that

Petitioner did not fairly present Claim 15 in state court.  (Dkt. 67 at 52; Dkt. 78 at 29.)

Because Petitioner did not raise Claim 15 in state court, it is unexhausted.  *Boerckel*, 526 U.S. at 848 (petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner).  If Petitioner were to return to state court now and attempt to litigate this claim, it would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it does not fall within an exception to preclusion.  *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h).   Therefore, this claim is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy.  *Coleman*, 501 U.S. at 732, 735 n.1.  Claim 15 will not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice, which Petitioner does not attempt to establish.  Claim 15 is procedurally barred.

### Claim 17 – Proof of Prior Convictions

Petitioner contends that his due process rights were violated when the trial court admitted evidence of prior felony convictions from Illinois.  (Dkt. 31 at 59-61.)  Petitioner further contends that his confrontation rights were violated because he was not allowed to cross-examine the person who prepared the documentation of his prior felony convictions.  (*Id.* at 60.)

Exhaustion

Respondents concede that the Sixth Amendment Confrontation Clause aspect of the claim was fairly presented in state court but contend that the due process aspect of this claim is unexhausted.  (Dkt. 67 at 54.)  Petitioner responds that the Arizona Supreme Court's independent sentencing review exhausted the due process aspect of this claim.  (Dkt. 78 at 30.)

The Arizona Supreme Court has stated that it independently reviews each capital case to determine whether the death sentence is appropriate.  In *State v. Gretzler*, 135 Ariz. 42, 54, 659 P.2d 1, 13 (1983), the court stated that the purpose of independent review is to assess the presence or absence of aggravating and mitigating circumstances and the weight to give

to each. *See also State v. Blazak*, 131 Ariz. 598, 604, 643 P.2d 694, 700 (1982).  The due process portion of Claim 17 goes far beyond the stated scope of that review, and the Court finds it was not exhausted thereby.  *Cf. Moormann v. Schriro*, 426 F.3d 1044, 1057-58 (9th Cir. 2005) (finding that Arizona's independent sentencing review did not exhaust numerous claims including claim alleging admission of prejudicial information).  Therefore, the due process aspect of Claim 17 remains unexhausted.  If Petitioner were to return to state court now and attempt to exhaust it, it would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it does not fall within an exception to preclusion.  *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h).  Therefore, this aspect of Claim 17 is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy.  *Coleman*, 501 U.S. at 732, 735 n.1.  The due process aspect of this claim will not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice, which Petitioner does not attempt to establish.  The due process aspect of Claim 17 is procedurally barred.

<u>Merits of Confrontation Clause Allegation</u>

*Background*

Following his jury conviction for conspiracy to commit first degree murder, first degree murder, attempted first degree murder, kidnapping, armed robbery and burglary, Petitioner was arraigned on charges regarding allegations of prior felony convictions.  *See* Ariz. R. Crim. P. 19.1(b) (1982).  The burden was on the prosecution to prove the validity of his prior convictions beyond a reasonable doubt.  *See State v. Gilbert*, 119 Ariz. 384, 385, 581 P.2d 229, 230 (1978).  For purposes of possible sentencing enhancement on his non-capital convictions, Petitioner was charged with having at least two prior felony convictions in Illinois. (RT 12/24/82 at 85-91; ROA 1070.)  On January 6, 1983, the court conducted the prior convictions trial regarding nine 1981 Illinois convictions, three for first degree murder, three for armed robbery and three for aggravated kidnapping. (RT 1/6/83 at 32-47; *see* Dkts. 118, 119.)  The prosecution submitted, and the court admitted, a certified statement of conviction and sentence from the Cook County Superior Court, Chicago, Illinois, signed by

1    the Clerk of Court, Morgan Finley.  (RT 1/6/83 at 37-41, 46.)  The certified statement of

2    conviction and sentence was sealed by Richard Fitzgerald, Chief Judge, Criminal Court,

3    Circuit Court of Cook County, Illinois.  (*Id.* at 37-41.)  The Arizona Supreme Court held that

4    these documents were self-authenticating and properly admitted; the supreme court denied

5    Petitioner's assertion that admission of the documents violated the Confrontation Clause.

6    *Hooper*, 145 Ariz. at 550, 703 P.2d at 493.

7        *Discussion*

8        Citing *Crawford v. Washington*, 541 U.S. 36 (2004), Petitioner contends that his right

9    of confrontation was violated because he was not allowed to cross-examine the person who

10   prepared the exhibits documenting his prior felony convictions in Illinois.  (Dkt. 31 at 59-61;

11   Dkt. 78 at 67.)  Because the *Crawford* decision occurred long after Petitioner's conviction

12   became final, Petitioner cannot obtain habeas relief under the AEDPA based on that case.[15]

13   *See Musladin*, 127 S. Ct. at 649.  The Supreme Court has rejected Petitioner's argument that

14   *Crawford* is retroactively applicable to this claim.  *See Whorton v. Bockting*, 127 S. Ct. 1173

15   (2007).  Because *Crawford* is inapplicable, this Court looks to the law in effect at the time

16   Petitioner's conviction became final.  *See Williams*, 529 U.S. at 365.

17       The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal

18   defendant "to be confronted with the witnesses against him."  Claims raised pursuant to the

19   Confrontation Clause generally fall into two broad categories:  those involving the admission

20

21       [15]    Moreover, *Crawford* would not entitle Petitioner to relief.  The *Crawford*
22   Court held that the Confrontation Clause prohibits the admission of testimonial evidence
     from a declarant who does not appear at trial unless the declarant is unavailable and the
23   defendant had a prior opportunity to cross-examine the declarant.  541 U.S. at 68.  The Court
     noted that "most of the hearsay exceptions covered statements that by their nature were not
24   testimonial, for example, business records or statements in furtherance of a conspiracy." *Id.*
25   at 56.  Courts that have addressed the issue of public records documenting prior convictions
     have concluded that they are non-testimonial and therefore beyond the prohibition of
26   *Crawford*.  *See United States v. Wieland*, 420 F.3d 1062, 1076-77 (9th Cir. 2005);  *State v.
     Bennett*, 216 Ariz. 15, 162 P.3d 654 (App. 2007)*; State v. King*, 213 Ariz. 632, 146 P.3d
27   1274 (App. 2006);  *see also State v. Benefiel*, 128 P.3d 1251 (Wash. App. 2006); *People v.
28   Taulton*, 29 Cal. Rptr.3d 203 (App. 2005).

of out-of-court statements and those involving restrictions on the scope of cross-examination. *See Delaware v. Fensterer*, 474 U.S. 15, 18 (1985). The instant claim falls into the first category, which reflects the recognition that the literal right to confront witnesses at the time of trial forms the core of the values furthered by the Confrontation Clause. *Id.*

*Ohio v. Roberts*, 448 U.S. 56, 66 (1980), established that the veracity of hearsay statements is sufficiently dependable for admission when the evidence falls within a firmly rooted hearsay exception or it contains particular guarantees of trustworthiness such that adversarial testing would be expected to add little to the statements' reliability. *See also Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999). The records admitted to establish the validity of Petitioner's prior felony convictions were public records and their certifying documents. *See Hooper*, 145 Ariz. at 550, 703 P.2d at 493. Those type of documents fall into a firmly rooted hearsay exception and have sufficient indicia of reliability. *See United States v. Wieland*, 420 F.3d 1062, 1077 (9th Cir. 2005). Based on the foregoing, the supreme court's rejection of Petitioner's confrontation claim was not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to relief.

### Claim 18 – Restriction on Cross-Examination

Petitioner argues that the trial court violated his Sixth Amendment right of confrontation when it prohibited him from cross-examining Dan Ryan, the prosecution's chief investigator, about contempt proceedings pending against Ryan. (Dkt. 31 at 61-62.) Respondents concede this claim is exhausted and entitled to merits review. (Dkt. 67 at 56.)

Background

During pretrial proceedings, the prosecution filed a motion in limine to preclude the defense from cross-examining witnesses regarding specific instances of misconduct not amounting to a conviction of a crime. (ROA 596.) The trial court granted the motion. (RT 9/30/82 at 11-12; ROA 804.) Subsequently, Investigator Dan Ryan was cited for contempt by another division of the Maricopa County Superior Court for his conduct in proceedings against alleged co-conspirator Joyce Lukezic, wife of Ron Lukezic. (ROA 784, 785, 1092.)

The prosecution filed a second motion in limine contending that the ongoing contempt proceedings were irrelevant and should not be referred to at trial. (ROA 863.)  The court agreed with the prosecution, ruling that reference to the ongoing contempt proceeding was irrelevant. (RT 10/28/82 at 48-49.)

During trial, Petitioner questioned witnesses regarding allegations of misconduct by Investigator Ryan. (*See, e.g.,* RT 11/18/82 at 58, 98; RT 11/29/82 at 23-41; RT 12/16/82 at 16, 35-59; RT 12/17/82 at 36-112.)  In response, the prosecution called Ryan as a rebuttal witness. (RT 12/20/82 at 27-168.)  On direct examination, Ryan was questioned about the facts and circumstances which formed the basis of the pending contempt citation against him. (*Id.* at 27-72.)  Ryan denied engaging in any misconduct. (*Id.*)  Prior to cross-examination, Petitioner asked the trial court to reverse its ruling prohibiting the defense from asking Ryan about the pending criminal contempt charges. (*Id.* at 71-72.)  Petitioner argued that the prosecution had made the pending contempt charge relevant by asking Ryan about the underlying facts and circumstances of the charges. (*Id.* at 133-37.)  The prosecution answered that Ryan was merely responding to allegations that the defense had brought out and that they had not opened the door to the contempt proceeding. (*Id.* at 135-37.)  The trial court refused to reconsider its earlier ruling, but reiterated that it would allow counsel to fully explore the factual basis for the contempt proceeding.[16]  (*Id.* at 137-38.)

The Arizona Supreme Court denied this claim:

> In the instant case we do not find an unreasonable limitation of the cross-examination right. First, the County Attorney prosecuting the instant case was not involved in prosecuting Mr. Ryan for contempt. Rather, a special, independent prosecutor had responsibility for prosecuting Mr. Ryan. Thus, the pending indictment would not have indicated that Mr. Ryan's testimony was colored by any hope of lenient treatment from the County Attorney. Second, the jury had before it ample evidence showing Mr. Ryan's bias and self-interest. Mr. Ryan was the prosecution's chief investigator answering directly to Mr. Brownlee, and the alleged instances of misconduct were serious. The jury could understand that he had bias and motives for testifying as he did. *See Skinner v. Cardwell*, 564 F.2d 1381, 1389 (9th Cir.1977) (test of reasonable limit on cross-examination is whether jury is otherwise in possession of

---

[16]      Ryan was subsequently acquitted of the contempt charges. *See Bracy*, 145 Ariz. at 532 n.7, 703 P.2d at 476 n.7.

sufficient information to assess the bias and motives of the witness).

*Bracy* 145 Ariz. at 533, 703 P.2d at 477 (additional citations omitted).

