**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Murray Hooper, | No. CV-98-02164-PHX-SMM |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| v. | |
| Charles L. Ryan, et al., | **ORDER** |
| Respondents. | |

This case is before the Court on remand from the Ninth Circuit Court of Appeals. (Doc. 140.) The Court is directed to reconsider, in the light of *Martinez v. Ryan*, 566 U.S. 1 (2012), Claim 4 of Hooper's habeas petition, alleging ineffective assistance of counsel at sentencing. (*Id.*) The Court is also to reconsider its order denying leave to amend the petition to include Claim 16, alleging that Hooper's Arizona death sentence is based on invalid Illinois convictions. (*Id.* at 2.)

The issues have been briefed. (Docs. 147, 152, 157.) For the reasons set forth below, the Court finds that Claim 4 remains procedurally defaulted and barred from federal review and that amendment of the petition to include Claim 16 remains futile.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 24, 1982, a jury convicted Hooper and William Bracy of two counts of first degree murder, one count of attempted murder, criminal conspiracy, and other associated crimes. *See State v. Hooper*, 145 Ariz. 538, 543, 703 P.2d 482, 487 (1985); *State v. Bracy*, 145 Ariz. 520, 524–25, 703 P.2d 464, 469–70 (1985).

Pat Redmond and Ron Lukezic were partners in a successful printing business in Phoenix called Graphic Dimensions. In the summer of 1980, Graphic Dimensions was presented with the possibility of some lucrative printing contracts with certain hotels in Las Vegas, but these deals fell through.

Robert Cruz, a businessman with ties to Chicago and Las Vegas, wanted Redmond killed in order to obtain his interest in the printing business and pursue the Las Vegas contracts. In September 1980, Cruz asked Arnold Merrill if he would be willing to kill Redmond for $10,000. Merrill declined, but arrangements were made with others. In early December 1980, Cruz and Merrill picked up Hooper and Bracy who arrived on a flight from Chicago.

Hooper and Bracy stayed in the Phoenix area for several days. Merrill took the pair to see Cruz, who gave Bracy a stack of $100 bills, some of which Bracy gave to Hooper. At Cruz's direction, Merrill took Bracy and Hooper to a gun store owned by Merrill's brother, Ray Kleinfeld. Hooper picked out a large knife and Bracy told Kleinfeld to put it on Cruz's account. Kleinfeld gave Bracy a bag containing three pistols. While Petitioner and Bracy were staying at Merrill's home, Merrill introduced them to Ed McCall.

A few days later, Merrill drove Hooper and Bracy to a cocktail lounge patronized by Pat Redmond. When Redmond departed, they followed his car. While following Redmond, Merrill noticed Hooper pointing a gun at Redmond's vehicle, getting ready to fire. Merrill swerved from Redmond's car to prevent the shooting. After the failed shooting, McCall told Merrill that he was "joining up" with Bracy and Petitioner.

On the evening of December 31, 1980, Hooper, Bracy, and McCall went to Redmond's home and forced their entrance at gunpoint. Redmond, his wife Marilyn, and his mother-in-law Helen Phelps were present. The three victims were taken into a bedroom where they were robbed of valuables, bound with surgical tape, and gagged. Each was shot in the head. Pat Redmond's throat was slashed. Pat Redmond and Helen Phelps died. Marilyn Redmond survived.

Hooper and Bracy were convicted and sentenced to death for the murders. On direct appeal, the Arizona Supreme Court affirmed Petitioner's convictions and death sentence. *See Hooper*, 145 Ariz. 538, 703 P.2d 482.

Hooper sought post-conviction relief ("PCR") in the trial court. (ROA 1494, 1529, 1540, 1570, 1581.) After discovery and the filing of affidavits, the PCR court summarily denied Hooper's first PCR petition. (ROA 1574, 1596.) Hooper moved for rehearing, which was denied. (ROA 1597, 1599.) The Arizona Supreme Court denied Hooper's petition for review. (ROA 1600, 1602.) PCR counsel did not raise a claim of ineffective assistance of counsel at sentencing.

In 1991, Hooper filed a petition for writ of habeas corpus in this Court, No. CIV 91-1495-PHX-SMM. The Court dismissed the petition without prejudice to allow Hooper to return to state court to exhaust additional claims. Hooper filed a second PCR petition, this time raising a claim of ineffective assistance of counsel at sentencing. (ROA 1626–27.) The PCR court denied relief. (ROA 1720.) Hooper submitted a petition for review, which was denied. (ROA 1733.)

Hooper filed a third PCR petition, which was summarily dismissed. (ROA 1741, 1769.) Review was denied. (ROA 1771.)

In 1998, Hooper returned to this Court and filed an initial habeas petition. (Doc. 1.) Subsequently, he filed a supplemental petition for writ of habeas corpus and a memorandum in support. (Docs. 29, 31.) In Claim 16, Hooper alleged that his Arizona sentence violated the Eighth Amendment because the sentencing court relied on invalid Illinois murder convictions to prove that Hooper had previously been convicted of a crime for which, under Arizona law, a sentence of life imprisonment or death was imposable. Hooper alleged that his Illinois murder convictions were invalid because he was tried and sentenced by a judge later convicted of racketeering and taking bribes.[1] (Doc. 29 at 9; Doc. 31 at 59.)

---

[1] *See United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995) (upholding former judge Maloney's convictions).

The Court concluded that Claim 16 was unexhausted. (Doc. 32.) Hooper withdrew the claim and the Court stayed this habeas proceeding pending exhaustion of the claim in state court. (*Id.*) The Court eventually vacated its stay and ordered the parties to brief the procedural status, merits, and requests for evidentiary development as to all claims. (Doc. 55.) Hooper filed, and the Court denied, a motion for discovery and an evidentiary hearing. (Docs. 79, 96.) Subsequently, Hooper moved to add Claim 16 back into his supplemental petition. (Doc. 106.) The Court denied amendment, concluding that Claim 16 was without merit and therefore amendment was futile. (Doc. 114.) The Court denied Hooper's remaining habeas claims on October 10, 2008. (Doc. 125.)