<u>Discussion</u>

There is no dispute that the trial court provided Petitioner a full opportunity to cross-examine Ryan about allegations of misconduct regarding his role in the investigation of the charges presented at trial. The record demonstrates that Petitioner used the opportunity and cross-examined both Ryan and other witnesses about allegations of Ryan's misconduct. However, Petitioner contends that he could not expose Ryan's bias due to the prohibition on cross-examining Ryan about the pending contempt citation. (Dkt. 78 at 68-70.)

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." "'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" *Davis v. Alaska*, 415 U.S. 308, 315-316 (1974) (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)). Impeachment of a witness's credibility and exposure of witness bias and possible motive in testifying are two purposes served by the constitutionally protected right of cross-examination. *See id.* at 316. However, a trial court has broad discretion in determining the scope and extent of cross-examination. *See Alford v. United States*, 282 U.S. 687, 694 (1931); *Carriger v. Lewis*, 971 F.2d 329, 332-33 (9th Cir. 1992). A trial court may impose reasonable limits on cross-examination to prevent harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is only marginally relevant. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Such limitations on cross-examination do not deny the constitutionally protected right of confrontation, but constitute legitimate evidentiary rulings entrusted to the discretion of the trial judge. *See id.* (Confrontation Clause guarantees opportunity for effective cross-examination, not cross-examination to whatever extent defendant might wish); *see also Perry v. Rushen*, 713 F.2d 1447, 1450 (9th Cir. 1983).

In both *Davis* and *Van Arsdall*, the trial court's restriction on cross-examination effectively prevented the defense from exploring the potential bias, partiality and reliability

of the witness.  *See Davis*, 415 U.S. at 317-18; *Van Arsdall*, 475 U.S. at 679.  Here, Petitioner had a full and fair opportunity to cross-examine witnesses about the misconduct allegations that revealed potential bias, the reliability and credibility of Ryan as a witness, and his influence on other witnesses (*see, e.g.,* RT 11/18/82 at 58, 98; RT 11/29/82 at 23-41; RT 12/16/82 at 16, 35-59; RT 12/17/82 at 36-112).  *See Bright v. Shimoda*, 819 F.2d 227, 229 (9th Cir.1987) (federal habeas court will rarely find a constitutional violation if the defendant was allowed to cross examine a witness at length and was restricted solely on a collateral matter).  In this case, the jury had sufficient information to appraise the bias, motives and reliability of the witness, Ryan; the restriction of cross-examination regarding a collateral matter was not a violation of the Confrontation Clause.  The Arizona Supreme Court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief.

### Claim 19 – Admissibility of Lineup Identification

Petitioner contends that the trial court's admission of his pretrial lineup identification violated his Fourteenth Amendment due process rights.  (Dkt. 31 at 62-64.)  Specifically, Petitioner contends that his pretrial lineup was impermissibly suggestive because he was the only suspect with his shirt tail out.  (Dkt. 78 at 70.)  Petitioner further contends that Marilyn Redmond's identification was unreliable because Redmond earlier provided inconsistent descriptions of her assailants to the police.  (*Id.* at 70-72.)  Finally, Petitioner alleges that Investigator Ryan influenced Redmond to make a lineup identification.  (*Id.*)  The Court has determined that this claim is exhausted and entitled to merits review.  ( Dkt. 96 at 16.)

Clearly Established Law

Evaluating whether an identification has been irreparably tainted by a suggestive procedure requires a two-part analysis.  First, the Court must determine whether the challenged procedure was suggestive.  *Neil v. Biggers*, 409 U.S. 188, 381 (1972).  "An identification procedure is suggestive when it 'emphasize[s] the focus upon a single individual' thereby increasing the likelihood of misidentification."  *United States v. Montgomery*, 150 F.3d 983, 992 (9th Cir. 1998) (quoting *United States v. Bagley*, 772 F.2d

482, 493 (9th Cir. 1985)).  Second, if the process was suggestive, the Court must examine the totality of the circumstances to determine whether the witness's identification is nonetheless reliable and, therefore, admissible.  *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).  The factors to be considered in assessing reliability are:  (1) the witness's opportunity to view the accused at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the description, (4) the witness's level of certainty, and (5) the length of time between the crime and the confrontation.  *Id.* (citing *Biggers*, 409 U.S. at 199-200).  The ultimate question is whether, in light of all the circumstances, the identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1968).

Background

Petitioner and William Bracy were arrested in Chicago on February 20, 1981.  On February 22, Marilyn Redmond was flown to Chicago for a lineup identification procedure.  (RT 8/26/82 at 21-27.)  Chicago Detective O'Callaghan and Investigator Ryan selected individuals to participate in the lineup identifications.  (*Id.* at 96-97; RT 9/1/82 at 5-11.)  After assisting O'Callaghan, Ryan moved to the viewing room, along with Redmond, Phoenix Detective Martinsen and Prosecutor Brownlee.  (RT 8/27/82 at 15.)  Redmond viewed three lineups, the first with Bracy, the second with Petitioner and then a final view of the first lineup.  (RT 8/26/82 at 23-45.)  Redmond positively identified Petitioner as one of the intruders in her home on New Year's Eve 1980.  (*Id.* at 143; RT 11/30/82 at 59-63; *see* Dkt. 122.)  While awaiting the reassembly of Bracy's lineup, Redmond was moved into a private office.  (RT 8/26/82 at 25-28.)  At this time, Phoenix police officials had access to Redmond.  (*Id.* at 34, 36, 110-11.)  However, Redmond stressed numerous times that no police official, from Phoenix or Chicago, pressed her to make an identification, suggested an identification or in any way influenced her to identify Petitioner.  (*Id.* at 43-44, 142-43.)

Prior to trial, the state court held a hearing on the admissibility of Redmond's identifications of Petitioner and Bracy.  (RT 8/26/82, 8/27/82, 9/1/82.)  At the hearing, Redmond testified extensively concerning her recollection of who perpetrated the murders

and her ability to view the assailants at that time, as well as her identification of Petitioner. (RT 8/26/82 at 7-143.) Martinsen, O'Callaghan, Petitioner and Ryan testified at the hearing. (RT 8/27/82, 9/1/82.)

Following the hearing, the trial court determined that the pretrial identification procedure was not unduly suggestive and denied Petitioner's motion to suppress the pretrial identification. (ROA 748.) On direct appeal, the Arizona Supreme Court also found the pretrial identification not suggestive, based upon the following:

> First the lineup was not suggestive. Nothing in the lineup singles out defendant. Although some age disparity exists among the participants, this difference is not so great as to be suggestive. In addition, while all the participants are not the same height, the height difference is not extraordinary among any of the participants. The difference does not single out defendant. Moreover that defendant was the only person in the lineup with his shirt tail untucked is in no way suggestive. Other lineup participants had unique items of clothing. Thus, this lineup was not suggestive. *See State v. Dessureault, supra.*

*Hooper*, 145 Ariz. at 544, 703 P.2d at 488.

Citing *Manson v. Brathwaite*, 432 U.S. 98 (1977), and *Neil v. Biggers*, 409 U.S. 188 (1972), the court held that even if the lineup was suggestive, Redmond's pretrial identification of Petitioner was reliable and, therefore, properly admitted at trial. *Hooper*, 145 Ariz. at 544-45, 703 P.2d at 488-89. Utilizing the five *Biggers* factors for assessing reliability, the Arizona Supreme Court made the following findings:

> First, Mrs. Redmond had ample opportunity to observe defendant at the time of the crime. She first saw defendant in the well-lighted bedroom after Bracy had led her there. Defendant spoke to her, asking if there were any guns in the house, and he grabbed her and led her down the hallway to where the guns were kept. The hallway was also well lighted and defendant's face was no more than a foot away from Mrs. Redmond's face.

> Mrs. Redmond had a high level of attention. Though frightened to a certain degree, Mrs. Redmond said she was paying attention to the faces of all three intruders in the house. She was not just a casual observer of defendant, but rather her attention was focused on the suspect. *See State v. Ware*, 113 Ariz. 337, 554 P.2d 1264 (1976).

> The accuracy of Mrs. Redmond's description was hotly contested at trial, with the defense arguing that Mrs. Redmond's first description of her assailants indicated that three black men, two of whom were masked, were the murderers. Regarding the reference to three black males, we believe the evidence shows that, at the scene, Mrs. Redmond initially said all three men were black, but that she corrected herself, saying, "no, one was white." The

- 47 -

record supports the inference that this discrepancy was caused by difficulties Mrs. Redmond had in communicating immediately following the gunshot wound to her head.

Concerning the masks, it appears by some accounts that Mrs. Redmond initially stated that one or two of the assailants wore masks. Other testimony, however, indicated that Mrs. Redmond never mentioned masks immediately following the crime. Mrs. Redmond herself never recalled mentioning masks, and her testimony indicated that none of the intruders had masks on. Her other initial descriptions of the two black men were not particularly detailed. Examining the totality of the circumstances regarding this factor, we do not find the discrepancies in the descriptions to be per se unreliable.

Mrs. Redmond exhibited a high level of certainty at the time of the pre-trial confrontation. After having viewed Bracy's lineup for the first time, Mrs. Redmond re-entered the viewing room and viewed Hooper's lineup. She then left the room, went to another office, and stated that she was positive the person occupying the third spot in the lineup, defendant, was the assailant. Her level of certainty is highly indicative of reliability.

Mrs. Redmond's identification of defendant came fifty-three days after the crime. Whether the length of time between the crime and the pretrial identification is too long depends upon the facts of each case; there is no *per se* rule. *See State v. Strickland*, 113 Ariz. 445, 556 P.2d 320 (1976) (ten days too long where witness saw attacker for very brief moment and at a point in time where she had no discernible interest in remembering what perpetrator looked like); *State v. McCall*, *supra* (fourteen days not too long where victim had ample opportunity to observe attacker at time of crime and where victim gave detailed description of attacker). In the instant case, in light of Mrs. Redmond's ample opportunity to observe defendant at the time of the crime, her high level of attention at the time of the crime, and her good level of certainty at the lineup, Mrs. Redmond's identification of defendant fifty-three days after the crime was not unreliable.

*Id.*

Discussion

Petitioner's argument as to why the lineup was suggestive is that he was the only person presented with his shirt untucked. (Dkt. 78 at 70-72.) The Arizona Supreme Court made factual findings about the lineup – that there was no significant age disparity nor extraordinary height difference among the participants, and that others in the lineup had unique clothing items. *Hooper*, 145 Ariz. at 544, 703 P.2d at 488. Petitioner has not attempted to overcome these findings with clear and convincing evidence as required by the AEDPA, *see* 28 U.S.C. § 2254(e)(1), and the findings are reasonable based on the state court record, see 28 U.S.C. § 2254(d)(2). There is no requirement that the other persons in the lineup be "nearly identical" to the petitioner. *See United States v. Barron*, 575 F.2d 752, 755

(9th Cir. 1978); *see also Roldan v. Artuz*, 78 F. Supp.2d 260, 271 (S.D.N.Y. 2000) ("police stations are not theatrical casting offices; a reasonable effort to harmonize the lineup is all that is normally required").  Petitioner has failed to establish that the lineup singled him out in a way that made misidentification likely.  *See Montgomery*, 150 F.3d at 992.  Thus, the state court's conclusion that the pretrial identification was not suggestive was not contrary to or an unreasonable application of federal law.