On August 19, 2014, the Ninth Circuit remanded the case for reconsideration of Claims 4 and 16. (Doc. 140.)

**CLAIM 4**

In Claim 4 of his supplemental habeas petition, Hooper alleges ineffective assistance of counsel at sentencing. (*See* Doc. 31 at 26–38.) The Court found the claim procedurally barred because Hooper did not raise it in his first PCR petition. (Doc. 96 at 12–13, 30.)

**A.    Applicable Law**

Federal review is generally not available for a state prisoner's claims when those claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In such situations, federal habeas review is barred unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice. *Id. Coleman* held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, however, the Court announced a new, "narrow exception" to the rule set out in *Coleman*. The Court explained that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral

proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17; *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013).

Accordingly, under *Martinez* a petitioner may establish cause for the procedural default of an ineffective assistance claim "where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* . . .' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 14); *see Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (en banc); *Dickens v. Ryan*, 740 F.3d 1302, 1319–20 (9th Cir. 2014) (en banc); *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc).[2]

In *Clabourne*, the Ninth Circuit summarized its *Martinez* analysis. To demonstrate cause and prejudice sufficient to excuse the procedural default, a petitioner must make two showings:

> First, to establish "cause," he must establish that his counsel in the state postconviction proceeding was ineffective under the standards of *Strickland. Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different.

*Clabourne*, 745 F.3d at 377 (citations omitted). Determining whether there was a reasonable probability of a different outcome "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id.* at 377–78. "PCR counsel

---

[2] In *Runningeagle v. Ryan*, 825 F.3d 970, 981–82 (9th Cir. 2016), the Ninth Circuit rejected the argument, raised by Respondents here, that *Martinez* does not apply to Arizona cases before 2002, when the Arizona Supreme Court expressly directed defendants to raise ineffective assistance of counsel claims in collateral proceedings rather than on direct appeal. *See State v. Spreitz*, 202 Ariz. 1, 39 P.3d 525 (2002).

would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective." *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012).

To establish "prejudice" in the *Martinez* context, a petitioner must show that the ineffective assistance of trial counsel claim was "substantial" or had "some merit." *Clabourne*, 745 F.3d at 377 (citing *Martinez*, 556 U.S. at 14).

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689; *see Wong v. Belmontes*, 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688.

With respect to *Strickland*'s second prong, a defendant must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).

The remand order states that "the remanded claims are for purposes of remand

substantial." (Doc. 140 at 2.) Because the Ninth Circuit has already found the remanded claim substantial, prejudice has been established. The issue of cause remains—that is, whether post-conviction counsel's performance was ineffective under *Strickland*. The Court will address cause by assessing the underlying ineffective assistance of trial counsel claim. *See Clabourne*, 745 F.3d at 377–78.

## B. Additional facts

### 1. Sentencing

A sentencing hearing was held on February 4, 1983. Hooper did not present any mitigating evidence at the presentencing hearing. (ROA 289.) Instead, at Hooper's sentencing on February 11, 1983, his counsel, Grant Woods, addressed the judge "person-to-person" to argue that Hooper should not be sentenced to death. (RT 2/11/83 at 22.) Woods invoked the "basic historical and . . . religious precept . . . that you should show mercy" and "turn the other cheek" and "most importantly that you should not kill." (*Id.* at 23.) He further argued that it was unnecessary to sentence Hooper to death because he had already received death sentences in Illinois; therefore, the judge would adequately protect society by imposing a life sentence. (*Id.*) Woods concluded: "So I urge you, Your Honor, at the last moment to consider, do justice, protect society, punish the guilty, follow a higher law, and you, yourself, do not kill and let that be the example that you show today. That you will not kill as others have done." (*Id.* at 25.)

The trial court found five aggravating factors. The court determined that Hooper had been convicted on September 23, 1981, of triple homicide, armed robbery, and aggravated kidnapping in Illinois. *See Hooper*, 145 Ariz. at 550, 703 P.2d at 494. This finding proved the aggravating factors set forth in A.R.S. § 13-703(F)(1) and (2); namely, that Hooper had previously been convicted of another offense for which under Arizona law a sentence of life imprisonment or death was imposable and had previously been convicted of a felony involving the use or threat of violence on another person. *Id.* The court found three additional aggravating circumstances: that in the commission of the offense Hooper knowingly created a grave risk of death to another person or persons, §13-703(F)(3); that Hooper committed the offense as consideration for the receipt, or in

expectation of the receipt, of anything of pecuniary value, § 13-703(F)(5); and that Hooper committed the offense in an especially heinous, cruel or depraved manner, § 13-703(F)(6). *Id.*

The court, after "consider[ing] all of the mitigating circumstances without limitation," sentenced Hooper to death. (*Id.*)

### 2. PCR proceedings

During his PCR proceedings, Hooper was represented by Philip Seplow. Seplow did not raise a claim of ineffective assistance of counsel at sentencing in his first PCR petition. He did raise such a claim in the second PCR petition, adding that he had performed ineffectively as PCR counsel by failing to raise the claim in the first PCR proceedings. (ROA 1627.) Seplow stated that during the initial PCR proceedings he did not realize the significance of claims of ineffective assistance of counsel at sentencing. He argued that sentencing counsel should have presented evidence that Hooper was loved by his family and friends, that he was an artist and had an excellent institutional record in Illinois, and that he was not an antisocial personality and was capable of rehabilitation. Seplow also argued that trial counsel performed ineffectively by failing to object to the presentence report that was introduced at Hooper's sentencing. The PCR court denied the claim as procedurally barred. (ROA 1720.)