Even if the lineup was somewhat suggestive, the use of the identification did not violate Petitioner's due process rights unless it was unreliable, based on the totality of the circumstances using the factors set forth in *Biggers*, and gave rise to a very substantial likelihood of irreparable misidentification.  409 U.S. at 197; *Brathwaite*, 432 U.S. at 114.  Reliability is the linchpin in determining the admissibility of identification testimony at trial.  *Brathwaite*, 432 U.S. at 114.  Therefore, the habeas court weighs any corrupting effect of a suggestive identification against the *Biggers* factors to resolve reliability.  *Id.*

The Supreme Court has discussed the interplay between state court factfinding utilizing the *Biggers* factors and the ultimate determination regarding the constitutionality of the pretrial identification procedure:

> In deciding this question, the federal court may give different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard.  But the questions of fact that underlie this ultimate conclusion are governed by the statutory presumption [of correctness] as our earlier opinion made clear.  *Thus, whether the witnesses in this case had an opportunity to observe the crime or were too distracted; whether the witnesses gave a detailed, accurate description; and whether the witnesses were under pressure from prison officials or others are all questions of fact as to which the statutory presumption applies.*

*Sumner v. Mata*, 455 U.S. 591, 597 (1982) (emphasis added) (referencing *Sumner v. Mata*, 449 U.S. 539 (1981)).  The statutory presumption applicable here requires this Court to presume the correctness of the state courts' factual findings unless the petitioner rebuts this presumption with "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  The relevant findings by the Arizona Supreme Court are that Redmond had a good opportunity to view Petitioner, had a high level of concentration, was certain about her pretrial identification of Petitioner, and that the discrepancies in her descriptions were due to communication

difficulties created by the gunshot wound she had just suffered. *Hooper*, 145 Ariz. at 544-45, 703 P.2d at 488-89.

With respect to the other factors, less than two months passed between the crime and the identification, which does not taint the reliability in light of the strength of the other factors. *See Barron*, 575 F.2d at 755 (finding two months between the crime and identification not inconsistent with reliability when witness has made no intervening identification of another suspect). Only the discrepancies in Redmond's descriptions weigh against reliability, but as found by the supreme court there is a sound basis to overlook those variances. Additional factors also contributed to the reliability of Redmond's pretrial identification of Petitioner. In *United States v. Field*, 625 F.2d 862, 867 (9th Cir. 1980), the court identified the presence and influence of other witnesses at the pretrial identification procedure and the conduct of government agents tending to focus the witness's attention on the defendant as indicia of unreliability. Neither of those have been established by this record. Redmond was the only witness at the Chicago police station, and she stated on the record that no government agent suggested any identification to her. (RT 8/26/82 at 43-44, 142-43.)

After review of the record, the Court finds that the Arizona Supreme Court's fact finding was not unreasonable. After assessing the totality of the circumstances, this Court concludes that Mrs. Redmond's pretrial identification was reliable and the lineup procedures used with her were not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Therefore, the state court decision denying this claim was not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to relief on Claim 19.

### Claim 20 – Denial of Counsel for Pre-Indictment Lineup

Petitioner contends that following his arrest he requested but was denied counsel prior to a lineup identification procedure, which violated his rights under the Sixth and Fourteenth Amendments. (Dkt. 31 at 64-68.) Respondents contend that Petitioner did not exhaust this claim in state court. (Dkt. 67 at 60.) Petitioner argues that he raised the claim in a *pro se*

supplemental brief as part of his direct appeal.  (Dkt. 78 at 31-32.)  The Court agrees that Petitioner fairly presented Claim 20 to the Arizona Supreme Court.  (*See* Appellant's *Pro Se* Supplemental Br.; Appellee's Supplemental Answering Br.)

Although Petitioner presented this claim on direct appeal, the Arizona Supreme Court did not discuss the merits of this claim.  Because there is no state court disposition, there are no facts or reasoning to defer to under the AEDPA; therefore, this Court reviews *de novo* the merits of this claim.  *Smith v. Digmon*, 434 U.S. 332, 332-33 (1978) (claim squarely raised but not addressed by state court is exhausted); *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (stating that *de novo* review, rather than the AEDPA deferential standard, is applicable to a claim that the state court did not reach on the merits).

As previously outlined in Claim 19, Petitioner and Bracy were arrested in Chicago on February 20, 1981.  On February 22, police agencies from Arizona flew Marilyn Redmond to Chicago to view a lineup of the suspects.  (RT 8/26/82 at 21-27.)  In August 1981, Petitioner was formally indicted in Arizona for the Redmond/Phelps homicides.  (ROA 1.)

In *United States v. Wade*, 388 U.S. 218, 237 (1967), the Court established that an accused is entitled to counsel at a post-indictment pretrial lineup because it is a critical stage in a criminal proceeding constituting a trial-like confrontation requiring the assistance of counsel.  Subsequently, in *Kirby v. Illinois*, 406 U.S. 682 (1972), the Court refused to extend the Sixth Amendment right to counsel to pre-indictment lineups.  The Court concluded that pre-indictment lineups are sufficiently protected by the Fifth and Fourteenth Amendment's Due Process Clause, which forbids admission of a pre-trial lineup identification that is unnecessarily suggestive and conducive to irreparable mistaken identification.  *Id.* at 691. The *Kirby* Court reasoned that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversarial proceedings have been initiated against him, whether by way of formal charges, preliminary hearing, indictment, information or arraignment.  *Id.* at  688-89; *see also United States v. Gouveia*, 467 U.S. 180, 188 (1984).

Because the lineup at issue was pre-indictment, Petitioner's right to counsel did not attach for this proceeding; Petitioner's constitutional rights were not infringed by lack of

counsel and he is not entitled to habeas relief for Claim 20.

### Claim 22 – Improper Impeachment of Defense Witness

Petitioner contends that his defense witness, Michael Wilson, was improperly impeached with a prior felony conviction and because he used an alias.  (Dkt. 31 at 69.)  Respondents contend, and Petitioner concedes, that Claim 22 was not exhausted as a federal claim in state court.  (Dkt. 67 at 63; Dkt 78 at 32.)

If Petitioner were to return to state court now and attempt to litigate this claim, it would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it does not fall within an exception to preclusion.  *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h).  Therefore, this claim is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy.  *Coleman*, 501 U.S. at 732, 735 n.1.  Claim 22 will not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice, which Petitioner does not attempt to establish.  Claim 22 is procedurally barred.

### Claim 23 – Comment on Failure to Testify

Petitioner alleges that, during closing argument, the prosecutor indirectly commented on Petitioner's failure to testify in violation of his Fifth and Fourteenth Amendment rights. (Dkt. 31 at 69-70.)  Respondents concede that this claim is exhausted and entitled to merits review.  (Dkt. 67 at 64.)

Background

The relevant closing argument by the prosecution is as follows:

[PROSECUTOR] MR. BROWNLEE: In conclusion, this case deals with greed, it deals with power, it deals with money, all the things which are superior in and supreme to human life. The state also seeks justice, not by sympathy, but by evidence. You heard the evidence. You know what it is. You know what kind of justice on New Year's Eve Patrick Redmond, Helen Phelps and Marilyn Redmond had. They had no jury. *They had a limited right to speak--*

MR. REMPE: Your Honor, would you note my objection as to that?

THE COURT: Yeah. Mr. Brownlee is reminded also.

MR. BROWNLEE: I'm referring to --

THE COURT: Mr. Brownlee, you hear what I said?

MR. BROWNLEE: Certainly.

THE COURT: Okay.

MR. BROWNLEE: Mrs. Redmond told you what happened there. You have heard it called a tragedy. A tragedy is an avalanche, a snowfall, an earthquake. It's not something planned. It was planned. It was intentional. It was brutal.

You have the evidence, you have a duty. You have a duty to stand up and speak individually for the victims that evening. Mrs. Phelps risked her life when she tried to protect something sacred, her wedding ring, and yet she was forced to give it up just as she was forced to give up her life.

There is no doubt in this case. You heard about reasonable doubt. Is there a reason to acquit these two gentlemen? There is not. There is no reason. They are guilty beyond a reasonable doubt of each of those offenses. We ask you to find them guilty as charged. Thank you.

(RT 12/21/82 at 175-76.)

The trial court denied Petitioner's motion for a mistrial explaining that the prosecutorial comments were ambiguous and not susceptible of a singular interpretation, meaning that the prosecution was not necessarily pointing a finger at either or both the defendants for not taking the stand.  (*See* RT 12/22/82 at 22-23.)  On direct appeal, the Arizona Supreme Court found "no violation of defendant's fifth amendment rights because we do not think the language was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify." *Hooper*, 145 Ariz. at 548, 703 P.2d at 492.

Discussion

The Fifth Amendment prohibits a prosecutor from commenting to the jury about a defendant's failure to testify at trial.  *See Griffin v. California*, 380 U.S. 609, 615 (1965).  "[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.*  The *Griffin* Court held that it was error to instruct a jury that a defendant's decision not to testify carried an adverse inference regarding his silence on matters for which he had personal knowledge. *Id.* at 614.   The Ninth Circuit evaluates potential *Griffin* error by asking "whether the

language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify."[17]  *See Cook v. Schriro*, 516 F.3d 802, 822 (9th Cir. 2008); *see also Hayes v. United States*, 368 F.2d 814, 816 (9th Cir. 1966) (establishing the Ninth Circuit test for *Griffin* error).

Petitioner's argument is that the prosecutor indirectly commented on his right to remain silent and his right not to testify at trial by comparing his trial to the murder scene. (Dkt. 31 at 69-70.) The Court disagrees. The prosecutor's singular indirect comment about the victims' limited right to speak on the night of the crime was not manifestly intended to call attention to the defendant's failure to testify or to count it against him. *Cf. United States v. Altavilla*, 419 F.2d 815, 816-17 (9th Cir. 1969) (concluding that the prosecutor's comments called attention to the defendant's failure to testify). Further, there is no *Griffin* error because the prosecutor did not suggest to the jury that Petitioner's failure to testify implied guilt. *See Portuondo v. Agard*, 529 U.S. 61, 69 (2000).