### C. Analysis

#### 1. Deficient performance

*Strickland* does not require defense counsel to present mitigating evidence at sentencing in every case. *See Wiggins v. Smith*, 539 U.S. 510, 533 (2003); *see also Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2009) ("No absolute duty exists to introduce mitigating or character evidence."); *Hawkins v. Coyle*, 547 F.3d 540, 548 (6th Cir. 2008) (explaining that "a careful reading of *Wiggins* reveals that counsel's performance will not necessarily be deficient because of a failure to investigate, so long as counsel's decision not to investigate is reasonable under the circumstance. *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) ("[T]he lesson to be drawn from our decisions is not that counsel's performance is always, or even usually, deficient if counsel

- 8 -

fails to present available mitigating circumstance evidence."). In *Strickland* itself, for example, counsel did not present mitigation evidence. 466 U.S. at 673–75. Counsel did not seek character witnesses or a mental health examination. *Id.* The Court explained that given the overwhelming aggravating factors trial counsel could "reasonably surmise . . . that character and psychological evidence would be of little help." *Id.* at 699. Instead, based on his knowledge of the sentencing judge, counsel focused on the fact that the defendant accepted responsibility for his crimes. *Id.* at 673. Counsel also argued that the defendant was fundamentally a good man who committed the crimes under extremely stressful circumstances. *Id.* at 674. Pursuing this strategy did not constitute deficient performance. *Id.* at 699.

If defense counsel decides not to investigate mitigation, that "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691; *see Wiggins*, 539 U.S. at 521–22 (explaining that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").

In a deposition taken in 1992, during the second round of PCR proceedings, Woods explained the reasoning behind his decision not to present a case in mitigation. First, he believed there was no compelling mitigating evidence to offer:

> It was clear to me there were no mitigating factors, and almost every aggravating factor listed in the statute was present. So this was a difficult sentencing, given that he really had nothing going for him at sentencing, I didn't believe.

> And to put on a mitigation hearing would do two things. One, it would prompt the prosecution to put on an aggravation hearing. And since they could prove every aggravating factor just about, if not all of them, that wouldn't be good. And he really didn't have any mitigation. If we came up with any, it would be really Mickey Mouse and his age—I can't remember how old he was, but late thirties or something—but anyway, you would have to be kind of making it up.

> I don't what age means, you know, poor, socioeconomic background. I mean, my goal was to try to have him not get the death sentence. And I believe my best chance would be to try to construct an argument directed specifically at that judge that maybe he might buy rather

than put on a completely ineffectual and unpersuasive mitigation hearing just for the record, because it wouldn't have done any good. So that's what I did.

(Doc. 147-1, Ex. 7 at 22–23.)

Woods again detailed why he believed it was tactically sound in this case not to present mitigation:

> Because my goal—I had a choice there. I could just try to protect the record, or I could try to talk the judge out of the death penalty. And I didn't think I could do both. I could aggravate the situation with the judge by coming up with—There were no mitigating factors. That's the bottom line. There were none.
>
> I could try to make up something or come up with some phony deal that he would not buy, or I could lay it on the line on a different level and see if I could persuade him.

(*Id.* at 23–24.) Woods reiterated that he thought his "best shot" was not to present a case in mitigation. (*Id.* at 24.)

Woods further explained that in the absence of strong mitigating evidence, the best chance to avoid a death sentence was to achieve an acquittal:

> We were faced with a difficult proposition here. The evidence that would come forward would not be evidence that I could see could—that you could use in any way to help your mitigation case. As far as the defense case that we would put it, that it would help us in mitigation, I didn't see it either. I don't know what it would have been.
>
> I mean, you had two guys [Hooper and Bracy] who, actually, were not unintelligent. They were both, I thought, bright guys, not well-educated, obviously, but bright guys. And neither of them—their actions were done, knowing exactly what they were doing without the influence of anything. So I just didn't see that at all.
>
> I thought our only chance we would have would be to beat the case. That was a rather daunting prospect, too if you look at the evidence. Just about anything you could have against you as evidence, they had when we started. And they had everything. And we got almost all of it precluded at the trial. And the fact that the jury was out three and a half days, given what we started with, I considered a great victory.

(*Id.* at 29–30.)

- 10 -

Woods further stated that he would have encouraged Hooper to accept "in a minute" any plea offer that would have avoided a death sentence, but the State did not make such an offer. (*Id.* at 30–31.)

Respondents argue that Woods' decision not to present mitigating evidence was reasonable and based on tactical considerations. (Doc. 152 at 18–20.) According to Respondents, "Woods not only reasonably believed that the sentencing judge would not have been persuaded by any good character evidence he presented, he also reasonably concluded that such a presentation would have prompted the State to respond with details of Hooper's extensive criminal record and activities to show his bad character." (*Id.* at 19–20.)

Hooper counters that Woods' decision not to present mitigating evidence was unreasonable and uninformed because he had not investigated Hooper's background. (Doc. 147 at 14–17.) Hooper also contends that Woods misapprehended the nature of capital sentencing proceedings by, among other errors, believing that the presentation of mitigating evidence would allow the State to present a case in aggravation and by misunderstanding the significance of humanizing mitigation evidence. (*Id.* at 16.) Hooper also argues that because the court was already aware of his criminal record through the presentence report, there was no risk in presenting humanizing mitigation evidence. (*Id.*)

"[T]he failure to present mitigating evidence during the penalty phase of a capital case, where there are no tactical considerations involved, constitutes deficient performance." *Smith v. Stewart*, 189 F.3d 1004, 1008–09 (9th Cir. 1999). Here, however, the record shows that Woods' decision not to present mitigating evidence was based on tactical considerations, as Woods described in his deposition. Moreover, it is apparent that Woods had some knowledge of the available mitigating evidence, primarily about Hooper's socioeconomic background. Woods traveled two or three times to Chicago, Hooper's hometown. His investigator also went to Chicago.