Even if the prosecutorial comment was construed as error, it was harmless. *See Cook*, 516 F.3d at 820. Relief is to be granted on a *Griffin* claim only "where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987) (quoting *United States v. Kennedy*, 714 F.2d 968, 976 (9th Cir. 1983)); *see Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993). Here, the comment was indirect and not extensive, there was no inference of guilt stressed to the jury and the evidence against Petitioner did not support acquittal; rather, the evidence substantially supported guilt. Thus, the state court's decision denying relief was not contrary

---

[17]     Under the AEDPA, the Seventh Circuit has concluded that *Griffin* error does not encompass a prosecutor's indirect comment about a defendant's failure to testify. *See Yancey v. Gilmore*, 113 F.3d 104, 106-07 (7th Cir. 1997) (stating that *Griffin* prohibited only "direct" prosecutorial references to the defendant's failure to testify; *Griffin* did not reach the issue of whether a prosecutor may comment on the evidence in such a way that indirectly refers to a defendant's silence). However, applying the AEDPA, the Ninth Circuit utilizes the standard that it adopted in *Hayes*, which includes and evaluates indirect prosecutorial comment. *See Cook v. Schriro*, 516 F.3d 802, 822 (9th Cir. 2008).

to or an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief on Claim 23.

### **Claim 24 – Jury Instruction Due Process Violation**

Petitioner contends that his due process right to a fair trial was violated because the judge did not define reasonable doubt for the jury prior to deliberations.  (Dkt. 31 at 70-71.) Petitioner further contends that when the jury asked for a definition, the judge provided an unconstitutional one.  (*Id.*)  Respondents contend that Petitioner only raised this claim as a state law issue on direct appeal.  (Dkt. 67 at 66-67.)  Regardless of whether Claim 24 was exhausted on direct appeal, it is meritless.  *See* 28 U.S.C. § 2254(b)(2).

Background

On December 21, 1982, following closing argument, the trial court instructed the jury. The trial court only addressed reasonable doubt as follows:  "The state must prove the defendants guilty beyond a reasonable doubt.  If the evidence is susceptible of two equally reasonable interpretations, one of the defendant's guilt and the other of his innocence, it is your duty to adopt the interpretation of innocence."  (RT 12/21/82 at 180-81.)

On December 23, 1982, the following occurred with all counsel present in the trial court's chambers:

> THE COURT:  The Court has received a question from the jury and I will read it: Quote, can you provide us with the court's definition of reasonable doubt? . . . All counsel have had the chance to review the question.  The Court has indicated preliminarily that its response should be or will be that they have been provided with all of the instructions on the rules of law applicable in this matter, and among those instructions is a definition of reasonable doubt. Please review those instructions and you will find the Court's definition of reasonable doubt among them.

> [PROSECUTOR] MR. JONES:  How about "Please review all of those instructions"?

> THE COURT:  Yeah, please review all of those instructions and you will find the Court's definition of reasonable doubt amongst them.

> MR. JONES:  I don't have any problem with that.

> MR. WOODS:  That's fine.

> MR. REMPE:  I have no problem with that.

(RT 12/23/82 at 41-42; *see also* ROA 1065.)

Because the instructions did not in fact include a definition of reasonable doubt the jury sent another request for a definition.  (RT 12/23/82 at 66-67.)  The court gave an additional instruction, defining reasonable doubt as follows:

> The state must prove the defendants guilty beyond a reasonable doubt. Reasonable doubt means a doubt based upon reason. It is not an imaginary or possible doubt. It is a doubt for which a reason can be given, arising out of an impartial consideration of the evidence or lack of evidence.

(*Id.* at 52.)  The trial court also gave its earlier instruction that touched on reasonable doubt:

> The state must prove the defendants guilty beyond a reasonable doubt. If the evidence is susceptible of two equally reasonable interpretations, one of the defendant's guilt and the other of his innocence, it is your duty to adopt the interpretation of innocence.

(*Id.* at 52-53.)

Subsequently, counsel for Petitioner moved for mistrial:

> The record should reflect that I believe this jury . . . sent out a request, a question asking the court what the court's definition of reasonable doubt was and the court sent back an answer that they should refer to their court's instructions. They almost immediately sent back their response which was in the form of a packet of instructions which we found did not include the reasonable doubt instruction. It is now apparent from the transcript and the record will reflect that this jury was not instructed on reasonable doubt despite the fact it was the intention of the court and the intention of all parties as reflected in our discussion on the instructions.

(*Id.* at 66-67.)  Counsel argued that because the jury had been deliberating for eleven hours without a definition of reasonable doubt that such deliberations were prejudicial and he was entitled to a mistrial.  (*Id.* at 66-71.)  The trial court denied the motion.  (*Id.* at 70-71.)

On direct appeal, the Arizona Supreme Court upheld the trial court's disposition:

> Next, defendant argues that the trial court committed reversible error by failing to provide the jury a definition of reasonable doubt until eleven hours after deliberations began. Though the court had intended to do so, it failed to give either a written or verbal definition of reasonable doubt. When the court realized its oversight, it reassembled the jury and read all the instructions, adding the reasonable doubt definition both verbally and in written form. The next day, the jury returned its verdicts. We find no error.
>
> First, though the trial court must always instruct the jury that the prosecution must prove its case beyond a reasonable doubt, there is no requirement that a trial court define reasonable doubt for the jury. The court, however, may do so if it sees fit. *State v. Hatton*, 116 Ariz. 142, 568 P.2d 1040 (1977); *State v. Canedo*, supra; *see also United States v. Miller*, 688 F.2d 652

1    (9th Cir.1982); *United States v. Witt,* 648 F.2d 608 (9th Cir.1981). Thus, even
2    the total failure to define reasonable doubt could not have resulted in reversal.
     Second, the trial court eventually defined reasonable doubt for the jury, giving
     it both an appropriate written and verbal definition.

3    *Bracy*, 145 Ariz. at 535, 703 P.2d at 479.

4        Discussion

5        "The beyond a reasonable doubt standard is a requirement of due process, but the

6    Constitution neither prohibits trial courts from defining reasonable doubt nor requires them

7    to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (citing *Hopt v.*

8    *Utah*, 120 U.S. 430, 440-41 (1887)). "[S]o long as the court instructs the jury on the

9    necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution

10   does not require that any particular form of words be used in advising the jury of the

11   government's burden of proof. Rather, taken as a whole, the instructions must correctly

12   convey the concept of reasonable doubt to the jury." *Id.* (further citation omitted). Thus, the

13   trial court did not constitutionally err by failing to provide a definition of reasonable doubt

14   prior to deliberations. The Arizona Supreme Court's decision was not contrary to or an

15   unreasonable application of clearly established federal law.

16       The Court further rejects Petitioner's argument that the reasonable doubt instruction

17   given during deliberations was unconstitutional. Petitioner's argument is entirely conclusory

18   as he has not presented any argument regarding the reasonable doubt definition given on

19   December 23; rather, Petitioner focuses only on the December 21 instructions. Petitioner

20   cites *Cage v. Louisana*, 498 U.S. 39 (1990) in support of this claim; however, the 1990 *Cage*

21   decision was not clearly established federal law when Petitioner's conviction became final

22   in January 1986. Even if applicable, *Cage* would not entitle Petitioner to relief. In *Cage*, the

23   Court found unconstitutional a reasonable doubt definition stating that for reasonable doubt

24   to exist, it must be an actual substantial doubt, a "doubt as would give rise to grave

25   uncertainty," and that a finding of guilt required a "moral certainty." 498 U.S. at 40. *Cage*

26   is easily distinguishable; the December 23 instructions did not suggest or indicate, as the

27   *Cage* instructions did, a higher degree of doubt than is required for acquittal under the

28

1    reasonable doubt standard.

2         Based on the foregoing, the Arizona Supreme Court's decision was not contrary to

3    or an unreasonable application of clearly established federal law; Petitioner is not entitled to

4    relief on Claim 24.

5         **Claim 25 – Jury Misconduct**

6         Petitioner contends that constitutional error arose from trial jurors and alternate jurors

7    meeting socially and discussing who was selected as foreman, after closing arguments had

8    been given and the court had sworn in the trial jury.  (Dkt. 31 at 71-72.)  Respondents

9    contend that Petitioner only raised this claim as a state law issue on direct appeal.  (Dkt. 67

10   at 68.)  Petitioner argues that the Arizona Supreme Court overlooked any failure to raise the

11   federal constitutional issues because it grounded its decision in federal constitutional

12   principles.  (Dkt. 78 at 33-34 (citing *Hooper*, 145 Ariz. at 548, 703 P.2d at 492).)  The Court

13   need not resolve the procedural status of Claim 25 because it is meritless.  *See* 28 U.S.C. §

14   2254(b)(2).

15        Background

16        On December 21, 1982, counsel presented closing arguments.  (RT 12/21/82 at 10-

17   176.)  Following the court's reading of the jury instructions, the court announced the four

18   alternate jurors that would be dismissed prior to deliberations.  (*Id.* at 195.)  The jury returned

19   guilty verdicts on December 24.  After his conviction, Petitioner filed a motion for a new trial

20   alleging, in part, juror misconduct.  (ROA 1093.)  The court held a post-trial hearing at which

21   a trial juror and an alternate juror testified.  (RT 2/4/83 at 66-88.)  The jurors testified that

22   after closing argument on December 21, four of them, two alternate and two trial jurors, went

23   out for twenty to thirty minutes for a drink to celebrate a birthday of one of the jurors.  (*Id.*)

24   When asked, the trial jurors identified who had been selected as foreperson.  (*Id.*)  Also, there

25   was some discussion about how alternate jurors were selected.  (*Id.*)  Both the trial juror and

26   the alternate juror emphasized that there was no discussion of the case.  (*Id.*)

27        The trial court determined that, on December 21, the trial jurors selected a foreperson

28   within ten to fifteen minutes and then were dismissed for the night, deliberations to commence

on the morning of the 22nd.  (*Id. at* 91-92.)  Because no deliberations had taken place at the time of the social outing, the trial court denied the motion alleging juror misconduct.  (*Id.*)

On direct appeal, the Arizona Supreme Court held as follows,

> In the instant case, we find no abuse of discretion. First, the alternate jurors did not discuss the merits of the case with the members of the final twelve. Second, these discussions occurred prior to the beginning of actual deliberations. Thus, we do not believe any prejudice resulted to defendant. *See State v. Poland,* 132 Ariz. 269, 645 P.2d 784 (1982) (finding of prejudice necessary to reverse case for juror misconduct); *see also State v. Rocco, supra* (no prejudice shown where alternate juror prayed with final jury panel in jury room for one minute prior to beginning of deliberations).

*Hooper*, 145 Ariz. at 548, 703 P.2d at 492.

Discussion

The Sixth Amendment guarantees that the accused shall enjoy the right to trial by an impartial jury and to be confronted with the witnesses against him. *Parker v. Gladden*, 385 U.S. 363, 364 (1966) (per curiam).  Outside influences upon the jury are analyzed for prejudicial impact.  *Id.* at 365.  The ultimate inquiry is whether the intrusion affected the jury's deliberations and thereby its verdict.  *See United States v. Olano*, 507 U.S. 725, 739 (1993) (concluding that the presence of alternate jurors in the jury room during deliberations was not presumptively prejudicial). The Constitution does not require a new trial every time a juror has been placed in a potentially compromising situation.  *See Smith v. Phillips*, 455 U.S. 209, 217 (1982).  "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

Here, the trial court concluded that no jury deliberations had taken place when the social gathering occurred between the two trial jurors and two alternate jurors.  (RT 2/4/83 at 91-92.)  As found by the Arizona Supreme Court, there was no discussion of the merits of the case at the social gathering.  These findings are entitled to a presumption of correctness and have not been rebutted.  *See* 28 U.S.C. § 2254(e)(1).  Based on the record, there was no intrusion into the deliberative process of the jury.  Absent intrusion, there was no effect on the jury and no prejudice.  Absent prejudice, Petitioner's constitutional rights were not violated.