Assuming, however, that Woods' investigation was not "thorough," *Strickland* made it clear that "strategic choices made after less than complete investigation are

reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91.

Woods' decision not to present mitigating evidence was based on his assessment of the strength of the available evidence as weighed against the aggravating factors and the perceived risk of opening the door to damaging rebuttal evidence, and his belief that he could make a more persuasive case for leniency by trying to persuade the judge it was not necessary to sentence Hooper to death when an Illinois court had already done so.

Hooper is correct that under Arizona law in every capital sentencing the State presents a case in aggravation, regardless of whether the defendant offers mitigating evidence. Hooper argues that the trial court was aware of his criminal record, so the presentation of mitigating information about his background and character would not necessarily have opened the door to additional, damaging rebuttal evidence. *See, e.g.*, *Burger v. Kemp*, 483 U.S. 776 (1987) (concluding that failure to introduce character evidence was effective performance because witnesses could have been subjected to harmful cross-examination or invited other damaging evidence); *Darden v. Wainwright*, 477 U.S. 168 (1986) (holding that trial counsel's decision to forego the presentation of mitigating evidence and rely on a plea of mercy was not constitutionally deficient because counsel reasonably determined that present mitigating evidence would open the door to damaging rebuttal).

The presentence report set forth Hooper's lengthy criminal record and noted that "in September of 1981 [Hooper] received the death sentence in Illinois for his part in the execution-style slaying of three men on November 13, 1980." (Doc. 147-1, Ex. 11.) The presentence report established the bare fact of the crimes. However, further details of the execution-style killings in Illinois, committed just six weeks before the Arizona murders, and Hooper's long history of criminal violence, could have been used to rebut any evidence of good character or the mitigating effects of a deprived childhood. *See State v. Pandeli*, 215 Ariz. 514, 528–29, 161 P.3d 557, 571–72 (2007) (finding that the underlying facts of previous murder admissible to rebut mitigation evidence of defendant's mental health and to show defendant not entitled to leniency).

Woods' approach to sentencing, when viewed with proper deference, did not fall below the standard set forth in *Strickland*. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

Hooper was a 35-year-old "hired killer," *Hooper*, 145 Ariz. at 551, 703 P.2d at 495, who, just weeks before travelling to Phoenix to commit the Redmond murders, committed another set of execution-style killings. With knowledge of those facts, it was not unreasonable for Woods to doubt the value of mitigating evidence concerning Hooper's childhood in Chicago, and to decide on a different approach in seeking to convince the judge not to sentence Hooper to death. As discussed next, even if Woods' performance at sentencing was deficient, Hooper cannot show prejudice.

### 2. Prejudice

To determine whether a defendant was prejudiced by counsel's deficient performance, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695. In assessing prejudice the court reweighs the aggravating evidence against the totality of the mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Id.* at 536

In arguing that he was prejudiced by counsel's performance, Hooper cites "classic" mitigating information about his background that Woods should have presented at sentencing. (Doc. 147 at 20.) This information is set forth in exhibits, including interview notes and memos, attached to the pending motion. (Doc. 147-1, Ex's 13–31.)

Hooper grew up in Chicago in a segregated neighborhood where he was "heavily influenced by his impoverished, dangerous, and violent surroundings." (*Id.* at 22.) Hooper needed to develop toughness to survive in those surroundings. He learned to

defend himself and was involved in fights to protect himself and his siblings. (*Id.* at 22–23, 25.) In one of these fights, at age 12, Hooper was knocked unconscious by blows from an ax handle. (*Id.* at 24.)

His father was a strict disciplinarian, who whipped Hooper with a belt when he got into trouble. (*Id.* at 23.) There was verbal as well as physical violence in the household. (*Id.* at 23–24.)

At around age 13, Hooper's conduct resulted in him being sent to a series of reformatories and juvenile detention centers. One of the institutions had a "sordid history"; Hooper was mistreated and "had to fight as a means of survival." (*Id.* at 26.)

At age 15, Hooper began carrying a gun. (*Id.* at 27.) Although he did not "formally" join a gang, he began hanging out with the "wrong crowd." (*Id.*) At age 17, he began drinking, and continued drinking for several years. (*Id.*) He became angry when intoxicated. (*Id.*)

Hooper had difficulty finding employment. (*Id.* at 28.) He spent most of his adult life in the Illinois prison system. (*Id.*) He was regarded as a cooperative and respectful inmate. (*Id.* at 28–29.) Hooper was a "loving and caring brother" and a "concerned friend."[3] (*Id.* at 29.)

Dr. Robert Heilbronner, a neuropsychologist, reviewed records and evaluated Hooper in 2011. (Doc. 147-1, Ex. 13.) He opined, based on the verbal-performance discrepancy in Hooper's IQ scores, that "Hooper demonstrated deficits on select objective measures of brain function" and this impairment was present in 1981.[4] (*Id.* at 4–5.) In June 2015, Dr. Heilbronner completed his evaluation by administering additional neuropsychological tests. (Doc. 157-1, Ex. 27.) The test results did not reveal the cause of the discrepancy between Hooper's verbal and performance scores. (*Id.*) Dr. Heilbronner

---

[3] The record contains contradictory evidence about Hooper's background. His brother stated that their parents did not punish them, that the neighborhood they grew up in was not overly violent, and that Hooper was aggressive and prone to rages. (Doc. 147-1, Ex. 18.)

[4] Dr. Heilbronner determined that Hooper had an overall IQ of 92 (average), with verbal intellectual abilities score of 103 (average) and a nonverbal, performance score of 82 (borderline to low average). (Doc. 157-1, Ex. 27.)

opined, however, that the evidence of brain impairment would have been "different" in 1981 than it is now. (*Id.*)

Finally, Dr. James Garbarino, a developmental psychologist, in a declaration from 2015, opined that as a child Hooper developed a "war zone mentality" due to the violence of his surroundings. (*Id.*, Ex. 28 at 6.) This mentality includes hyper-vigilance and "a high probability of responding to threats with aggression." (*Id.*) This mindset "played a role in the chronically anti-social and violent behavior that characterized his adolescence and early adulthood." (*Id.* at 11.)