*Parker*, 385 U.S. at 365.  Based on the foregoing, the Arizona Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law and Petitioner is not entitled to relief on Claim 25.

### Claim 26 – Prior Convictions

Petitioner alleges that the trial court erred in refusing to allow him to withdraw his waiver of trial by jury on charges that he had prior felony convictions, that were proffered to enhance his sentences on non-capital convictions.  (Dkt. 31 at 72.)  Petitioner claims that his lack of knowledge concerning the effect of the waiver rendered that waiver involuntary in violation of due process.  (*Id.*)  Respondents contend that Petitioner only raised this claim as a state law issue on direct appeal.  (Dkt. 67 at 70.)  The Court agrees with Petitioner (Dkt. 78 at 34) that he fairly presented Claim 26 (Pet'r Opening Br. at 22); it will be reviewed on the merits.

Background

After two and one-half months of trial, on December 24, 1982, the jury returned guilty verdicts against Petitioner and Bracy for conspiracy to commit first degree murder, first degree murder, attempted first degree murder, kidnapping, armed robbery and burglary.  *See Hooper*, 145 Ariz. at 543, 703 P.2d at 487; *Bracy*, 145 Ariz. at 524, 703 P.2d at 468. Following the verdicts, together, Petitioner and Bracy were immediately arraigned on charges that they had prior felony convictions in Illinois.  *See* Ariz. R. Crim. P. 18.1(b), 19.1(b) (1982).

> THE COURT:  [Have] not guilty pleas been entered for either or both of you on the prior convictions?  Do you remember?
>
> MR. REMPE:  I honestly don't, Your Honor.  If they are not guilty pleas my client verbally told me he would waive his right to a jury for the prior felony conviction decision.
>
> [PROSECUTOR] MR. JONES:  Your Honor, Mr. Brownlee doesn't recall them being arraigned on this.  We can proceed with an arraignment.
>
> THE COURT:  Let me proceed with the arraignment and then set this, recess the trial and reset it down the road, unless we are going to get admissions.
>
> MR. WOODS:  No.

> THE COURT:  If we are not going to get admissions, not try them without a jury, then I'll reset it on the trial on the priors down the road.  Okay, approximately ten days to two weeks okay?  So let's take arraignments now at this time.

(RT 12/24/82 at 84-85.)  After the trial court arraigned Bracy and entered a not guilty plea on allegations of prior felony convictions in Illinois, the following colloquy occurred regarding waiver of trial by jury:

> MR. JONES:  While Mr. Bracy is standing in front of the Court, could we have a waiver from his mouth as to a right to trial by jury on an allegation of prior conviction?

> THE COURT:  Okay, I'll get it from both of them at the same time.  [Mr. Bracy's] counsel has stated on the record, but I will get it from him also.

(*Id.* at 86-87.)  Before discussing waiver of trial by jury with both Bracy and Petitioner, the trial court arraigned Petitioner, entered a not guilty plea, and then addressed both defendants:

> THE COURT:  Now from each of the defendants, the Court desires at this time to have on the record the fact that they both will waive a trial by jury on allegation of prior convictions and allow the Court to proceed on those matters, sitting as both the factfinder and the legal judge on it.  Mr. Bracy?

(*Id.* at 87-88.)  Defendant Bracy decided to admit his prior felony convictions.  (*Id.*)  The trial court then addressed Petitioner:

> THE COURT:  Okay, Mr. Woods, I need to set a trial date in your matter.

> MR. WOODS:  Yes, we do.

> THE COURT:  Okay, it's ordered setting the matter, State of Arizona versus Murray Hooper for trial on the prior convictions, and Mr. Hooper, you still indicate that you desire to waive the jury in your matter?

> DEFENDANT HOOPER:  Yes, I decided to waive the jury, but I want the trial on the priors.

> THE COURT:  Okay, fine, no problem.  We will set the trial in that matter for January 6, at  1:30 . . . Is there anything also to come before the Court at this time?

(*Id.* at 89.)  At this juncture, Defendant Bracy changed his mind and asked the court if he could withdraw his admission of prior convictions.  The trial court allowed Bracy to withdraw his admission and to have a trial on his prior convictions.  (*Id.* at 90-91.)  The trial court then entered its order that Petitioner and Bracy waived trial by jury on the allegations of prior

1   felony convictions.  (*Id.*; ROA 1070.)

2       On January 5, 1983, Petitioner moved to withdraw his waiver, asking the court for trial

3   by jury on his prior felony convictions.  (ROA 1081.)  On January 6, Petitioner testified in

4   support of his motion and was cross-examined about his earlier decision to waive a jury:

5           MR. BROWNLEE:  Let me make sure I understand what you're telling
            us.  At the time that you waived your right to a trial by jury on December 24th,
6           no one threatened you or forced you into waiving your trial did they?

7           DEFENDANT HOOPER:  No, I was not threatened. . . .

8           MR. BROWNLEE:  And no one made any promises to you or told you
            you had to waive your right to a trial by jury, did they?

9
            DEFENDANT HOOPER:  No, I was advised to waive my rights.
10
            MR. BROWNLEE:  Who were you advised by?
11
            DEFENDANT HOOPER:  Mr. Woods.
12
            MR. BROWNLEE:  Did he explain to you that you did have a right to
13          a trial by jury? . . .

14          DEFENDANT HOOPER:  Sure.

15          MR. BROWNLEE:  And Mr. Hooper, you know what a right to a trial
            by a jury is, don't you? . . .
16
            DEFENDANT HOOPER:  Yes.
17
            MR. BROWNLEE:  And you have, based on your prior experiences with
18          a jury trial that just concluded on December 24th, you knew that in a jury trial
            the jury would be the triers of fact, not the judge, is that correct?
19
            DEFENDANT HOOPER:  Yes.
20
    (RT 1/6/83 at 10-11.)  Based on the foregoing, the trial court denied the motion, concluding

21  that Petitioner had validly waived his right to trial by jury on prior felony convictions.  (*Id.*

22  at 24; ROA 1082.)  The court then conducted the trial on Petitioner's and Bracy's prior felony

23  convictions.  (RT 1/6/83 at 24-47.)  Based on the record presented during trial, the court

24  concluded that the prosecution had proven the validity of Petitioner's prior felony convictions.

25  (ROA 1086.) (*See supra* Claim 17.)

26      On direct appeal, the Arizona Supreme Court concluded:

27          The trial court properly denied defendant's motion to withdraw the
28          waiver. First, the waiver was voluntary. Defendant admitted that no force or

threats were used against him to extract the waiver. Further, the trial judge fully explained the rights attendant to a jury trial. Though the court never explained that a finding of priors would enhance punishment, such information was irrelevant to defendant's decision. The effect of a waiver of the jury trial was only that the trial court and not the jury would determine the matter; waiver has no effect on enhancement. The trial court provided defendant with sufficient information with which to make an intelligent waiver. *See State v. Butrick,* 113 Ariz. 563, 558 P.2d 908 (1976).

*Hooper*, 145 Ariz. at 548-49, 703 P.2d at 492-93.

<u>Discussion</u>

Petitioner had a right to trial by jury on allegations of prior felony convictions to determine, not guilt or innocence of the prior crimes, but merely the truth or falsity of the fact of the prior convictions. *See State v. Gilbert*, 119 Ariz. 384, 385, 581 P.2d 229, 230 (1978). The right to trial by jury is a constitutional right protected by the Sixth Amendment. *See Adams v. United States*, 317 U.S. 269, 275 (1942); *see also Johnson v. Zerbst*, 304 U.S. 458 (1938). Constitutional rights, though, are subject to waiver. *Johnson*, 304 U.S. at 464. A waiver is an intentional relinquishment or abandonment of a known right or privilege, a matter which depends upon the particular facts and circumstances surrounding that case. *Id.* The right to trial by jury may be waived when the waiver is knowing, voluntary and intelligent. *Adams*, 317 U.S. at 275.

Petitioner argues that his waiver was not knowing or voluntary because the trial judge did not inform him that proof of his prior convictions would enhance the sentence he received for his non-capital convictions. (Dkt. 31 at 72.) There is both state and federal law to support the proposition that trial courts must make a record that a defendant has been advised of the sentencing range before waiving his right to trial and entering a plea of guilty. *See Boykin v. Alabama*, 395 U.S. 238 (1969); *State v. Avila*, 127 Ariz. 21, 25, 617 P.2d 1137, 1141 (1980). The Court disagrees with Petitioner's contention that waiver of trial by jury in this case is tantamount to a guilty plea, invoking the requirements of *Boykin*. *See Butrick*, 113 Ariz. at 566-67, 558 P.2d at 911-12 (noting that a jury waiver is not equivalent to a guilty plea to which additional protections attach). Petitioner's waiver of trial by jury had no impact or effect on whether his non-capital convictions would be subject to enhancement, it only

- 63 -

1   established that the judge would be the fact-finder.  *Id.*

2   The Arizona Supreme Court found that Petitioner knew and understood that he was

3   choosing to have the trial court, rather than a jury, decide whether the allegations of prior

4   felony convictions had been proven beyond a reasonable doubt.  *See Hooper*, 145 Ariz. at

5   548-49, 703 P.2d at 492-93.  The supreme court also found that no force or threats were used

6   against him to extract the waiver.  *Id.*  The Court concludes that the supreme court did not

7   unreasonably determine the facts in light of the evidence presented in state court.  *See* 28

8   U.S.C. § 2254(d)(2).  Based upon these facts, the supreme court concluded that Petitioner

9   constitutionally waived his right to trial by jury on his prior felony convictions.  *See Hooper*,

10  145 Ariz. at 548-49, 703 P.2d at 492-93.  While the waiver colloquy between the judge and

11  the Petitioner could have been more extensive, the particular facts of this case support the

12  conclusion that the Petitioner made a knowing and voluntary waiver.  All matters were

13  discussed in the presence of his counsel, and it is clear that he had discussed the matter with

14  his attorney.  In the end, Petitioner adequately understood his right to have a jury determine

15  if he was the individual in those convictions, and he knowingly and voluntarily waived those

16  rights and agreed to have the matters determined by the judge without a jury.  Thus,

17  Petitioner, with the assistance of counsel, knowingly, intelligently and voluntarily waived his

18  right to trial by jury on his prior felony convictions.  (RT 12/24/82 at 89; ROA 1070.)