The Court finds there is not a reasonable probability that Hooper would have received a different sentence if Woods had offered such evidence to the trial judge. Several factors support this conclusion. First, the aggravating factors were especially strong. The Arizona Supreme Court has explained, for example, that "when a 'hired hit' has taken place, the (F)(5) aggravator has substantial weight." *State v. Harrod*, 218 Ariz. 268, 284, 183 P.3d 519, 535 (2008).

Next, given Hooper's age at the time of the murders and the fact that he served as a hired killer, mitigating evidence relating to his childhood in Chicago would have had minimal value. In *State v. Hampton*, 213 Ariz. 167, 140 P.3d 950 (2006), the Arizona Supreme Court noted that the defendant had a "horrendous childhood"; his mother, biological father, and three stepfathers were all alcoholics; his fathers abused him verbally and physically; his family moved constantly, and he spent time in six different foster homes; his older brother sexually molested him and injected him with heroin when Hampton was 11 years old; he became addicted to methamphetamine and cocaine before age 20, and he used meth a few hours before the murders; he suffered numerous mental health problems, and first attempted suicide at age 11. *Id.* at 184–85, 140 P.3d at 967–68.

The court nevertheless affirmed Hampton's death sentence, explaining that a "difficult family background, in and of itself, is not a mitigating circumstance" sufficient to mandate leniency in every capital case. *Id.* at 185, 140 P.3d at 968 (citation omitted). The court also noted "Hampton's troubled upbringing is entitled to less weight as a mitigating circumstance because he has not tied it to his murderous behavior. Further,

Hampton was thirty years old when he committed his crimes, lessening the relevance of his difficult childhood." *Id.* Finally, because Hampton committed three homicides, the court found the mitigation evidence not sufficiently substantial to call for leniency. *Id.*

Hooper's mitigation evidence is not as compelling as that detailing Hampton's "horrendous" childhood. He came from an intact family, and there is no evidence that he was sexually abused or exposed to drug use as a child. Nor is there evidence that Hooper experienced severe mental health problems or was under the influence of drugs or alcohol when he committed the murders. *See Allen v. Woodford*, 395 F.3d 979, 1007 (9th Cir. 2005) (explaining that the omitted mitigation evidence was not exculpatory and did not diminish the petitioner's culpability; "[n]one of the testimony portrays a person whose moral sense was warped by abuse, drugs, mental incapacity, or disease or who acted out of passion, anger or other motive unlikely to reoccur"); *Apelt v. Ryan*, 878 F.3d 800, 834 (9th Cir. 2017) ("This conclusion [that the petitioner was not prejudiced by sentencing counsel's performance] is all the more reasonable as none of the proffered mitigating evidence excuses Apelt's callousness, nor does it reduce Apelt's responsibility for planning and carrying out the murder.").

In addition, as noted, Hooper was 35 years old at the time of the killings; evidence of a difficult childhood therefore lacks weight as a mitigating circumstance. *See Hampton*, 213 Ariz. at 185, 140 P.3d at 968; *Pandeli*, 215 Ariz. at 532, 161 P.3d at 575 ("Pandeli's difficult childhood and extensive sexual abuse, while compelling, are not causally connected to the crime. Moreover, Pandeli murdered [the victim] when he was in his late twenties, reducing the relevance of his traumatic childhood."); *State v. Bocharski*, 218 Ariz. 476, 499, 189 P.3d 403, 426 (2008) ("Bocharski committed this offense when he was thirty-three years old, lessening the relevance of abuse and neglect that occurred during his childhood.").

The United States Supreme Court has explained that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)

(quoting *California v. Brown*, 479 U.S. 538, 545 (1987)), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). However, in contrast to cases such as *Wiggins*, 539 U.S. 510; *Rompilla v. Beard*, 545 U.S. 374 (2005); and *Porter v. McCollum*, 558 U.S. 30 (2009), where counsel's failure to investigate mitigating evidence prejudiced the defendant, the omitted mitigation evidence about Hooper's background is relatively "weak." *Landrigan v. Schriro*, 550 U.S. 465, 481 (2005).[5] For example, in *Wiggins*, counsel failed to present evidence that the defendant suffered consistent abuse during the first six years of his life, was the victim of "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," was sometimes homeless, and had diminished mental capacities. 539 U.S. at 535. In *Rompilla*, counsel failed to present evidence that his client was beaten by his father with fists, straps, belts, and sticks; that his father locked him and his brother in a dog pen filled with excrement; and that he grew up in a home with no indoor plumbing and was not given proper clothing. 545 U.S. at 391–92. In *Porter*, trial counsel neglected to present mitigating evidence about "(1) Porter's heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." 558 U.S. at 41.

As outlined above, this type of substantial mitigation evidence does not exist for Hooper, and the evidence he has offered does little if anything to exculpate or explain his actions as a hired killer. The execution-style killings Hooper carried out in his mid-30s are not attributable to the disadvantaged background he experienced as a child in Chicago. *Penry*, 492 U.S. at 319. Even if, as Hooper argues, he needed to develop toughness and a willingness to defend himself in order to survive his environment, those characteristics are unrelated to his later role as a hired killer who committed multiple

---

[5] This "weak" evidence included Landrigan's exposure to alcohol and drugs in utero, abandonment by his biological mother, his own drug and alcohol abuse, his family's history of violence, and a possible genetic predisposition to violence. 550 U.S. at 480. Nevertheless, the Court concluded that there was no reasonable probability that presentation of the additional evidence would have changed the outcome at sentencing. *Id.* at 481.

murders as part of a business transaction. Again, the mitigating value of the evidence is reduced by the lack of a causal connection between Hooper's childhood in a violent neighborhood and the premeditated and calculated nature of the crimes.[6]

For the same reason the opinions of Drs. Heilbronner and Garbarino have little mitigating value. Dr. Heilbronner opined that Hooper suffered from brain impairment at the time of the murders. There is no indication that such impairment, if it existed, bore any relationship to the premeditated and calculated murders Hooper committed. Dr. Garbarino drew a connection between Hooper's childhood in the "war zone" of Chicago and his violent behavior as an adolescent and young adult. Hypervigilance of the type ascribed to Hooper by Dr. Gabarino does not explain the Hooper's conduct as a hired killer who flew from Chicago to Phoenix to rob and shoot three bound victims in their own home.