19  Therefore, pursuant to 28 U.S.C. § 2254(d)(1), the Arizona Supreme Court's decision is not

20  contrary to or an unreasonable application of Supreme Court precedent.  Petitioner is not

21  entitled to relief on Claim 26.

22  **Claim 27 – Non-Capital Sentencing**

23  Petitioner contends that his sentencing on certain non-capital counts violated the

24  Constitution because the trial court arbitrarily found that he was a dangerous, repetitive

25  offender.  (Dkt. 31 at 72-73.)  Respondents answer that this claim was raised only as a state

26  law issue in state court.  (Dkt. 67 at 72.)  The Court agrees.

27  On direct appeal, Petitioner raised Claim 27 as a state law violation, asking that he be

28  resentenced on certain non-capital counts.  (Opening Br. at 24.)  Because Petitioner did not

alert the state court that he was alleging a specific federal constitutional violation, the claim was not fairly presented. *See Casey*, 386 F.3d at 913.  In turn, the Arizona Supreme Court's resolution of the claim had no basis in federal constitutional law. *See Hooper*, 145 Ariz. at 550, 703 P.2d at 494.

Petitioner contends that, regardless of presentation, this claim was exhausted by the supreme court's independent review of his capital sentence. (Dkt. 78 at 35.)  The Arizona Supreme Court's independent sentencing review applies only to death sentences. *See Gretzler*, 135 Ariz. at 54, 659 P.2d at 13 (stating that the purpose of independent review is to assess the presence or absence of aggravating and mitigating circumstances and the weight to give to each); *State v. Brewer*, 170 Ariz. 486, 493-94, 826 P.2d 783, 790-91 (1992) (reviewing the record regarding aggravation and mitigation findings to ensure compliance with Arizona's death penalty statute, and deciding independently whether the death sentence should be imposed); *Blazak*, 131 Ariz. at 604, 643 P.2d at 700.  Thus, this claim was not fairly presented, and it was not exhausted by the Arizona Supreme Court's review of the claim or independent sentencing review.

If Petitioner were to return to state court now and attempt to litigate this claim as a federal constitutional issue, it would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it does not fall within an exception to preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h).  Therefore, this claim is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *Coleman*, 501 U.S. at 732, 735 n.1.  Claim 27 will not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice, which Petitioner does attempt to establish.  Claim 27 is procedurally barred.

### Claim 28 – *Sua Sponte* Severance

Petitioner contends that the trial court should have *sua sponte* severed his trial from that of co-defendant Bracy because (1) the incompetence of Bracy's trial attorney, Stephen Rempe, had a spillover effect upon Petitioner's alibi defense, and (2) due to Bracy's criminal history of escape, the trial court decided to shackle both of them for trial. (Dkt. 31 at 73-74;

1   Dkt. 78 at 35, 78.)  The parties contest exhaustion.  (Dkt. 67 at 74; Dkt. 78 at 35.)

2           In his second PCR petition, Petitioner argued that the spillover effect from Rempe's

3   ineffectiveness was devastating to his alibi defense.  (ROA 1626 at 2.)  However, Petitioner

4   did not allege that the trial court *sua sponte* should have ordered severance on any grounds.

5   (*Id.* at 2, 18; ROA 1721 at 42-47.)  Based upon a review of the state court record, the Court

6   concludes that Petitioner did not fairly present and exhaust a claim that the trial court erred

7   in failing to *sua sponte* sever the trials.[18]

8           If Petitioner were to return to state court now and attempt to litigate Claim 28, it would

9   be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of

10  Criminal Procedure because it does not fall within an exception to preclusion.  *See* Ariz. R.

11  Crim. P. 32.2(b); 32.1(d)-(h).  Therefore, it is "technically" exhausted but procedurally

12  defaulted because Petitioner no longer has an available state remedy.  *Coleman*, 501 U.S. at

13  732, 735 n.1.  Claim 28 will not be considered on the merits absent a showing of cause and

14  prejudice or a fundamental miscarriage of justice, which Petitioner does attempt to establish.

15  Claim 28 is procedurally barred.

16          **Claim 29 – (F)(1) Aggravating Circumstance**

17          Petitioner contends that the state courts did not find the A.R.S. § 13-703(F)(1)

18  aggravating circumstance beyond a reasonable doubt and that the trial court unconstitutionally

19  double-counted his prior murder convictions in support of two aggravating circumstances.

20  (Dkt. 31 at 74-75.)  Petitioner asserts that this claim was exhausted by virtue of the supreme

21  court's independent sentencing review.  (Dkt. 78 at 10-20.)  Regardless of exhaustion, this

22  claim is meritless.  *See* 28 U.S.C. § 2254(b)(2).

23          Petitioner first argues that the trial court did not properly find this aggravating

24  circumstance because it did not specify that it found the existence of the circumstance beyond

25          [18]     Even if these arguments were considered on the merits, Petitioner would not

26  be entitled to relief.  The Court has already concluded that Petitioner was not prejudiced by

27  Rempe's conduct during Petitioner's joint trial with Bracy.  *See supra* Claim 3.  Further, the

28  Court concluded that the trial court was justified in shackling Petitioner at trial.  *See supra*
    Claims 8 and 12.

a reasonable doubt.  At the time of Petitioner's sentencing, a judge determined the existence of aggravating circumstances, A.R.S. § 13-703(B) (1983), which had to be established beyond a reasonable doubt, *see State v. Jordan*, 126 Ariz. 283, 286, 614 P.2d 825, 828 (1980).  Judges "are presumed to know the law and to apply it in making their decisions." *Walton*, 497 U.S. at 653.  Additionally, the Arizona Supreme Court found the (F)(1) aggravating circumstance when it independently reviewed the record and upheld Petitioner's sentence. *Hooper*, 145 Ariz. at 550, 703 P.2d at 494.  This Court also presumes that the Arizona Supreme Court properly applied state law and found that the circumstance existed beyond a reasonable doubt. *See Woratzeck v. Stewart*, 97 F.3d 329, 335-36 (9th Cir. 1996); *Clark v. Ricketts*, 958 F.2d 851, 860 n.6 (9th Cir. 1991).  This portion of Petitioner's claim is without merit.

Next, Petitioner argues that the supreme court erred in concluding that the (F)(1) aggravating circumstance was properly established because it utilized his prior convictions for murder in Illinois to establish both the (F)(1) and the (F)(2) aggravating circumstances. (Dkt. 31 at 75.)  Petitioner's argument is factually erroneous.  The Arizona Supreme Court used Petitioner's Illinois convictions for murder to establish the (F)(1) aggravating circumstance; the court used Petitioner's Illinois convictions for armed robbery and aggravated kidnapping to establish the (F)(2) aggravating circumstance. *See Hooper*, 145 Ariz. 538 at 550, 703 P.2d at 494.  Thus, Petitioner's double-counting argument is without merit.

Finally, Petitioner argues that his prior murder convictions upon which this aggravating circumstance is based are convictions that may be found invalid by the Illinois courts.  Petitioner raised this same argument in Claim 16 and the Court rejected it.  (Dkt. 114.)  Petitioner is not entitled to relief on Claim 29.

### Claim 30 – (F)(2) Aggravating Circumstance

Petitioner contends that the state courts improperly found the existence of the

A.R.S. § 13-703(F)(2) aggravating circumstance.[19]  (Dkt. 31 at 75-80; Dkt. 78 at 81-86.)

Specifically, Petitioner argues that the state court erred in failing to consider the statutory

definitions of Petitioner's prior felonies when deciding the existence of the (F)(2) aggravating

circumstance and that there was insufficient evidence of his prior convictions to support the

(F)(2) finding.   (Dkt. 78 at 82-86.)   Rather than resolve the parties' dispute over the

procedural status of this claim, the Court finds it judicially expedient to reach and deny the

merits of this claim. *See* 28 U.S.C. § 2254(b)(2).

Background

At the time of Petitioner's crime, the (F)(2) aggravating circumstance existed if the

"defendant was previously convicted of a felony in the United States involving the use or

threat of violence on another person." The Arizona courts defined "violence" as the "exertion

of any physical force so as to injure or abuse." *See State v. Arnett*, 119 Ariz. 38, 51, 579 P.2d

542, 555 (1978). When assessing the existence of the (F)(2) factor, the sentencer looks only

to whether the previous offense by its statutory definition involves violence. *See State v.

Gillies*, 135 Ariz. 500, 511, 662 P.2d 1007, 1018 (1983). The court may take judicial notice

that certain offenses were, by definition, violent felonies against others. *See State v.

Romansky*, 162 Ariz. 217, 227, 782 P.2d 693, 703 (1989); *State v. Nash*, 143 Ariz. 392, 404,

694 P.2d 222, 234 (1985).

At sentencing, the State presented evidence establishing that Petitioner had been

convicted of six prior felonies in Illinois, three counts of armed robbery and three counts of

aggravated kidnapping. (RT 1/6/83 at 32-47.) To confirm that the convictions involved the

use or threat of violence against others, the prosecution provided and the trial court accepted

the Illinois statutory citation for the crimes. (RT 2/4/83 at 93-96.) The prosecution and

counsel for Petitioner agreed that citation to the Illinois statutes was sufficient to present the

substance of these crimes to the judge for consideration as (F)(2) aggravation:

---

[19] To the extent this claim is based on Petitioner's argument that the state courts failed
to find the aggravating circumstance beyond a reasonable doubt, it is rejected for the reasons
discussed as to Claim 29.

PROSECUTOR: We have the Illinois statutes that spell out and I believe would show to the Court that they do involve the use or threat of use of violence.

DEFENSE COUNSEL: We have no objection to just having the statute submitted.

(RT 2/4/83 at 94.)   In the Special Verdict, the trial court found the (F)(2) aggravating circumstance established by Petitioner's three prior felony convictions for armed robbery and three felony convictions for aggravated kidnapping.  (ROA 1116.)

In performing its independent review of the record to determine the existence of the aggravating circumstance, the Arizona Supreme Court held as follows:

> We also find the existence of A.R.S. § 13-703(F)(2) that "defendant was previously convicted of a felony in the United States involving the use or threat of violence on another person." On September 23, 1981 judgment was entered against defendant in Cook County, Illinois on three counts of armed robbery and three counts of aggravated kidnapping. We take judicial notice that all these crimes involve the use or threat of violence against others. *See State v. Nash, supra*.

*Hooper*, 145 Ariz. at 550, 703 P.2d at 494.

Discussion

The Supreme Court holds that the appropriate standard of federal habeas review of a state court's application of an aggravating circumstance is the "rational factfinder" standard; i.e., "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found" the aggravating factor to exist. *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Federal habeas review is limited to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. *Id*.