In *Apelt*, the petitioner carried out a scheme by which he convinced a woman to marry him, obtained an insurance policy on her life, and then murdered her to collect the proceeds. 878 F.3d at 833. The Ninth Circuit found that, given the calculated and depraved nature of the crime, Apelt was not prejudiced by counsel's performance at sentencing, even though counsel failed to present evidence that Apelt's father beat and sexually abused him, that Apelt was developmentally delayed and attended a special learning school, that his family lived in extreme poverty, and that he was sent to a psychiatric institution after a suicide attempt. *Id.* at 823–24. The court also noted that "presenting Apelt's upbringing and activities in Germany to explain how Apelt became a calculating killer arguably could weigh in favor rather than against the death penalty." *Id.* at 834 (citing *Cullen v. Pinholster*, 563 U.S. 170, 201 (2011)).

Hooper, by contrast, had less compelling mitigating evidence to offer, while committing two "premeditated and calculated" murders and attempting a third. Also

---

[6] *See State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (explaining that mitigating evidence must be considered regardless of whether there is a nexus between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence); *Eddings v. Oklahoma*, 455 U.S. 104, 114–15 (1982).

balanced against this mitigating evidence were the aggravating factors arising from the three Illinois murders, as well as the pecuniary gain and cruel, heinous or depraved aggravating factors.

Finally, the Court addresses Hooper's argument that the prejudice analysis concerning trial and PCR counsel's deficient performance must take into account the fact that the Illinois murder convictions were subsequently vacated. According to Hooper, "[p]rejudice must be reckoned now in light of the altered landscape of the case, *i.e.*, one in which the two weightiest aggravating factors no longer exist." (Doc. 147 at 46.) Respondents counter that the "invalidation of [Hooper's] Illinois convictions in 2014 has no bearing on whether his trial and PCR lawyers performed deficiently in the 1982 sentencing and 1989 PCR proceedings, nor on whether there was a reasonable likelihood of a different result in those proceedings absent any allegedly deficient performance." (Doc. 152 at 26.)

Hooper relies on *Johnson v. Mississippi,* 486 U.S. 578 (1988), where the Supreme Court held that the Eighth Amendment requires reexamination of a death sentence that was based in part on a prior felony conviction which was set aside after the capital sentence was imposed, and *Clemons v. Mississippi*, 494 U.S. 738 (1990), where the Court held that a state appellate court can affirm a death sentence based on an invalid aggravating factor only after conducting either a harmless error review or re-weighing the mitigating evidence against the remaining valid aggravating factors. These principles are the basis of Claim 16, which the Court discusses below.

Hooper offers no support for his assertion that the holdings in *Johnson* and *Clemons* are relevant to a claim of ineffective assistance of counsel under the Sixth Amendment. Hooper concedes that trial counsel's performance must be judged based "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. He contends, however, that prejudice must be evaluated "in the present." (Doc. 157 at 25.)

Hooper's argument is unpersuasive. To demonstrate prejudice, Hooper must "show that there is a reasonable probability that, *but for counsel's unprofessional errors*,

the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). Hooper does not allege that trial counsel's performance was deficient based on his handling of the prior convictions that formed the basis of two aggravating factors.

The Supreme Court has explained that "the 'prejudice' component of the *Strickland* test . . . focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland*, 466 U.S. at 687). "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.*

Nothing trial counsel did with respect to the prior convictions deprived Hooper of his Sixth Amendment rights. The "altered landscape" of the case resulting from the vacated convictions is not relevant in assessing whether Hooper was prejudiced by counsel's performance at sentencing.

**D.    Conclusion**

Trial counsel did not perform ineffectively at sentencing. PCR counsel, therefore, was not ineffective for failing to raise a claim of ineffective assistance of trial counsel. *Sexton*, 679 F.3d at 1161; *see Clabourne*, 745 F.3d at 377. Because Hooper has not shown that PCR counsel was ineffective, he has not demonstrated cause to excuse his procedural default. Claim 4 remains procedurally defaulted and barred from federal review.

<u>**CLAIM 16**</u>

The remand order directed the Court to reconsider its order denying leave to amend the petition to include Claim 16, alleging that Hooper's Arizona death sentence is based on invalid Illinois convictions.[7] This Court previously denied Hooper's motion to amend as futile. (Doc. 114.)

------

[7] In 2013, the United States District Court for the Northern District of Illinois

- 20 -

**A.      Applicable legal standards**

Although leave to amend a petition for habeas corpus "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), futility of amendment may justify the denial of leave to amend. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). "A determination of futility contemplates whether, upon de novo review, the amendment could present a viable claim on the merits for which relief could be granted." *Murray v. Schriro*, 745 F.3d 984, 1015 (9th Cir. 2014).