Petitioner challenges the fact that the state did not present copies of the statutes to the state court, thereby not meeting its burden of proof that the convictions were for crimes of violence.  Based upon the record presented to the trial court and the statutory definition of Petitioner's offenses, a reasonable fact finder could have determined that his prior convictions for armed robbery were crimes of violence as required by § 13-703(F)(2). The record establishes that Petitioner was convicted of, and judgment was entered on, three counts of armed robbery.  (RT 1/6/83 at 32-47.)  By definition, the offense of robbery is committed

"when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force."  Ill. Comp. Stat. Ch. 38, § 18-1 (1981).  By statutory definition, a person commits armed robbery "when he or she violates Section 18-1 while he or she carries on or about his or her person, or is otherwise armed with a dangerous weapon." *Id.*, § 18-2.  Because the statutory definitions are not in question, Petitioner's argument that the State failed to meet its burden because it did not submit copies of the Illinois statutes is meritless.  In sum, it was not arbitrary for the Arizona courts to conclude that Petitioner's conviction qualified as a "felony in the United States involving the use or threat of violence on another person" supporting the existence of § 13-703(F)(2).  Because Petitioner's three prior convictions for armed robbery support the existence of the (F)(2) aggravating circumstance, the Court need not continue to evaluate Petitioner's other felony convictions. *See State v. Ramirez*, 178 Ariz. 116, 130, 871 P.2d 237, 251 (1994) (one of two prior convictions, "standing alone, is sufficient to support the court's finding of an aggravated circumstance under § 13-703(F)(2)").

With respect to Petitioner's assertion that the trial court's admission of the prior convictions was erroneous under state evidentiary law, the Court reiterates that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (federal court's habeas powers do not allow it to grant relief simply because it believes the trial court incorrectly interpreted the rules of evidence).  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution or laws of the United States. *Id*.  Therefore, the federal court must only determine whether the alleged error of state law "so infused the proceeding with unfairness as to deny due process of law." *Id*. at 75; *see Jammal v. Van deKamp*, 926 F.2d 918, 920 (9th Cir. 1991) ("The issue is not whether introduction of [the evidence] violated state evidentiary principles, but whether the trial court committed an error which rendered the trial so arbitrary and fundamentally unfair that it violated federal due process") (quoting *Reiger v. Christensen*, 789 F.2d 1425, 1430 (9th Cir. 1986)).

Even if the trial court erred in its admission of the records of Petitioner's prior felony

convictions, the Court finds that the error did not deny Petitioner due process of law or render the proceedings fundamentally unfair. The fact that the trial court reviewed documentary evidence, the authenticity and import of which were not subject to reasonable dispute, did not "violate 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352 (1990) (defining the "category of infractions that violate 'fundamental fairness' very narrowly") (citing *United States v. Lovasco*, 431 U.S. 783, 790 (1977)). The Arizona Supreme Court reasonably determined that the convictions presented were prior felonies involving violence and constituted an aggravating factor pursuant to § 13-703(F)(2). Petitioner is not entitled to habeas relief on Claim 30.

### Claim 31 – (F)(5) Aggravating Circumstance

Petitioner contends that A.R.S. § 13-703(F)(5), the pecuniary gain aggravating circumstance, is unconstitutionally vague. (Dkt. 31 at 80-83.) Petitioner further contends that this aggravating circumstance was erroneously found due to unconstitutional double-counting.[20] Specifically, Petitioner claims it was error for the state to use the factual basis of robbery to substantiate the finding of guilt for felony murder and also to substantiate the finding of the (F)(5) aggravating circumstance. (*Id.*) Rather than resolve the parties' dispute over the procedural status of this claim, the Court finds it judicially expedient to reach and deny the merits of this claim. *See* 28 U.S.C. § 2254(b)(2).

The Ninth Circuit has expressly rejected the argument that § 13-703(F)(5) is unconstitutionally vague. *Poland v. Stewart*, 117 F.3d 1094, 1098-1100 (9th Cir. 1997); *Woratzeck*, 97 F.3d at 334-35. As the *Woratzeck* court explained, factor (F)(5) is constitutionally permissible because it "is not automatically applicable to someone convicted of robbery felony-murder"; the factor therefore "serves to narrow the class of death-eligible persons sufficiently." 97 F.3d at 334. Moreover, as the Arizona Supreme Court has noted, the pecuniary gain aggravating circumstance "does not apply in every situation where an

---

[20]    Petitioner also argues that the A.R.S. § 13-703(F)(5) aggravating circumstance was not found beyond a reasonable doubt. The Court has already determined that this allegation is meritless. *See supra* Claim 29.

individual has been killed while at the same time the defendant has made a financial gain. It is limited to those situations where 'the defendant committed the offense . . . *in the expectation* of the receipt of anything of pecuniary value.'" *State v. Hensley*, 142 Ariz. 598, 603, 691 P.2d 689, 695 (1984) (quoting *State v. Harding*, 137 Ariz. 278, 296, 670 P.2d 383, 401 (1983) (Gordon, J., specially concurring)).

In addition, the Arizona Supreme Court and the Ninth Circuit have addressed and rejected the argument that § 13-703(F)(5) impermissibly allows the pecuniary gain factor to be counted both as an element of the underlying robbery offense and an aggravating circumstance at sentencing. The Arizona Supreme Court has explained that the "facts necessary to prove a taking of property are not the same facts necessary to prove the motive for murder. Thus, there is no double-counting of an element of robbery when the State proves pecuniary gain as an aggravating factor." *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31; *see State v. Carriger*, 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984) ("the state must prove additional facts to prove the aggravating circumstance of pecuniary gain once it has proved the robbery"). The Ninth Circuit, citing *Greenway*, has similarly held that the (F)(5) factor does not result in double-counting because not every felony murder that occurs in the course of a robbery is motivated by pecuniary gain; therefore, the motivation of pecuniary gain must be proven as a fact in addition to the elements of the underlying crime. *Woratzeck*, 97 F.3d at 334-35. Petitioner is not entitled to relief on Claim 31.

### Claim 32 – (F)(6) Aggravating Circumstance

Petitioner contends that the A.R.S. § 13-703(F)(6) aggravating circumstance is facially vague. (Dkt. 31 at 83-91.) Petitioner also asserts that the state courts applied the (F)(6) aggravating circumstance to the facts of his case in an unconstitutionally arbitrary and capricious manner. (*Id.*) Rather than resolve the parties' dispute over the procedural status of this claim, the Court finds it judicially expedient to reach and deny the merits of this claim. *See* 28 U.S.C. § 2254(b)(2).

First, as addressed in Claim 14, the United States Supreme Court has upheld the (F)(6) aggravating factor against allegations that it is vague and overbroad, rejecting a claim that

1   Arizona has not construed it in a "constitutionally narrow manner." *See Lewis v. Jeffers*, 497

2   U.S. 764, 774-77 (1990); *Walton*, 497 U.S. at 649-56.

3       Second, Petitioner contends there was insufficient evidence to support the trial court's

4   application of the (F)(6) aggravating circumstance to the facts of his case.  (Dkt. 31 at 83-91.)

5   A state court's finding of the existence of an aggravating circumstance is a question of state

6   law.  *See Jeffers*, 497 U.S. at 780.  Therefore, federal habeas review is limited to determining

7   whether the state court's finding was so arbitrary or capricious as to constitute an independent

8   due process or Eighth Amendment violation.  *Id.*  To assess the sufficiency of the evidence

9   in support of the factor, the Court applies the "rational factfinder" standard and asks "whether,

10  after viewing the evidence in the light most favorable to the prosecution, any rational trier of

11  fact could have found" the aggravating factor to exist.  *Id.* at 781 (quoting *Jackson*, 443 U.S.

12  at 319).  "[A] federal habeas court faced with a record of historical facts which supports

13  conflicting inferences must presume – even if it does not appear in the record – that the trier

14  of fact resolved any such conflicts in favor of the prosecution, and must defer to that

15  resolution."  *Jackson*, 443 U.S. at 326.

16      Under Arizona law, the especially cruel, heinous or depraved factor is satisfied by a

17  finding of especial cruelty *or* a finding that the murder is evidenced by especial heinousness

18  or depravity.  *See State v. Beaty*, 158 Ariz. 232, 242, 762 P.2d 519, 529 (1988).  Cruelty is

19  established when the victim is conscious and suffers physical pain or emotional distress at the

20  time of the offense.  *State v. Bible*, 175 Ariz. 549, 604, 858 P.2d 1152, 1207 (1993) (pain or

21  distress may be mental or physical).  The terms heinous and depraved focus upon a

22  defendant's state of mind at the time of the murder as reflected by his words or his actions.

23  *Beaty*, 158 Ariz at 242, 762 P.2d at 529.  The Arizona Supreme Court evaluates five factors

24  to determine whether a defendant's state of mind was heinous or depraved at the time of the

25  murder:  relishing of the murder; infliction of gratuitous violence upon the victim; mutilation

26  of the victim's body; senselessness of the crime; and helplessness of the victim.  *Id.* at 242-43,

27  762 P.2d at 529-30.

28      In finding that the (F)(6) aggravating circumstance had been established, the Arizona

1  Supreme Court held:

2      In analyzing the instant facts we quote from *State v. McCall, supra,* whose
       identical facts and analysis are applicable here.

3      "The Redmonds and Mrs. Phelps were herded about the Redmond home at
4      gunpoint by three men. After giving up their valuables, they were forced to lie
       down on a bed, had their hands taped behind their backs, and were gagged with
5      socks. They knew that their captors were armed. [In addition, one of the
       attackers said 'we don't need these two anymore' immediately before the
       shooting started.] It may be inferred that [the victims] were uncertain as to their
6      ultimate fate. *State v. Steelman,* 126 Ariz. 19, 612 P.2d 475 (1980). Except for
       the first victim, each of them had to endure the 'unimaginable terror' of having
7      their loved ones shot to death within their hearing and then having to wait for
       their own turn to come. *State v. Gretzler,* 135 Ariz. at 53, 659 P.2d at 12. Such
8      mental distress clearly constitutes cruelty. *State v. Gretzler, supra; State v.
       Steelman, supra.* In addition, expert medical testimony was given that Mrs.
9      Phelps did not die from the first gunshot wound to her head, that she did not
       lose consciousness as a result thereof, and that she most certainly suffered pain
10     from that wound. The infliction of such physical pain also clearly constitutes
       cruelty."

11
       The finding of A.R.S. § 13-703(F)(6) is also justified by two factors showing
12     defendant's heinousness or depravity. The concepts of "heinousness" and
       "depraved" involve the killer's vile state of mind at the time of the murder. *State
13     v. McCall, supra; State v. Gretzler, supra.* Here, the murderers not only shot Pat
       Redmond twice through the head, but also slashed his throat at the time of his
14     death or shortly thereafter. The infliction of gratuitous violence or the needless
       mutilation of the victim indicates depravity or heinousness. *State v. McCall,
15     supra,* and cases cited therein. Additionally, the murderers killed Mrs. Phelps,
       an elderly houseguest of the Redmonds with no possible interest in their
16     business affairs. Her murder in no way furthered the plan of the killers.
       Heinousness or depravity can be indicated by the senselessness of the crime or
17     the helplessness of the victim. *State v. McCall, supra; State v. Zaragoza,* 135
       Ariz. 63, 659 P.2d 22, *cert. denied,* 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d
18     1356 (1983); *State v. Ortiz, supra.*

19  *Hooper*, 145 Ariz. at 551, 703 P.2d at 495 (stating that it incorporated its § 13-703(F)(6)

20  analysis from its opinion in the companion case of *State v. Bracy*, 145 Ariz. at 537, 703 P.2d

21  at 481.)