Claim 16 is governed by the provisions of the AEDPA, the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 2254(d)(1), a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court clarified that under § 2254(d), "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101. Accordingly, to obtain habeas relief, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

**B.      Additional background**

At sentencing, the trial court determined that the aggravating factors set forth in A.R.S. § 13-703(F)(1) and (2) were satisfied by Hooper's prior convictions for homicide, armed robbery, and aggravated kidnapping. The court found three additional aggravating circumstances: that Hooper knowingly created a grave risk of death to another person, §13-703(F)(3); that he committed the offense as consideration for the receipt, or in

granted habeas relief as to Hooper's Illinois convictions. (*See* Doc. 147-1, Ex. 1.)

expectation of the receipt, of anything of pecuniary value, (F)(5); and that he committed the offense in an especially heinous, cruel or depraved manner, (F)(6).

On direct appeal, the Arizona Supreme Court concluded that the (F)(3) factor was not present but affirmed the death sentence. *Hooper*, 145 Ariz. at 550–51, 703 P.2d at 494–95. With respect to mitigating evidence, the court explained:

> The trial court also considered all possible mitigating circumstances and found none to exist. We agree. At the sentencing hearing, defendant's counsel argued as a mitigating circumstance that the death penalty was immoral. Defendant's opposition to the death penalty, however, is not a mitigating circumstance sufficiently substantial to outweigh the aggravating circumstances. Reviewing the record, we find no other mitigating circumstances.

*Id.* at 551, 703 P.2d at 495.

In Claim 16 of his amended petition, Hooper alleged that his Illinois convictions would likely be overturned because the trial judge was subsequently convicted of taking bribes while trying cases. (Doc. 29 at 9; Doc. 31 at 59). Hooper argued that if his Illinois convictions were overturned, his Arizona sentence would violate the Eighth Amendment because the sentencing court relied upon those convictions in finding the (F)(1) and (F)(2) aggravating circumstances. (*Id.*)

This Court determined that Claim 16 was unexhausted. (Doc. 32.) Hooper withdrew the claim and the Court stayed these proceedings while Hooper exhausted the claim in state post-conviction proceedings. After Hooper filed his PCR petition, the PCR court stayed its proceedings while Hooper sought post-conviction relief in Illinois. (Doc. 106, Ex. C.) This Court later vacated its stay, directing Hooper to move for leave to amend his habeas petition once the claim was exhausted. (Doc. 55.)

The PCR court ultimately determined that Hooper's claim that the reversal of his Illinois convictions would invalidate his death sentence was not colorable. (Doc. 106, Ex. C at 2.) The court explained that even if the Illinois convictions were invalidated, two aggravating factors would remain. (*Id.*)

Next, the PCR court noted that the Arizona Supreme Court, agreeing with the trial court, found that no mitigating circumstances existed. (*Id.*) The PCR court then

concluded that the invalidity of Hooper's Illinois convictions had no effect on his Arizona death sentence:

> [E]ven if the Illinois convictions are subsequently declared invalid, there remain two valid aggravators (§ 13–703(F)(5) and (6)) and no mitigators. Pursuant to § 13–703(E) (1982), the court was required to impose the death penalty if it found one or more aggravating circumstances and that there were no mitigating circumstances sufficiently substantial to call for leniency. The fact that there are only two aggravators rather than five does not affect the resulting death sentence in this case.

(*Id.*) The Arizona Supreme Court summarily denied review. (Doc. 106, Ex. J.)

Hooper then filed his motion to amend his habeas petition to include Claim 16. (Doc. 106.) The Court denied the motion on the ground that amendment would be futile. (Doc. 114.) Hooper cited *Brown v. Sanders*, 546 U.S. 212 (2006), and *Clemons*, 494 U.S. 738. The Court rejected Hooper's argument under *Sanders* that his death sentence violated the Eighth Amendment because the sentencer considered two invalid aggravating factors. The Court found that *Sanders* was not clearly established federal law at the time of the PCR court's decision in 2005. (*Id.* at 6–7.) The Court also concluded even if *Sanders* was the applicable clearly established law, the PCR court's ruling was not contrary to or an unreasonable application of the case because the state court,  in denying Hooper's claim, reweighed the aggravation and mitigation. (*Id.* at 8.)

Furthermore, this Court found that the state court complied with *Stringer v. Black*, 503 U.S. 222 (1992), by reweighing the aggravating and mitigating factors and finding that "the remaining aggravating evidence was weightier than the mitigation presented at sentencing." (*Id.* at 7.) Finally, the Court rejected Hooper's contention that the state court violated *Clemons* by automatically affirming without reweighing the aggravation and mitigation: "The PCR court's upholding of the death sentence was not automatic because it believed that death was the 'required' sentence but because it weighed the remaining aggravation evidence against the mitigation evidence and determined that the mitigation was not sufficiently substantial to warrant leniency." (*Id.* at 8–9.)

In his supplemental brief, Hooper raises several grounds for the Court to reconsider its denial of leave to amend. He contends that the PCR court "did not engage in harmless-error analysis" or any "meaningful 'independent re-weighing.'" (Doc. 147 at 51.) He asserts that the PCR court did not reweigh the remaining aggravating factors and mitigating circumstances but instead "automatically" affirmed the death sentence. (*Id.*) He also contends that the PCR court erroneously determined that the trial court and Arizona Supreme Court had found there were no mitigating circumstances, and based on this error found that a death sentence was required. (*Id.* at 53–54.) Finally, Hooper argues that under *Stringer* only a reviewing court can perform the reweighing or harmless error analysis. (*Id.* at 56.)

These arguments do not change the Court's previous analysis. First, reweighing or harmless-error analysis by the PCR court was appropriate. As the Supreme Court explained in *Stringer*, when a sentencer has relied on an invalid aggravating factor, "constitutional harmless-error analysis or reweighing at *the trial or appellate level*" is necessary to ensure that the defendant received an individualized sentence. 503 U.S. at 232 (emphasis added); *see Richmond v. Lewis*, 506 U.S. 40, 49 (1992) ("Where the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor, the state appellate court or some other state sentencer must actually perform a new sentencing calculus."); *Sanders*, 546 U.S. at 217.