22      Based upon the trial record and the facts discussed by the Arizona Supreme Court, the

23  Court easily concludes that there was sufficient evidence to support a finding that the murders

24  were especially cruel and especially heinous or depraved.  In light of such evidence, the

25  Arizona Supreme Court's determination that the (F)(6) factor was satisfied was not contrary

26  to or an unreasonable application of clearly established federal law.  Petitioner is not entitled

27  to relief.

28

- 74 -

1

**Claim 33 – Mitigation Consideration**

2   Petitioner contends that the trial court failed to find, consider and give effect to

3   statutory and non-statutory mitigation in violation of the Eighth and Fourteenth Amendments.

4   (Dkt. 31 at 91-98.) Respondents contest exhaustion. (Dkt. 67 at 87.) Petitioner responds that

5   this claim was exhausted by virtue of the supreme court's independent sentencing review.

6   (Dkt. 78 at 10-20.) Rather than resolve the procedural issue, the Court finds it judicially

7   expedient under the AEDPA to summarily reach and deny the merits of Claim 33. *See* 28

8   U.S.C. § 2254(b)(2).

9   Prior to the presentencing hearing, the trial court specifically indicated that it would

10  consider any and all mitigating circumstances. (ROA 1116.) At his presentencing hearing,

11  Petitioner chose not to present any mitigation evidence. (RT 2/4/83 at 96.) Instead, Petitioner

12  relied on the presentence report and any mitigating information that had been presented at

13  trial. (ROA 1120.) At sentencing, in final argument, counsel argued that the death penalty

14  was immoral and should not be imposed. (RT 2/11/83 at 22-25.) The trial court indicated that

15  it had considered all mitigation presented without limitation. (*Id.* at 15-16.) Ultimately, the

16  trial court determined that the mitigation evidence presented was not sufficiently substantial

17  to call for leniency. (*Id.* at 26, 28-29, 32-34.) The Arizona Supreme Court affirmed this

18  finding:

19      The trial court also considered all possible mitigating circumstances and found
        none to exist. We agree. At the sentencing hearing, defendant's counsel argued
20      as a mitigating circumstance that the death penalty was immoral. Defendant's
        opposition to the death penalty, however, is not a mitigating circumstance
21      sufficiently substantial to outweigh the aggravating circumstances. Reviewing
        the record, we find no other mitigating circumstances.

22  *Hooper*, 145 Ariz. at 551, 703 P.2d at 495.

23  In capital sentencing proceedings, the sentencer must not be precluded, by statute, case

24  law or any other legal barrier, from considering, and may not refuse to consider, any

25  constitutionally relevant mitigation evidence. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978);

26  *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). Relevant mitigating evidence is "any

27  aspect of a defendant's character or record and any of the circumstances of the offense that

28

the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. The Constitution and the clearly established law require only that the sentencing court hear and consider all constitutionally relevant mitigation evidence, but the court may determine the *weight* to accord such evidence. *See Eddings*, 455 U.S. at 114-15 (emphasis added). On habeas review, the habeas court does not evaluate the substance of each and every piece of evidence submitted as mitigation; rather, it reviews the state court record to ensure that the state court allowed and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (holding that when it is evident that all mitigating evidence was considered, trial court is not required to discuss each piece of such evidence).

The record does not support Petitioner's argument that the trial court failed to consider his mitigating evidence. Petitioner chose not to present any mitigation evidence at his presentencing hearing. Further, there is a distinction between "a failure to consider relevant evidence and a conclusion that such evidence was not mitigating"; the latter determination does not implicate a defendant's federal constitutional rights. *Williams v. Stewart*, 441 F.3d 1030, 1057 (9th Cir. 2006). The fact that the court found the evidence "inadequate to justify leniency . . . did not violate the Constitution." *Ortiz*, 149 F.3d at 943; *see Eddings*, 455 at 114-15.

Moreover, the Arizona Supreme Court independently reviewed Petitioner's mitigation evidence and agreed that there were no mitigating circumstances sufficiently substantial to outweigh the aggravation.[21] *Hooper*, 145 Ariz. at 551, 703 P.2d at 495. Even if the trial court had committed constitutional error at sentencing, the Arizona Supreme Court's independent review of the mitigation and aggravation cured any such defect. *See Clemons v. Mississippi*,

---

[21] The Arizona Supreme Court's conclusion regarding the lack of substantial mitigation is certainly understandable given the horrific facts surrounding the armed robbery and "execution style" murder of the two victims in this case. *See Woodford v. Visciotti*, 537 U.S. 19, 26 (2002) (per curiam) (noting the overwhelming nature of the aggravation involved in "execution style" murders in the course of a pre-planned armed robbery). Additionally, Petitioner had just committed a triple homicide in Illinois prior to committing these murders, which resulted in the finding of the (F)(2) aggravating circumstance.

494 U.S. 738, 750, 754 (1990) (holding that appellate courts are able to fully consider mitigating evidence and are constitutionally permitted to affirm a death sentence based on independent re-weighing despite any error at sentencing). Petitioner is not entitled to habeas relief on Claim 33.

### Claim 34 – Admission of Hearsay

Petitioner contends that the trial court's admission of hearsay testimony from Nina Marie Louie violated his due process rights and his right of confrontation under the Sixth Amendment. (Dkt. 31 at 98.) Respondents contend that this claim is procedurally defaulted because it was not fairly presented in state court. (Dkt. 67 at 89-90.) Petitioner contends that the claim was fairly presented in his first PCR petition. (Dkt. 78 at 36-37.)

Petitioner raised this claim in his first PCR petition. (ROA 1494.) The PCR court found the claim procedurally defaulted as waived pursuant to Ariz. R. Crim. P. 32.2(a)(3) and alternatively ruled on the merits. (ROA 1574.) Petitioner did not preserve this claim in a motion for rehearing, or in his petition for review. (ROA 1597, 1600, 1602.) At the time of Petitioner's first PCR proceeding, Ariz. R. Crim. P. 32.9 required that alleged errors in a PCR ruling be identified in a motion for rehearing following a denial of post-conviction relief in order to be preserved for further appellate review. *See Bortz*, 169 Ariz. at 577, 821 P.2d at 238; *see also Cook*, 516 F.3d at 827-28. *See supra* Claim 5 and accompanying text for a full discussion of this rule. Consequently, Petitioner did not exhaust Claim 34 in state court.

If Petitioner were to return to state court now and attempt to exhaust this claim, it would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it does not fall within an exception to preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h). Therefore, this claim is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *Coleman*, 501 U.S. at 732, 735 n.1. Claim 34 will not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice, which Petitioner does not attempt to establish. Claim 34 is procedurally barred.

### Claim 35 – Choice of Death Penalty Administration

Petitioner contends that the State is forcing him to choose between lethal gas and lethal injection for administration of the death penalty, which violates the Eighth Amendment. (Dkt. 31 at 98.)  Petitioner exhausted this claim in his second PCR proceeding.  (*See* ROA 1657 at 6; ROA 1723 at 9.)  The PCR court dismissed the claim as not colorable and meritless. (ROA 1720.)

The governing Arizona statute provides:

> A defendant who is sentenced to death for an offense committed before November 23, 1992 shall choose either lethal injection or lethal gas at least twenty days before the execution date.  If the defendant fails to choose either lethal injection or lethal gas, the penalty of death shall be inflicted by lethal injection.

A.R.S. § 13-704.  Pursuant to the statute, Petitioner is not forced to choose; if he makes no choice his death sentence will be inflicted by lethal injection.  The Supreme Court has held that if a petitioner chooses lethal gas as his method of execution, he cannot complain that it is unconstitutional, because he has another option.  *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999).  Further, neither the Ninth Circuit, *see Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998); *LaGrand v. Stewart*, 133 F.3d 1253, 1264-65 (9th Cir. 1998); *Poland v. Stewart*, 117 F.3d 1094, 1105 (9th Cir. 1997), nor the Supreme Court has ever held that execution by lethal injection violates the Eighth Amendment.  More directly on point, the Ninth Circuit has rejected Petitioner's argument that being forced to choose your method of execution constitutes an Eighth Amendment violation.  *See Campbell v. Blodgett*, 978 F.2d 1502, 1517-18 (9th Cir. 1992).  The Ninth Circuit reasoned that allowing the defendant to choose the "less frightening" method appeared to be a humane approach and did not violate the Eighth Amendment.  *Id.*  Based on the foregoing, Claim 35 is meritless.

## Claims 36 and 37 – Death Sentence

In Claim 36, Petitioner contends that his death sentence violates the substantive due process guarantee of the Fourteenth Amendment.  (Dkt. 31 at 98-99.)  In Claim 37, he contends that his death sentence violates the Equal Protection Clause of the Fourteenth Amendment. (Dkt. 31 at 99-100.)  Petitioner concedes that these claims were not exhausted in state court. (Dkt. 78 at 37.)

If Petitioner were to return to state court now and attempt to litigate these claims, they would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because they do not fall within an exception to preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h). Therefore, these claims are "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *Coleman*, 501 U.S. at 732, 735 n.1. Claims 36 and 37 will not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice, which Petitioner does not attempt to establish. Claims 36 and 37 are procedurally barred.

## CONCLUSION

The Court concludes that Petitioner is not entitled to habeas relief on any of his claims. The Court further finds that an evidentiary hearing in this matter is neither warranted nor required.[22] Therefore, Petitioner's Supplemental Petition for Writ of Habeas Corpus must be denied and judgment will be entered accordingly.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that might be consumed drafting and reviewing an application for a certificate of appealability (COA) to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter,

---

[22] The Court previously denied Petitioner's request for evidentiary development as to specific claims (Dkt. 96), but conducted an independent review as to all the claims as required by Rule 8 of the Rules Governing Section 2254 Cases.

agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

The Court finds that reasonable jurists could debate its resolution of the following issue:

> Claim 1. Whether the prosecution's failure to disclose favorable evidence violated Petitioner's rights under *Brady v. Maryland*, 373 U.S. 83 (1963).

Therefore, the Court issues a COA on this issue.  For the remaining claims, the Court declines to issue a COA for the reasons set forth in the instant Order and this Court's previous Orders. (Dkt. 96, 114.)

Based on the foregoing,

**IT IS HEREBY ORDERED** that Petitioner's Supplemental Petition for Writ of Habeas Corpus (Dkts. 29, 31) is **DENIED WITH PREJUDICE.**  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issue:  Claim 1. Whether the prosecution's failure to disclose favorable evidence violated Petitioner's rights under *Brady v. Maryland*, 373 U.S. 83 (1963).

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona 85007-3329.

DATED this 9th day of October, 2008.

Stephen M. McNamee
United States District Judge