The PCR court did not err in its assessment of the mitigating evidence or err in finding a death sentence was required. The Arizona Supreme Court found that the only argument presented at sentencing—that the death penalty is immoral—was not a mitigating circumstance sufficiently substantial to outweigh the aggravating circumstances. *Hooper*, 145 Ariz. at 551, 703 P.2d at 495. The PCR court repeated that finding when it explained there "were no mitigating circumstances sufficiently substantial to call for lenience." (Doc. 106, Ex. C at 2.)

The PCR court then explained that under A.R.S. § 13–703(E), the sentencer "shall impose a sentence of death if [it] finds one or more of the aggravating circumstances . . . and then determines that there are no mitigating circumstances sufficiently substantial to

call for leniency." (*Id.*) The court found that with the two remaining aggravating factors and the lack of sufficiently substantial mitigating circumstances, death was the appropriate sentence. (*Id.* at 2–3.) The PCR court's application of § 13-703(E) did not violate Hooper's rights. Accordingly, the PCR court's ruling was neither contrary to nor an unreasonable application of clearly established federal law under § 2254(d)(1).

Finally, in *Walton v. Arizona*, the Supreme rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency. 497 U.S. 639, 651–52 (1990), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002); *see Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006) (relying on *Walton* to uphold Kansas' death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *Smith v. Stewart*, 140 F.3d 1263, 1272 (1998) (summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty statute).

The Court again finds that amending the petition to include Claim 16 would be futile because the claim is not viable.

## **EVIDENTIARY DEVELOPMENT**

Hooper argues that he is entitled to evidentiary development, including expansion of the record, discovery, and an evidentiary hearing, to support his argument that the procedural default of Claim 4 is excused under *Martinez*. (Doc. 147 at 35.) He seeks to "present testimony from mental health experts, sentencing and post-conviction counsel, prior investigators, and lay witnesses in order to prove that the prior representation was deficient and that there was a reasonable probability of a life sentence." (*Id.* at 37–38.)

Respondents do not object to expanding the record to include materials relevant to the *Martinez* issue. (Doc. 152 at 27–28.) Accordingly, the Court will expand the record to include the materials attached to Hooper's brief as well as the exhibits attached to his reply. (Docs. 147-1, Ex's 1–31; 157-1, Ex's 27, 28.) The Court has reviewed and fully considered the materials in analyzing the remanded issues.

Respondents do, however, oppose Hooper's requests for discovery and an evidentiary hearing. They contend that the Court can adjudicate the *Martinez* issue on the expanded record, that Claim 4 is not colorable, and that Hooper has not shown good cause for discovery. (*Id.* at 28–29.) The Court agrees.

The court in *Detrich* explained that for claims to which *Martinez* applies, "the district court should allow discovery and hold an evidentiary hearing where appropriate to determine whether there was 'cause' under *Martinez* for the state-court procedural default and to determine, if the default is excused, whether there has been trial-counsel IAC." 740 F.3d at 1246. Here, discovery and an evidentiary hearing are not necessary. The exhibits submitted by Hooper include the deposition of trial counsel Woods and a declaration by PCR counsel Seplow, both of which address the issue of ineffective assistance of counsel. (Doc. 147-1, Ex's 7, 12.) They also include information obtained from Hooper's brother and sister and other people who knew Hooper during his youth in Chicago. (*Id.*, Ex's 18–23.) This material is sufficient for the Court to evaluate the performance of trial and PCR counsel for purposes of *Martinez*.

Hooper requests the opportunity to depose "the major actors who support his claim," including trial counsel Woods and PCR counsel Seplow, as well as co-defendant Bracy's trial and PCR counsel. (Doc. 147 at 143.)

Rule 6 of the Rules Governing Section 2254 Cases provides that:

> A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery. . . . A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents.

R. 6(a), (b), Rules Governing Sec. 2254 Cases.

Hooper fails to show good cause for the requested discovery. His request to depose the "major actors" lacks the specificity required by Rule 6. Hooper does not allege specific, relevant facts that might be found in the requested depositions. Moreover, as noted, the record contains the deposition of trial counsel and a declaration by PCR counsel. (Doc. 147-1, Ex's 7, 12.) Additional depositions of the same parties on the same

issues are not necessary for Hooper to develop this claim. *See Dung The Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (explaining that a district court abuses its discretion by failing to allow discovery that is essential for the petitioner to fully develop his claim).

Next, having reviewed the entire record, including the evidence presented by Hooper in his supplemental *Martinez* brief, the Court concludes that an evidentiary hearing is not warranted. Rule 8(a), Rules Governing Sec. 2254 Cases. There are no contested facts concerning Hooper's counsel, and Hooper has failed to indicate what evidence he seeks to develop. Further, the Court has found Claim 4 without merit on the facts alleged. *See Sexton*, 679 F.3d at 1161 (finding the record "sufficiently complete" with respect to underlying ineffective assistance of trial counsel claim); *cf. Dickens*, 740 F.3d at 1321 (explaining that "a district court may take evidence to the extent necessary" (emphasis added)). Thus, the Court denies Hooper's request to hold an evidentiary hearing.

## **CERTIFICATE OF APPEALABILITY**

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists could debate its resolution of the remanded claims.

## **CONCLUSION**

Based on the foregoing,

**IT IS ORDERED** that Claim 4 is **DENIED** as procedurally barred.

**IT IS FURTHER ORDERED** that Hooper's request to amend his petition to include Claim 16 is **DENIED.**

**IT IS FURTHER ORDERED** that Hooper's request to expand the record with the materials attached to his supplemental brief and reply brief (Docs. 147-1, 157-1) is **GRANTED.** His requests for discovery and an evidentiary hearing are **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED** as to both remanded issues.

**DATED** this 30th day of May, 2018.

_____
Honorable Stephen M. McNamee
Senior United States District Judge